1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT FOR THE

7                   EASTERN DISTRICT OF CALIFORNIA

8

9    CONSTANTINO CARRERA,              )      Case No. 1:90-CV-00478-AWI
                                       )
10                    Petitioner,      )      DEATH PENALTY CASE
                                       )
11        vs.                          )      ORDER DENYING PETITIONER'S
                                       )      MOTION FOR EVIDENTIARY HEARING
12   ROBERT L. AYERS, JR. As Warden    )
     of San Quentin State Prison,      )
13                                     )
                      Respondent.      )
14   _____  )

15

16

17

18

19

20

21

22

23

24

25

26

27

28

90dp00478.ODenyEH.Car.wpd

# Table of Contents

I.      Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.     Brief Summary of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

III.    Prior Findings Made. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

IV.     Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

V.      Claims for which Further Evidentiary Development is Sought. . . . . . . . . . . . . . . . . . . . . .   6

        A.      Claims 3, 18, and 40: that Carrera Was Deprived His Constitutional Right to Counsel
                Due to the Trial Court's Delay in Appointing Conflict-Free Counsel. . . . . . . . . . .   6

                1.      Facts Relevant to Deprivation of Counsel. . . . . . . . . . . . . . . . . . . . .   6

                2.      Carrera's Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

                3.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

                        a.      Contesting Probable Cause for His Arrest. . . . . . . . . . . . . . .  11

                        b.      The Expectation of Privacy during Jail Visits. . . . . . . . . . . .  12

                        c.      Negotiating a Plea Bargain. . . . . . . . . . . . . . . . . . . . . . . . .  13

        B.      Claim 20: that Carrera's Trial Attorney was Ineffective for Failing to Object After the
                Prosecutor Exercised Racially Discriminatory Peremptory Strikes During Jury Selection.
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

                1.      Facts Relevant to Ms. Huffman's Representation During Jury Selection. .  16

                        a.      Statements By and About Ms. Huffman and Mr. Vendrasco. . . . . .  16

                        b.      Voir Dire Questioning of and Argument About Selected and Prospective
                                Jurors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

                                (1)     Selected and Prospective Jurors of Hispanic or Reputed Hispanic
                                        Heritage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

                                (2)     Discussion About Hispanic Representation on the Venire and the
                                        Jury Panel During Voir Dire. . . . . . . . . . . . . . . . . . . . . . .  28

                                (3)     Selected and Prospective Jurors Not of Hispanic Heritage. .  29

                2.      Carrera's Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

                3.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

        C.      Claim 85: that the Jurors Committed Misconduct, the Prosecutor Committed
                Misconduct, and Carrera's Trial Attorney Was Ineffective in Connection with the Jurors'
                Examination of Partially Unburned Corduroy Pants Material. . . . . . . . . . . . . . . .  43

1          1.      Facts Relevant to the Discovery of the Partially Burned Corduroy Pants Material.
                   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

                   a.      Trial Proceedings.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

                           (1)     Percipient Witness Testimony About Carrera's Clothing.
                                   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

                           (2)     Exhibit 186.
                                   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

                           (3)     Guilt Phase Summation Excerpts.
                                   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

                   b.      Declarations Attached to Carrera's State Exhaustion Petition.
                           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

                           (1)     Declaration of Juror Gregory Brouckaert.
                                   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

                           (2)     Declaration of Juror Antonio Chavez.
                                   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

                   c.      Declarations Attached to Carrera's Evidentiary Hearing Motion.
                           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

                           (1)     Declaration of Lois Costello.
                                   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

                           (2)     Mr. Bedrick's Declaration.
                                   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

                                   (a)     Condition of the Bundled Material.
                                           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

                                   (b)     Offer of Proof on Mr. Jinkerson's Opinion Testimony.
                                           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

          2.       Carrera's Argument.
                   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

          3.       Analysis.
                   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

D.        Claim 87: that Juror Misconduct Deprived Carrera of his Sixth Amendment Right to an
          Impartial Jury and Fourteenth Amendment Right to Due Process.
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

          1.       Facts Relevant to Juror Misconduct Concerning Pre-Judgment and Shackling.
                   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

                   a.      Antonio Chavez's Declaration (Second Reference).
                           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

b.   Carrera's 2005 Declaration.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

c.   Trial Court Inquiry into Incident Where Jurors Reportedly Saw Carrera in Shackles.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

d.   Evidence Introduced and Argument Made at Trial Regarding Carrera's Pre-Trial Escape Attempt.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

e.   Order Granting Carrera Investigative Funds to Further Develop Claim 87.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

2.   Carrera's Argument.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

3.   Analysis.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

E.   Claims 88 and 89: that Carrera's Trial Attorney was Ineffective for Failure to Present a Mental Defense at Guilt Proceedings.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

1.   Facts Relevant to the Availability of a  Mental State Defense.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

a.   Trial Testimony Regarding Carrera's Use of Alcohol and Drugs.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

b.   Mental Health Expert Declarations.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

c.   Lay Witness Declarations.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

d.   Summary of Jailhouse Tape Recordings.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

(1)   Summary of Exhibit 216.   . . . . . . . . . . . . . . . . . . . . . . .   63

(2)   Summary of Exhibit 217.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

e.   Jailhouse "Kites" Passed by Carrera to Other Inmates.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

f.   Ms. Huffman's Declaration Describing her Guilt Phase Defense Strategy.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

g.   Offer of Proof of *Strickland* expert Guyton Jinkerson.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

2.   Carrera's Argument.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

3.    Analysis.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

VI.    Order.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   71

Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   72

1    This matter is before the Court on a motion for an evidentiary hearing filed by Petitioner

2 Constantino Carrera ("Carrera").  The motion is opposed by Respondent Robert L. Ayers, Jr., as Warden

3 of San Quentin State Prison (the "Warden").

4  **I.    Procedural Background.**

5    This action was commenced in federal court on July 31, 1990 by the filing of an initial petition

6 for habeas corpus.[1]  Following appointment of counsel, a first amended petition was filed on August 23,

7 1991 and a second amended petition was filed on September 14, 1993, the latter of which presented

8 both exhausted and unexhausted claims.  Carrera was ordered on May 3, 1994 to exhaust his state

9 remedies.  He filed an exhaustion petition in the California Supreme Court on October 27, 1995 and a

10 subsequent state petition on June 25, 1997.  On August 13, 1998, the California Supreme Court denied

11 both pending state petitions (in separate orders).  Carrera filed his third amended petition in federal court

12 on November 6, 1998.  The third amended petition was amended on March 10, 1999 to delete Claim 79,

13 which was determined to be unexhausted.  The third amended petition is the operative petition (hereafter

14 "Petition").

15    Carrera filed a motion for partial summary judgment and the Court denied this motion on June

16 22, 2000 (doc. 194).  One of the claims denied in that motion, Claim 44, alleges an instructional

17 omission under *People v. Beeman*, 35 Cal. 3d 547, 561 (1984).[2]  Following a motion for reconsideration,

18 Claim 44 was found to have merit when considered in conjunction with two other claims which were

19 not part of the summary judgment motion.  Those claims, Claims 2 and 2A, allege prosecutorial

20 misconduct for Mr. Vendrasco's withholding evidence of testimonial inducements for two jailhouse

21 informants.  The order granting partial reconsideration as to Claim 44 and determining the merits of

22 Claims 2 and 2A in Carrera's favor was issued on October 4, 2004 (doc. 241).  The June 22, 2000 and

23 October 4, 2004 orders, together, conclude that while the evidence presented at trial and offered on

24 federal habeas fully support Carrera's conviction of robbery and first degree robbery felony murder, the

25

26    [1] No distinct claims were alleged.  Rather, Carrera merely concluded his conviction and death
sentence were obtained in violation of his constitutional rights.

27

28    [2] *Beeman* error is alleged because the trial court did not instruct Carrera's jury on the intent to
kill element required for criminal liability under an aiding and abetting theory for murder.

state court determination of his intent to kill cannot stand. Accordingly, the special circumstances rendering Carrera death eligible must be vacated.

After conducting further discovery on guilt phase claims only, Carrera filed the within motion for evidentiary hearing on October 13, 2005 (doc. 271). All remaining guilt phase claims are record based and will be resolved in a separate order. All remaining penalty phase claims are moot.

**II.     Brief Summary of the Case.**

Carrera and Ramiro Ruiz-Gonzales ("Ruiz") were convicted following separate trials of robbery and first degree murder for the April 12, 1982 stabbing deaths of motel managers Jack and Carol Hayes and robbery of approximately $239 in cash from the office of the Imperial 400 Motel in Mojave, California. Carrera was 20 years old and Ruiz was 17 years old at the time of the crime. The evidence presented at Carrera's guilt phase trial included testimony that he cut Mrs. Hayes on the arm or wrist early in the encounter, but after Ruiz initially stabbed her. The character of Ruiz's initial stab was never developed. There also was evidence that Mr. Hayes was stabbed in his head, and that the force of this blow caused the knife blade to break and remain embedded in his skull. During the guilt phase proceedings of Carrera's trial, the jury determined the robbery-murder and multiple murder special circumstances to be true, making him eligible for the death penalty. Essential to both special circumstance findings was that Carrera actually participated in the killing of Mr. and Mrs. Hayes, or, to the extent he was only an aider and abettor in the murders, he intended to kill Mr. and Mrs. Hayes. The jury returned a verdict that Carrera should suffer the death penalty at a separate penalty phase trial.

The key players at Carrera's trial were his co-perpetrator Ruiz, his appointed defense attorney Donnalee Huffman (previously Mendez), the prosecutor, Deputy District Attorney Michael Vendrasco, friend-witness Teresa Fout (age 14 at the time of the crime), friend-witness Miguel Santana (age 19 at the time of the crime), jailhouse informant-witness Julius Jones, and jailhouse informant-witness Thomas Hill a.k.a. Morse. Teresa Fout and Miguel Santana mainly gave evidence about the sequence of events on the night of the crime and how Carrera later described the circumstances of the crime to them (individually). The inmate witnesses gave the only account of Carrera's specific intent to kill as well as his participation as a principal in the stabbing deaths of both Mr. and Mrs. Hayes. Testimony

1  of all four witness was relied on by Mr. Vendrasco to establish Carrera's criminal responsibility for

2  robbery and murder.  Santana also was a key witness against Ruiz at his separate trial.[3]

3  **III.    Prior Findings Made.**

4        In the June 22, 2000 and October 4, 2004 orders, the Court determined from the record that

5  Carrera entered the Imperial 400 Motel accompanied by Ruiz and that, at a minimum, he participated

6  in the robbery effort.  This conclusion is supported by statements of percipient witnesses at a party

7  gathering on the night of the crime about Carrera's and Ruiz's absence from the party and the substance

8  of what Carrera told Teresa Fout and Miguel Santana as to the robbery, including the fact that when

9  Carrera entered the motel, he had in his possession a knife or knives and rubber gloves, and that he cut

10 Mrs. Hayes on the wrist.  The Court further found that Teresa did *not* participate in the crime and that

11 Miguel Santana's participation was limited to an accessory after the fact for assisting in the destruction

12 of evidence.  The Court declined to adopt Carrera's view that Santana acted as a "look-out" during the

13 robbery murders.

14       What the October 4, 2004 order did that the June 22, 2000 order did not do was determine that

15 the *Beeman* instructional omission was not harmless in light of the prosecutorial misconduct committed

16 by Mr. Vendrasco in several respects.  First, he elicited contradictory evidence during the separate trials

17 of Ruiz and Carrera as to which young man asked Miguel Santana if he (Santana) had the guts or nerve

18 to kill someone.  Attributing the question to Ruiz at Ruiz's trial and Carrera at Carrera's trial, Mr.

19 Vendrasco argued that asking this question meant the questioner harbored a plan to commit murder.

20 Oct. 4, 2004 Ord., at pp. 8-9 (Carrera asking the question), 25 (arguing Carrera's intent to kill), 31-32

21 (Ruiz asking the question and arguing Ruiz's intent to kill).  Second, he argued inconsistently at the two

22 trials that Santana's testimony about one of the perpetrators obtaining a larger knife during the attack

23 on Mr. Hayes supported the theory that Carrera obtained the larger knife at Carrera's trial, and Ruiz

24 obtained the larger knife at Ruiz's trial.  *Id*., pp. 33-34.  Third and fourth, he concealed the fact of

25 inducements to inmate witnesses Julius Jones and Thomas Hill/ Morse.  *Id*., p.106.  The Court concluded

26

27       [3] Ruiz was tried as an adult and convicted of two counts of murder.  He is serving a 50-year to
28 life sentence.  Although Ruiz was tried as an adult, because he was a minor at the time the crime was
   committed, he could not be eligible for the death penalty under California law.

1   that although the inmate testimony was exaggerated and uncorroborated as to the extent of injuries

2   inflicted on the victims and the amount of money stolen, Mr. Vendrasco nonetheless relied on it.

3          In light of these findings, the Court could not consider the instructional omission under *People*

4   *v. Beeman*, harmless because all evidence relative to Carrera's actual killing or intent to kill Mr. and

5   Mrs. Hayes was derived from evidence elicited as the result of alleged prosecutorial misconduct.[4]   The

6   Court did not foreclose the possibility that with proper instructions, omission of misleading argument,

7   and introduction of withheld impeachment evidence, Carrera's intent to kill and/or actual participation

8   in the murders could be established beyond a reasonable doubt.   Oct. 4, 2004 Ord., at pp. 116-118.

9   Evidence in support of this prosecution theory, includes that Carrera lied on the witness stand about his

10  involvement in the robbery, relied on a dishonest defense strategy – to falsely inculpate Teresa Fout in

11  the murders, invoked an uncorroborated alibi of having sexual intercourse with a 12-year old girl at the

12  time of the crime, and bragged about killing Mr. and Mrs. Hayes to friends and family members visiting

13  him in the jail.   The evidence as to whether Carrera cut Mrs. Hayes after she was severely wounded or

14  just mildly wounded by Ruiz also is not clear.   At his trial, the only credible evidence, from Miguel

15  Santana and Teresa Fout, about when he cut Mrs. Hayes in relation to Ruiz's murderous attack was

16  simply unclear.   At Ruiz's trial, however, it was not unclear.   Santana there testified that Ruiz said

17  Carrera cut Mrs. Hayes after she was so severely wounded she was lying on the floor pleading for her

18  and her husband's lives.[5]

19  **IV.     Standard of Review.**

20         This action is not subject to the review provisions of the Anti-terrorism and Effective Death

21  Penalty Act of April 24, 1996 ("AEDPA"), codified in amended 28 U.S.C. § 2254.   Carrera filed his

22  original, first amended, and second amended petitions prior to the effective date of AEDPA.   Under

23  controlling United States Supreme Court precedent, it is the filing of "an application for habeas relief

24

25         [4] The California Supreme Court already determined *Beeman* error had occurred.   *People v. Carrera*, 49 Cal. 3d 291, 309 (1989).   In determining the error was harmless, the California Supreme

26  Court did not take into account the factual background of the prosecutorial misconduct claims developed from extra-record evidence during post-conviction proceedings.

27

28         [5] Although testimony of Ruiz's statements at Carrera's retrial would be inadmissible, the fact the testimony was given demonstrates how confused the recitation of the events were.

seeking an adjudication on the merits of petitioner's claims" that triggers applicability of AEDPA. *Woodford v. Garceau*, 538 U.S. 202, 207 (2003). Cases with petitions on file prior to April 24, 1996 are not subject to AEDPA. Carrrera's first and second amended petitions, filed on August 23, 1991 and September 14, 1993, respectively, were substantive pleadings seeking adjudication on the merits of the claims therein presented. Because the filing of Carrera's substantive petitions preceded the enactment of AEDPA, the law in effect before its passage, former 28 U.S.C. § 2254, is controlling. *See id*. Under this prior law, the only standard relevant to the present motion is for granting an evidentiary hearing.

> A habeas petitioner is entitled to an evidentiary hearing as a matter of right on a claim where the facts are disputed if two conditions are met: (1) the petitioner's allegations would, if proved, entitle him to relief; and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts.

*Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997) *citing Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992). *See also Townsend v. Sain*, 372 U.S. 293, 312 (1963), *overruled in part, Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). The first prong is referred to as the requirement of asserting a "colorable claim." *Siripongs v. Calderon*, 35 F.3d 1308, 1310 (9th Cir. 1994) (*Siripongs I*). The second prong is informed by six factors identified in *Townsend v. Sain*. When any one or more of these factors is present, the state court trier of fact has not reliably found the relevant facts:

    1.    the merits of the factual dispute were not resolved in the state hearing;

    2.    the state factual determination is not fairly supported by the record as a whole;

    3.    the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing;

    4.    there is a substantial allegation of newly discovered evidence;

    5.    the material facts were not adequately developed at the state court hearing;[6]

---

[6] In *Tamayo-Reyes*, the Court modified *Townsend* by adopting a stricter standard for granting an evidentiary hearing under the fifth enumerated factor. Before *Tamayo-Reyes*, so long as the petitioner did not deliberately bypass the opportunity to develop facts at the state level, an evidentiary hearing on federal habeas still was available. *See Fay v. Noia*, 372 U.S. 391, 438 (1963). Under the new standard stated in *Tamayo-Reyes*, a habeas petitioner must demonstrate cause for failure to develop facts in the state court proceedings and actual prejudice resulting therefrom, consistent with the reasoning in procedural default cases. 504 U.S. at 8, 11. In the absence of cause and prejudice, the habeas petitioner must demonstrate a fundamental miscarriage of justice, also consistent with the analysis of procedural default cases. *Id.* at 12.

6.      for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

372 U.S. at 313.

In addition to being entitled to an evidentiary hearing as of right when the petitioner presents a colorable claim and the state court has not reliably found the relevant facts, a federal court retains discretionary authority to conduct an evidentiary hearing. *Seidle v. Merkle*, 146 F.2d 750, 753 (9th Cir. 1998).

**V.      Claims for which Further Evidentiary Development is Sought.**

Five categories of contentions are the subject of Carrera's request for further evidentiary development. These categories relate to prejudice occasioned by the deprivation of counsel during a critical stage of the proceedings, racially motivated juror peremptory challenges by Mr. Vendrasco, juror misconduct during deliberations for considering evidence not properly introduced, related prosecutorial misconduct for not alerting the trial court to juror misconduct about the improper evidence, a separate allegation of juror misconduct for prejudging Carrera, and failure of defense counsel to develop a mental state defense.

**A.      Claims 3, 18, and 40: that Carrera Was Deprived His Constitutional Right to Counsel Due to the Trial Court's Delay in Appointing Conflict-Free Counsel.**

Carrera maintains that the time span between the date of his arrest, April 12, 1982, until April 24 or 25, 1982, when appointed counsel, Ms. Huffman, first visited him at the jail, constituted a critical stage in the criminal proceedings against him. He argues that deprivation of counsel during a critical stage of the proceedings requires his conviction to be vacated without a prejudice analysis. Alternatively, he argues he can demonstrate he was prejudiced on account of not having counsel during this 12 to 13 day period. The evidentiary hearing is requested to establish prejudice.

**1.      Facts Relevant to Deprivation of Counsel.**

The facts proffered by Carrera relate to his own encounters with the justice system as well as proceedings in which Miguel Santana and Teresa Fout were involved. First with respect to himself, he was arrested for the present crime on April 12, 1982. Not mentioned in Carrera's rendition of facts for these claims is that he was interviewed by authorities the following day and, after waiving his right to

counsel, spoke to sheriff's deputies about the crime. CT-1: 29-30.[7] Another fact not mentioned in Carrera's moving papers is the fact that two days after his arrest, on April 14, 1982, an arrest warrant was issued (even though he already was in custody) by Municipal Court Judge Carey F. Scott. CT-1: 37. Also on April 14, 1982, two separate audio tape recordings were made of conversations at the jail he had with visiting friends and family. These recordings eventually were admitted into evidence against him. CT-2: 279; RT-2: 76, Trial Exhibits 216 and 217. Ms. Huffman's efforts to suppress the tape recordings of Carrera's jail visits were unsuccessful. CT-1: 166 (motion filed to suppress evidence of jailhouse conversations based on privacy violation); CT-1: 166 (ruling on motion to suppress the tape recordings deferred); CT-2: 31 (motion renewed and denied); CT-2: 279 (tape recordings admitted).

On April 15, 1982, Carrera was arraigned in the Municipal Court. CT-1: 45; CT-8: 8; RT-1(A). Since Carrera had no retained counsel at the arraignment, the Public Defender was tentatively appointed, after the court gave him (Carrera) a copy of the criminal complaint, read the charges, and ascertained that Carrera understood the charges. RT-1(A): 3-5. Aside from this appearance at Carrera's arraignment, no member of the Kern County Public Defender's Office ever spoke Carrera about the case or visited him in jail. Four days later, on April 19, the Public Defender's Office moved to be relieved as Carrera's counsel due to a conflict of interest because the office apparently also represented a juvenile potential co-defendant. CT-8: 9; RT-1(B).[8] Between April 19 and April 24 or 25, Carrera avers that private attorney Jere Sullivan, Jr., another potential candidate for appointment, visited him in jail, but they did not talk about the case. According to Carrera's March 30, 1987 declaration (attached as Exhibit B to his original state habeas petition filed on December 31, 1987), Mr. Sullivan indicated his uncertainty about representing Carrera because "there might be a conflict of interest." 1987 Carrera Decl., p. 2. It was not until Ms. Huffman visited Carrera on April 24 or 25, 1982 that Carrera actually discussed his case with any attorney. On April 27, 1982, Ms. Huffman was formally appointed as Carrera's counsel and Mr. Sullivan was relieved as counsel. CT-1: 43; CT-8: 18; RT-1(D).

---

[7] The police report indicates that when his rights were read to him, Carrera stated he wanted to speak to authorities, *with* his attorney present. Because of the invocation of counsel, the interview was terminated. However, a short time later investigating deputies were informed that Carrera wanted to talk to them. His rights were read to him again and he waived counsel.

[8] Carrera surmises this could have been either Ruiz or Teresa Fout.

Although the record does not reflect when Teresa Fout received appointed counsel, Carrera points out that she was first interviewed by Kern County Sheriff Sergeant Paul Montgomery on April 12, 1982. Sergeant Montgomery's report concerning Teresa's interview indicates she was actually with authorities investigating the route taken by Carrera and Ruiz after the homicides when she identified a passing car as being driven by Ruiz. Carrera was seated as a passenger in the front seat of the car. At that point Sergeant Montgomery requested back up from another deputy in the vicinity. They stopped Ruiz's car, and Ruiz, together with Carrera, were taken into custody. CT-1: 27.[9] Formal immunity was conferred on Teresa three weeks later, on May 4, 1982. The record reflects she was charged with being an accessory after the fact to the murder of Mr. and Mrs. Hayes. CT-7: 2. The record also shows that even though a formal grant of immunity was given on May 4, Teresa was confined at Juvenile Hall as of May 28, 1982, when the preliminary examination hearing for Carrera and Ruiz commenced. CT-1: 69.

Sergeant Howard Thurston first interviewed Miguel Santana in the afternoon of April 13, 1982.[10] The report indicates that Santana came into the Sheriff's Mojave Sub-Station and was then released. CT-1: 31-32. He was never formally charged with murder or as an accessory after the fact and the trial judge, in fact, made a post-trial finding that immunity for Santana was never granted in writing. *See* RT-1(P): 5.[11] Nonetheless, Santana did understand that he had been offered immunity from prosecution for being an accessory in exchange for his testimony. RT-9: 829.[12] *See* Oct. 4, 2004 Ord., at pp. 14-15, and

---

[9] Carrera states in his evidentiary hearing motion that Teresa Fout was interviewed on April 12, 1982 and that this was the day *before* Carrera was arrested. Elsewhere, Carrera alleges he was arrested on April 12, 1982. The record reflects the latter is the case.

[10] Carrera alleges in his evidentiary hearing motion that Santana was first interviewed on April 14, 1982. The confusion may be in the date and time Sergeant Montgomery prepared the report, which was April 14, 1982. He clearly states in the body of the report, however, that he interviewed Santana on April 13, at about 1730 hours. CT-1:31.

[11] Notwithstanding discovery granted by this Court on August 19, 2005 (doc. 262), efforts of Carrera's attorneys to locate any such charging documents in the Kern County Superior Court or among the records maintained by the Kern County District Attorney's Office with respect to Santana proved fruitless.

[12] There was no corroborating evidence that Santana was involved in the actual crime, even as a look-out man. There was only evidence that he had acted as an accessory after the fact for destroying evidence.

n. 16.  New evidence uncovered after discovery includes a handwritten note by Deputy District Attorney Joseph K. Beckett, dated October 19, 1982 (Exhibit 2 to EH Motion).  The note provides: "His recruiting sgt. is Manuel Herrera – U.S. Army – 945-3631.  Mike is due to report for training in Nov. – & will be back during the holidays – Sgt. Herrera will cooperate w/us in securing Mike's attendance at both trials – JKB, 10/19/82."[13]

## 2.  Carrera's Argument.

Based on the timing of the events relative to Teresa Fout, Carrera believes the prosecutor offered her immunity some time between April 12, 1982, when she was first interviewed, and April 25, 1982, when conflict-free counsel was retained to represent him.  Carrera believes that the October 19, 1982 note regarding Santana and Sergeant Herrera establishes that the prosecution gave Santana informal immunity from being prosecuted for *murder* provided he testify against both Carrera and Ruiz, and he enlist in the military.  Carrera further believes that immunity discussions with Santana began on, or shortly after April 14, 1982, when police first interviewed him.

Carrera maintains he was not represented by legal counsel "legally able" to act upon his behalf at any time between his arrest and Ms. Huffman's retention on April 24 or 25, 1982.  Included in this period was his arraignment on April 15, 1982, which is considered a critical stage of the proceedings.  *See Michigan v. Jackson*, 475 U.S. 625, 629-30 (1986) (holding that defendants had a right to counsel during post-arraignment custodial interrogations).  Since he was denied conflict-free counsel during a "critical stage of the criminal proceeding," he maintains his conviction must be reversed without the necessity of showing prejudice, citing *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978) (holding that when a defendant is deprived of presence and assistance of counsel during a critical stage of the proceeding in a capital prosecution, reversal is automatic); *White v. Maryland*, 373 U.S. 59 (1963) (holding a defendant's entry of a guilty plea at a proceeding equivalent to an arraignment without the benefit of counsel entitled him to reversal of his conviction).  Carrera explains the "arraignment period" is critical because that is the time defense counsel, having preliminarily researched the law and facts, is in the best position to persuade the prosecution to strike a favorable plea bargain.  Separately he argues

---

[13] Carrera discovered this note among files produced to his counsel following the Court's August 19, 2005 discovery order.

that plea negotiations and the cooperation process constitute a critical stage in the proceedings under Ninth Circuit authority, citing *United States v. Leonetti*, 326 F.3d 1111, 1117 (9th Cir. 2003) (pre-sentence period while the defendant attempted to cooperate with the government to obtain a more lenient sentence was a critical stage of the criminal process to which a Sixth Amendment claim of ineffective assistance of counsel attaches). Carrera further argues that even if the deputy public defender standing in for him at the arraignment and Mr. Sullivan are said to have been representing him during the period between arrest and Ms. Huffman's formal retention, they both suffered (separate) conflicts of interest and he therefore he is entitled to relief as a matter of law, citing *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980) (holding that a defendant who demonstrates an actual conflict of interest due to joint representation of co-defendants is entitled to relief without showing prejudice).

Proceeding on the assumption that prejudice must be shown, he identifies three separate non-harmless consequences occasioned by the delay in appointment of counsel. First, since he maintains his arrest was accomplished without a warrant, he argues he should have been permitted to show there was no probable cause for the arrest. He claims if he had been provided that opportunity, through appointed counsel, he would have successfully challenged any probable cause finding because the only information police had against him at that point was Teresa Fout's statement, and she turned out to be less than credible.[14] Next, he maintains he lost a valuable opportunity to be advised early on by counsel not to expect privacy when talking to visitors on the jail telephones. In connection with the tape recording of his jail visits, Carrera separately argues his trial attorney was constitutionally ineffective for not challenging admission of the jail visit tapes and that the trial court erred in not suppressing the jail house tapes due to the delay in appointing counsel.[15] The final consequence flowing from the delay in appointing conflict-free counsel is the missed opportunity to enter into negotiations with authorities for a plea bargain. He maintains that since Teresa had counsel and he didn't, her attorney convinced the

---

[14] The Court agrees Teresa Fout generally was an unreliable witness, having already determined she provided various inconsistent accounts of the crime including her alleged participation in the crime, which turned out to be uncorroborated. Oct. 4. 2004 Ord., pp. 16-17.

[15] The relevant facts demonstrate Ms. Huffman did attempt to suppress the tapes on the grounds that the recordings violated Carrera's privacy rights. She did not pursue a suppression motion based on the delay in her appointment as counsel.

1  prosecutor to charge Carrera and not her with the murders.  His request for an evidentiary hearing is

2  centered on this third consequence.  He claims an evidentiary hearing is warranted to show that the delay

3  in appointing conflict-free counsel deprived him the opportunity to enter into plea negotiations and the

4  inability to bargain for immunity contemporaneously with Teresa Fout and Miguel Santana.

5                  **3.      Analysis.**

6          As a preliminary matter, the lack of counsel to challenge probable cause for his arrest and to

7  advise him that jail house visits were not private, do not and cannot present grounds for automatic

8  reversal under *Holloway v. Arkansas*, 435 U.S. 475.  Both missed opportunities occurred during the

9  period between Carrera's arrest and arraignment.  Carrera has not cited any authority and the Court is

10 aware of no authority for the proposition that pre-arraignment events fall into the critical stage of the

11 proceedings category. *Michigan v. Jackson*, 475 U.S. 625, only supports the notion that arraignment and

12 post-arraignment proceedings are critical litigation stages.  Moreover, the idea that counsel could or

13 would have been appointed for Carrera prior to his first appearance in court (April 15, 1982) is not

14 established.  The Court is not aware of any previous opportunity the state trial court would have had to

15 do so, and Carrera has presented nothing to suggest a contrary reading of the record. Each of the three

16 consequences flowing from not having conflict-free counsel appointed are discussed in turn.

17                **a.      Contesting Probable Cause for His Arrest.**

18         In presenting his argument about the inability to have challenged the probable cause for his

19 warrantless arrest, Carrera has overlooked two important facts: (1) the issuance of an arrest warrant on

20 April 14, 1982; and (2) his waiver of counsel on April 13, 1982. With respect to the arrest warrant, even

21 though the magistrate, Judge Scott, did not have the benefit of an attorney's argument about the lack of

22 probable cause for the arrest, a probable cause finding is supportable by the record.  The police reports

23 demonstrate that authorities questioned a number of witnesses, not just Teresa Fout, by the time the

24 arrest warrant was issued.  Carrera was only arrested on April 12, 1982 because authorities were

25 concerned that Carrera and Ruiz saw Teresa talking to sheriff's deputies.  Deputies made the

26 determination that exigent circumstances existed justifying Carrera's and Ruiz's immediate arrest to

27 protect Teresa. The actual probable cause determination was made two days later, when the arrest

28

1   warrant was issued.  CT-1: 37.[16]  More importantly, the record also demonstrates that Carrera waived

2   his right to counsel the previous day, April 13, 1982, when he spoke to interrogating deputies.  Carrera

3   did not request that counsel be appointed until his arraignment on April 15, 1982.  The claim that

4   Carrera's constitutional rights were violated because counsel was not appointed to assist him in

5   contesting the probable cause for his arrest is denied.[17]

6                    **b.        The Expectation of Privacy during Jail Visits.**

7        The same analysis applies to advice appointed counsel might have given Carrera about not

8   expecting privacy during jail visits.  Appointment of counsel was not mandated during this pre-

9   arraignment period.  Separate and apart from this, although the incriminating statement Carrera made

10  during his April 14, 1982 jail visits were prejudicial (and thus offered by the prosecution), the fact that

11  non-privileged communications were tape recorded was not a violation of his constitutional rights at the

12  time.  A case decided nearly two months later, on July 8, 1982, *DeLancie v. Superior Court*, 31 Cal. 3d

13  865 (1982), held that monitoring and recording conversations of persons detained in county jail awaiting

14  trial to gather evidence for use in the criminal trial infringes on the detainee's right to privacy.  *Id.* at

15  873.  Prior to the rendering of *DeLancie*, however, inmate monitoring and recording for purposes of

16  gathering prosecution (prejudicial) evidence was lawful in California.  *People v. Loyd*, 27 Cal. 4th 997,

17  1003 (2002).  There is no chance Ms. Huffman's failed efforts to suppress the tape recordings under the

18  after decided *DeLancie* case would have been more successful had she grounded her motion on the fact

19  that she, or other "conflict-free" counsel, should have been appointed earlier.  The claim that Carrera's

20  constitutional rights were violated because counsel was not appointed to advise him he should not expect

21  privacy during jail visits is denied.  Separately the claims of ineffective assistance of counsel for failing

22  to move to suppress the jail visit tape recordings and trial error for the trial court's failure to suppress

23  the recordings *sua sponte* on the grounds of delayed appointment of counsel are denied.[18]

24  _____

25        [16] The arrest warrant was based on the affidavit of Sergeant Montgomery and numerous crime
    reports appended to his affidavit.  CT-1: 5-32
26

27        [17] The Warden's argument that this claim is procedurally barred is not addressed in light of the
    Court's ruling on the merits.

28        [18] In light of these conclusions, the Warden's procedural default arguments are not addressed.

c.      **Negotiating a Plea Bargain.**

In considering the post-arraignment period from April 15, 1982 through Ms. Huffman's retention on April 25, 1982 as a critical stage of the proceedings, the Court concludes that the failure or inability to engage in plea negotiations during that period does not entitle Carrera to relief, even though the opportunity to engage in plea negotiations may have followed his arraignment. In *United States v. Leonetti*, 326 F.3d at 1117, the Ninth Circuit explains that the essence of a critical stage is "the adversary nature of the proceeding, combined with the possibility that a defendant will be prejudiced in some significant way by the absence of counsel." *Id*. at 1117.  While the communication of a plea offer is a critical event requiring the active representation of counsel, *see id*. (citing *United States v. Fuller*, 941 F.2d 993, 995 (9th Cir. 1991); *United States v. Akins*, 276 F.3d 1141, 1146 (9th Cir. 2002)), the failure to initiate plea negotiations is not a critical event because it is not an adversarial proceeding and does not carry the risk that the defendant's status will worsen. The cases relied on by Carrera illustrate this point.  In each, the critical stage proceedings involved events in which the defendants were participants and the presumption of their innocence was at risk because of the absence of counsel.  In *White v. Maryland*, 373 U.S. 59, an unrepresented defendant charged with capital murder was brought before a magistrate for a preliminary examination hearing on August 9, 1960 and was arraigned.  Without the benefit of counsel, he pleaded guilty.  A month later he was arraigned again, this time with counsel present, and pleaded not guilty and not guilty by reason of insanity.  *Id*. at 59-60.  At the trial, the defendant's guilty plea at the August 9, 1960 preliminary examination hearing was introduced against him.  He was convicted and sentenced to death.  The conviction and sentence were reversed because taking the defendant's plea without counsel subjected him to significant prejudice.  *Id*.  In reaching this decision, the Court in *White* relied on *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961), which held that the arraignment of the defendant was a critical stage of the proceeding because "[o]nly the presence of counsel could have enabled th[e] accused to know all the defenses available to him and to plead intelligently."  The critical event involving the defendant's participation in *Michigan v. Jackson*, 475 U.S. 625, was a post-arraignment custodial interrogation, after the defendant specifically requested counsel.  The Court found that the defendant's right to counsel at post-arraignment custodial interrogations was supported by his Fifth Amendment right against compelled self-incrimination and

the Sixth Amendment right to counsel at adversary judicial proceedings (which are triggered by the arraignment). *Id*. at 629. *Holloway v. Arkansas*, 435 U.S. 475, involved actual trial proceedings before a jury at which three defendants with conflicting defenses were represented by a single attorney. The attorney requested separate counsel for each of the defendants and his argument became especially urgent when the three defendants all insisted on their rights to testify. *Id*. at 477-80. Because an actual conflict existed in the joint representation, Holloway's conviction was reversed. *Id*. at 491. The high Court was clear in noting, however, that joint representation is "not *per se* violative of constitutional guarantees of effective assistance of counsel." *Id*. at 482. Rather, the defendant must demonstrate an actual conflict. *See Cuyler v. Sullivan*, 446 U.S. at 348.

Carrera's reliance on *Leonetti*, 326 F.3d 1111, for the proposition that negotiating a plea constitutes a critical stage of the proceedings is misleading. In that case, a represented defendant, who had already been charged with drug trafficking crimes was attempting to cooperate with authorities to assist in making further arrests so he could obtain a more lenient sentence. His attorney was supposed to facilitate cooperation but failed to appear at most meetings and exerted little if any effort on behalf of his client. *Id*. at 1114-16. After the defendant was sentenced, with no downward departure in the term, he filed a claim for post-conviction relief under 28 U.S.C. § 2255 alleging ineffective assistance of counsel. *Id*. at 1116. The court held that the defendant stated a claim for relief under the Sixth Amendment which entitled him to an evidentiary hearing because the "cooperation period" after his plea and before sentencing was a critical stage of the criminal process to which the right of counsel under the Sixth Amendment attached. *Id*. at 1117-18. The facts of *Leonetti* cannot benefit Carrera because plea negotiations had never been initiated with respect to Carrera's involvement in the crime. As the Warden's vehemently maintains, Carrera cannot establish that the prosecutor's failure to offer him a plea agreement resulted from delay in appointing conflict-free counsel. The initial police reports (based on numerous interviews, not just the interview with Teresa Fout) placed Carrera and Ruiz as the two participants in the robbery-murder at the Imperial 400 Motel. The plea agreement with then-14 year old Teresa only involved dropping charges as an accessory after the fact, not a participant in the murders. No evidence presented at trial or on these federal habeas proceedings convinces the Court that a different result should obtain. The contentions regarding Santana are even less compelling. In the first place, as

already determined, no formal charges or immunity were ever made or given.  Second, there is no indication Santana was ever represented by counsel who negotiated anything on his behalf.  Third, the credible evidence at trial, as well as in the course of these proceedings shows that at most, Santana could only be implicated as an accessory after the fact, not as a co-perpetrator in the murders, even as a look-out man.  The trial evidence that Santana was present at the scene of the crime came from discredited jailhouse informant Thomas Hill/ Morse.[19]  The evidence proffered with Carrera's motion for an evidentiary hearing fails to provide any further factual support implicating Santana.  The existence of a note from Santana's Army recruiting officer that Santana would be available to testify at the trials of Ruiz and Carrera does not show that Santana received immunity from murder charges, much less that he received a plea benefit that would have been made available to Carrera if he (Carrera) had been represented by counsel prior to April 25, 1982.  The Warden's argument that Mr. Vendrasco's failure to offer Carrera a plea agreement had nothing to do with Carrera's lack of representation is persuasive.  Moreover, Carrera has advanced no argument or proffered evidence that Ms. Huffman was in any way hampered from negotiating a plea *after* she became Carrera's lawyer.

While there is no question but that Carrera's arraignment constituted a critical stage of the proceedings, he has not alleged that an actual conflict of interest existed for purposes of taking his not guilty plea.  The public defender only conflicted out after the arraignment because advancing to the next adversary proceeding apparently would implicate conflicting defenses.  No conflict existed at the arraignment in terms of the not guilty plea Carrera entered, and he does not claim otherwise.  The conflict, he alleges, was in a legal representative *not* negotiating a plea.  This omission does not fit into the Ninth Circuit explanation of a critical stage of a criminal proceeding given in the *Leonetti* case.  The claim that delay in appointment of counsel deprived Carrera his Sixth Amendment right to counsel at a critical stage of the proceedings is denied.

Claims 3, 18, 40 are denied on the merits.  The request for further evidentiary development with respect to these claims is denied.

---

[19] To the extent Hill/ Morse testified that Santana was the look-out man, that testimony has been discredited, just as his testimony that Carrera actively and substantially participated in both murders has been discredited.

**B.      Claim 20: that Carrera's Trial Attorney was Ineffective for Failing to Object After the Prosecutor Exercised Racially Discriminatory Peremptory Strikes During Jury Selection.**

Carrera argues that Mr. Vendrasco's use of his peremptory challenges to strike six out of eight qualified prospective jurors of Hispanic heritage constitutes an equal protection violation under *Batson v. Kentucky*, 476 U.S. 79 (1986), as well as a Sixth Amendment violation under *People v. Wheeler*, 22 Cal. 3d 258 (1978).[20]  Notwithstanding these violations, Ms. Huffman failed to object.  Carrera now maintains that Ms. Huffman's inattention to or ignorance of the law regarding jury selection amounts to ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).  He requests an evidentiary hearing to establish Ms. Huffman's professional incompetence through expert testimony.

**1.      Facts Relevant to Ms. Huffman's Representation During Jury Selection.**

The facts pertinent to this claim fall in two separate categories.  First are statements made by and about the attorneys involved in the trial, Ms. Huffman and Mr. Vendrasco, describing their actions and omissions.  Next are excerpts from the voir dire of various Hispanic as well as non-Hispanic selected and prospective jurors questioned at Carrera's trial.

**a.      Statements By and About Ms. Huffman and Mr. Vendrasco.**

In a declaration executed on December 28, 1987, Ms. Huffman states she does not know why she failed to make a *Wheeler* motion as to the stricken Hispanic jurors.  When asked if she had a strategic reason for not advancing a *Wheeler* motion, she responded she did not.  Mr. Guyton N. Jinkerson, an experienced defense lawyer who has testified as a *Strickland* expert in a number of previous cases opines in a declaration executed on December 3, 1987, that because Ms. Huffman cannot identify a strategic reason for her failure to make a *Wheeler* motion, her failure to do so amounts to constitutionally deficient representation.[21]  Both Ms. Huffman's December 28, 1987 declaration and Mr.

---

[20] Carrera concedes that as to one of these stricken jurors, Manuel Estrada, Ms. Huffman had good reason not to challenge Mr. Vendrasco's peremptory challenge.  He was her residential letter carrier.

[21] Mr. Jinkerson's declaration in this regard consists of a statement that he has reviewed a number of documents and responses Ms. Huffman prepared to specific inquiries presented by habeas counsel Mr. Bedrick. Included among these responses is Ms. Huffman's statement that she did not know of a strategic reason for her failure to advance a *Wheeler* motion to Mr. Vendrasco's peremptory challenges.

1   Jinkerson's December 3, 1987 declaration are attached to Carrera's initial state habeas petition filed on

2   December 31, 1987.[22]

3        In the return to Carrera's original state habeas petition, the State of California submitted a

4   declaration over the signature of Mr. Vendrasco dated April 29, 1988.  Mr. Vendrasco states that due

5   to the nearly five year lapse in time between the execution of his declaration and jury selection (which

6   commenced on June 1, 1983 (CT-2: 287, RT-2: 182), his memory of the jury selection process "has been

7   substantially diminished."  He also states that for each peremptory strike he made he did have a specific

8   reason, which he could have articulated at the time if Ms. Huffman had made a contemporaneous

9   *Wheeler* motion.  His reasons were based on his consideration of responsibility, not race.  To dispel the

10  notion that he wanted to eliminate Hispanics from the jury, he states:

11        I believed the crimes Constantino Carrera committed were so brutal and senseless that
          any responsible juror would hold Carrera responsible if I proved my case.  I thought
12        responsible Hispanic jurors would be very good jurors, as they would not tolerate such
          lawless, senseless, brutal and vicious conduct and would be particularly interested in
13        holding Carrera responsible for his actions.

14        Carrera's current federal counsel, Mr. Stephen B. Bedrick, offers a declaration that he personally

15  thoroughly examined the prosecution files on Carrera's state trial.  Mr. Bedrick specifically was looking

16  for voir dire notes and Mr. Vendrasco's reasons for peremptorily striking minority jurors.  Mr. Bedrick

17  reports that "No reasons were contained in the file."  Moreover, there were "no notes whatsoever

18  regarding any aspect of voir dire or jury selection in the two and one half boxes made available."   Mr.

19  Bedrick also makes an offer that Mr. Jinkerson Carrera's *Strickland* expert, would opine trial lawyers,

20  both defense and prosecution, at the time of Carrera's trial invariably would have made and maintained

21  notes about jury selection.

22        Ms. Huffman also gave a supplemental declaration filed with the State's return, executed June

23  13, 1988, regarding claims that her representation of Carrera was constitutionally ineffective.[23]  Like Mr.

24

25        [22] No explanation is offered for the mixed up chronology of the declarations.  Mr. Jinkerson's
26  declaration dated December 3, 1987 comments on the content of Ms. Huffman's declaration dated
    December 28, 1987.  Both declarations were refiled with the California Supreme Court on January 19,
27  1988.

28        [23] Both Mr. Vendrasco's April 29, 1988 declaration and Ms. Huffman's June 13, 1988
    declaration are attached to the State's return to Carrera's original state habeas petition.

Vendrasco, Ms. Huffman also indicates that the passage of five years between the events of the trial and her declaration have left her with diminished recollection.  To become conversant on the subject in preparation for her declaration, Ms. Huffman reviewed the list of jurors with Hispanic surnames Mr. Vendrasco struck.  She states:

> I have read the list of jurors with hispanic surnames that the prosecutor excused by way of peremptory challenge, and still see no need to make a *Wheeler* motion in this case. While I cannot now recall my reasons for any other jurors, I do know that I could not make a *Wheeler* motion in regard to the prosecutor's excusal of potential juror Estrada. He was my letter carrier.

### b.    Voir Dire Questioning of and Argument About Selected and Prospective Jurors.

The following transcript excerpts cover questioning of fourteen Hispanic prospective jurors (or jurors with Hispanic-sounding surnames) who served on and were excused from service on Carrera's jury.  These include the six Hispanic jurors[24] Carrera claims should have prompted Ms. Huffman to advance a *Wheeler* motion.  The excerpts also include discussions between the trial court and trial counsel about Hispanic representation on the venire as a whole, and voir dire excerpts of non-Hispanic jurors to inform a comparative evaluation of Carrera's contentions.

### (1)    Selected and Prospective Jurors of Hispanic or Reputed Hispanic Heritage.

Antonio Chavez, who sat on Carrera's jury, was the first Hispanic juror to be individually questioned for death qualification and other cause issues.  He was asked by Ms. Huffman, "Would you have any problems, sir, being of Hispanic descent and Hispanic last name, having a problem with Mr. Carrera being Hispanic, would that cause you any difficulties?"  RT-3: 264.  After responding in the negative, Ms. Huffman passed him for cause.  Mr. Vendrasco asked him a few death qualifying questions and passed him for cause as well.  *Id*.: 266.  During general voir dire, Mr. Chavez disclosed he was a letter carrier.  RT-4: 649/15.  He informed Ms. Huffman he spoke Spanish, but that if the testimony of any Spanish-speaking witnesses was interpreted, he would listen to the official interpretation rather than try to interpret himself.  *Id*.: 649/43.  If he perceived a mistranslation by the

---

[24] This includes stricken prospective juror Mr. Estrada.

court interpreter, he would bring the matter to the attention of the court, rather than wait for the commencement of deliberations. *Id.*: 649/44. Mr. Vendrasco elicited that Mr. Chavez had a brother-in-law in prison, but that Mr. Chavez did not know the crime of which his brother-in-law was convicted. *Id.*: 649/64.

Mr. Vendrasco asked Mr. Chavez further questions on general voir dire about his (Mr. Chavez's) incarcerated brother-in-law. Mr. Chavez felt he could be impartial despite the fact he had a brother-in-law who was serving time in state prison for a crime. RT-5: 708-09.

Petra Celedon disclosed on death qualification questioning by the trial judge that she had applied for a summer job as a special education aide beginning the first part of July 1983 through the beginning of August 1983. RT-3: 282-83. Ms. Huffman questioned and confirmed that Ms. Celedon had a Spanish-speaking accent. *Id.*: 285.

On general voir dire, Ms. Celedon was seated in the jury box for final voir dire. RT-5: 759. In ascertaining that Ms. Celedon could be an impartial juror in the case, the trial judge noted that she seemed "very bitter." He asked her if there was something wrong. *Id.*: 760. She responded, "I wish that I could be in school with the [special education] kids because this is a special day for them and some of them have been very anxious because I am not going to be there today." *Id.* Ms. Huffman asked her some further general questions and passed her for cause, again. *Id.*: 763. Mr. Vendrasco passed her for cause again after eliciting from her that she could sit in judgment of another person. *Id.* Ms. Huffman reopened her questioning to inquire about Ms. Celedon's Spanish-speaking abilities. Ms. Celedon agreed she would have no problems listening to the court interpreter rather than relying on her own understanding of what witnesses were saying. Ms. Celedon further confirmed that if she heard something that was misinterpreted, she would bring that fact to the court's attention. *Id.*: 763-64. A short time later, Mr. Vendrasco exercised a peremptory challenge as to Ms. Celedon. *Id.*: 770.

Manuel J. Estrada immediately disclosed to the court and the parties that he was Ms. Huffman's residential letter carrier, but that he could still be impartial. *Id.*: 312. Before passing him for cause, Mr. Vendrasco asked him one question about death qualification and elicited a negative response to the question: "And the fact that the defendant might be Hispanic, that's no consideration [sic] to you one way or another?" *Id.*: 316.

1    Mr. Estrada was seated in the jury box during general jury selection (and peremptory challenges).

2    Ms. Huffman elicited from him that he and prospective juror Antonia Chavez knew each other from

3    being letter carriers, even though they worked out of different stations.  In fact, they were friends.  RT-5:

4    671.  Ms. Huffman further elicited that Mr. Estrada had a brother who had an undisclosed experience

5    with law enforcement causing Mr. Estrada to have "a problem" with "the judicial system."  *Id*.: 672.

6    Ms. Huffman then passed him for cause (again). *Id*.

7    Mr. Vendrasco questioned Mr. Estrada further about the fact that he was Ms. Huffman's

8    residential letter carrier.  Mr. Estrada said he could be impartial because he didn't know Ms. Huffman.

9    *Id*.: 673.  During further private voir dire in the trial judge's chambers, Mr. Estrada revealed his view

10   that since there are numerous law enforcement personnel on the witness list, they likely all would "stick

11   together."  *Id*.: 694.  The trial judge and Ms. Huffman explained that evidence from law enforcement

12   officer s pertains to the various pieces of the investigation.  *Id*.: 694-96.  Mr. Vendrasco clarified that

13   there would be no police officer eye-witnesses and further that officers do not have to stick together in

14   the context of a criminal investigation.  *Id*.: 696, 699.  Mr. Vendrasco struck Mr. Estrada on a

15   peremptory challenge.  *Id*.: 725.

16   Richard S. Mara stated he was a teamster truck driver for United Parcel Service.  RT-3: 378, 382.

17   Ms. Huffman ascertained he could vote for the death penalty or life without parole, as the facts of the

18   case indicated would be appropriate.  *Id*.: 380.  Mr. Vendrasco only asked him if he could vote the death

19   penalty in certain circumstances.  *Id*.: 382.

20   On general voir dire, Mr. Mara reiterated his occupation as a truck driver, marital status, and

21   parentage of three children.  RT-5: 779-80.  Mr. Mara explained to Ms. Huffman that he previously was

22   a victim of an assault by a "Mexican fellow" who spoke no English, and that all proceedings had to be

23   conducted with an interpreter.  *Id*.: 780.  He also said that in the present trial it would make no difference

24   to him whether or not a witness required an interpreter.  *Id*.: 781.  Carrera does not acknowledge him

25   to be Hispanic or of Hispanic origin.  The Warden argues he is Hispanic or of Hispanic origin.  Mr. Mara

26   sat on Carrera's jury.

27   To further establish that Mr. Mara is not of Hispanic or Latin heritage, Carrera's investigator in

28   federal habeas proceedings located him to interview him about this subject.  The offer of proof from the

investigator, Ms. Pat McGregor, is that Mr. Mara told her his ethnic background was not Spanish and that he was not Hispanic.  Ms. McGregor was not able to obtain a declaration from Mr. Mara because he would not permit her on his property.  The conversation between them was conducted via cellular telephone with Ms. McGregor sitting in her car outside the locked gate to Mr. Mara's property, while he was talking to her from his front porch.

Tony Nunez a prospective juror of Hispanic heritage who eventually was excused for financial hardship, was asked about his heritage during death qualification by both Ms. Huffman (at the time Mendez) and Mr. Vendrasco.

> [Question by Ms. Huffman] If you were selected as a juror, sir, your last name is a Spanish surname and so is mine [Mendez] and Mr. Carrera['s].  If you were maybe the only Spanish surname on the jury, would that cause you any problems in deliberation or do you feel you could stick with your own feelings without that being any problem? [Answer] It wouldn't cause no problems.

RT-3: 392.

> [Question by Mr. Vendrasco] Mr. Nunez, defense brought up some questions with regard to Spanish surnames.  Is a fact the defendant has probably a Spanish surname. [sic] Do you have any problem in reference to possibly convicting him if there is sufficient evidence?  [Answer] No. [Question] In other words, in any race there are bad apples. [Answer] True.

Id.: 395.  A week later, when the trial judge learned that Mr. Nunez would suffer a financial hardship if called as a juror, he was excused from service on Carrera's jury.  RT-5: 749.

Angelo Urrea, who eventually was seated on Carrera's jury, was initially subjected to questioning by Ms. Huffman about his familiarity with media reports of the crime.  RT-3: 408.  Ms. Huffman then asked him about his Hispanic heritage.

> [Question by Ms. Huffman] Sir, your name is [a] Spanish surname; is that correct? [Answer] Yes, it is. [Question] And mine is also [Mendez] and so is Mr. Carrera['s]. Would this cause you any difficulty if you were picked as a juror and you were the only gentleman with a Spanish surname with regard to your feelings about the evidence and the testimony that you heard? [Answer] No, that wouldn't affect me at all.

RT-3: 409.

Mr. Vendrasco's entire voir dire was:

> [Question] Mr. Urrea, you are not opposed then to the death penalty under certain circumstances? [Answer] No. [Question] And as far as the Spanish surname or anything like that, would that cause you any problems if the defendant was Spanish in reference to convicting him if I proved the case? [Answer] No. [Mr. Vendrasco] I would pass for cause.

1    *Id*.: 411.

2        On general voir dire, Mr. Urrea confirmed to Ms. Huffman that he would listen to the interpreter

3    and not attempt to interpret between Spanish and English himself.  He further confirmed he would bring

4    in any perceived translation mistakes to the court's attention.  RT-5: 784.

5        <u>Lawrence Martinez</u>, who eventually was stricken by Mr. Vendrasco on a peremptory challenge,

6    was asked about his Hispanic heritage by both Ms. Huffman and Mr. Vendrasco on death qualification.

> [Question by Ms. Huffman] Also, Mr. Martinez, you have a Spanish surname, I have a
> Spanish surname [Mendez], and Mr. Carrera has a Spanish surname.  If you were chosen
> as a juror in this case and you were the only one that had a Spanish surname sitting on
> the panel, would you feel that you would be under an undue hardship, so to speak, for
> want of a better word, feeling you would have to vote just as everyone else did simply
> because they might claim because you have a Spanish surname maybe you were being
> more lenient or that sort of thing? [Answer] No, I don't think so. [Question] That would
> not enter into your deliberations whatsoever? [Answer] No.

12    *Id*.: 463.  Ms. Huffman passed him for cause.  *Id*.: 464.

> [Question by Mr. Vendrasco] Mr. Martinez, if it turns out the defendant is [of] Spanish
> descent, would that cause you any problems in reference to whether you could convict
> him of murder and impose the death penalty? [Answer] No. [Question] That has no
> significance? [Answer] No. [Question] In other words, you are going to judge the
> defendant just as a human being, and if he committed the crime and you believe he
> committed the crime, you will convict him, and that race is not really material? [Answer]
> No, it is not.

17    *Id*.: 464.  Mr. Vendrasco passed him for cause.  *Id*.: 465.

18        Both attorneys also questioned Mr. Martinez about the potential burden of him having to drive

19    from his home in Delano to Bakersfield for the trial (approximately 30 miles).[25]  Mr. Martinez responded

20    to both counsel that the drive between Delano and Bakersfield would not be a hardship for him.  *Id*.:

21    463-64.  He informed Mr. Vendrasco that he knew three different routes he could take.  *Id*.: 464

22        When Mr. Martinez took a seat in the jury box during final jury selection (and peremptory

23    challenges), the trial judge questioned him further and Mr. Martinez revealed he was currently disabled

24    and previously drove a truck.  RT-5: 661.  Ms. Huffman then elicited that he spoke "very little Spanish"

25    and would bring the court's attention to any perceived error in Spanish-English translations by the court

---

27/28    [25] Without the juror questionnaires, the Court cannot tell the exact mileage between Mr.
Martinez's Delano home and the Kern County Superior Court in Bakersfield.  Mileage therefore is
estimated at approximately 30 miles.

1  interpreter.  *Id.*: 662.  Ms. Huffman passed Mr. Martinez for cause again.  *Id.*: 664. Mr. Vendrasco

2  confirmed that Mr. Martinez could keep an open mind about offering immunity to witnesses uninvolved

3  in the crime and then passed him for cause, again.  *Id.*: 665.  The following day, Mr. Vendrasco excused

4  him on a peremptory challenge.  *Id.*: 779.

5       Marilyn Torres explained that her Spanish surname was her husband's last name and that she is

6  "white."  *Id.*: 470.  Nonetheless, Ms. Huffman asked Ms. Torres about the impact her Spanish surname

7  would have on her deliberative process were she chosen as a juror.

8       [Question] Mrs. Torres, you have a Spanish surname. [Answer] My husband was – I am
       white. [Question] Okay.  But I'm asking you this: Because you are carrying a Spanish
9       surname and I have a Spanish surname [Mendez] and so does Mr. Carrera, if you were
       the only person on the panel to carry such a name, would you have difficulty regarding
10      innocence or guilt? [Answer] No. [Question] How about the penalty phase, would you
       have a problem with that because you would be the only one on the panel with a Spanish
11      surname? [Answer] No. [Question] Would that cause you any problems? [Answer] No.
       [Question] What I'm asking is if everybody is voting in the opposite direction than you
12      are voting, would the fact you have a Spanish surname make you more lenient toward
       Mr. Carrera or make you more the other way toward Mr. Carrera? [Answer] No.
13      [Question] You wouldn't vote against Mr. Carrera not based on the evidence before you
       but simply because you didn't want anybody else on the panel to feel you were being
14      biased or anything? [Answer] No.

15  *Id.*: 470-71.

16       Mr. Vendraso, then followed suit: "[Question] Mrs. Torres, if it turns out that the defendant is

17  Spanish, would that cause you any problems whether you could convict him? [Answer] No. [Question]

18  That would be immaterial; is that correct? [Answer] It doesn't matter."  Before passing Ms. Torres for

19  cause, Mr. Vendrasco asked her briefly if she knew Carrera or had been exposed to media reports about

20  the crime.  *Id.*: 471.

21       Prior to general voir dire, Ms. Torres obtained a letter from her employer indicating she would

22  not be paid for more than two weeks of jury duty.  RT-5: 700.  Both Ms. Huffman and Mr. Vendrasco

23  agreed she should be excused due to financial hardship.  *Id.* 700-01.  The trial judge thereupon excused

24  her.  *Id.*: 701.

25

26

27

28

Notwithstanding the excusal, Ms. Torres came up for general voir dire in the jury box. *Id*.: 727. Then Ms. Huffman and Mr. Vendrasco both passed her for cause. *Id*.: 728. Mr. Vendrasco struck Ms. Torres on a peremptory challenge.[26] *Id*.: 733.

<u>Maria Carrillo</u> was asked during voir dire, by both Ms. Huffman and Mr. Vendrasco about her Spanish surname.

> [Question by Ms. Huffman] Mrs. Carrillo, first I would have to ask you if you were chosen as a juror in this case, due to the fact that you have a Spanish surname and so does Mr. Carrera, and in fact I do too [Mendez], would you have any problems with that? Would you feel that you should be a little more harsh or a little more biased? Would that cause you any problems at all in this case? [Answer] No. [Question] You feel that if you made a determination on the evidence as it was presented to you and went into the jury room to deliberate and you were the only one with a Spanish surname, would you back down in your determination simply because – maybe some pressure brought upon you, or would you stay firmly convinced with your decision until the jurors changed your decision by logic and on the evidence itself? [Answer] Huh-uh, no. [Question] You don't feel that would have any – you would have any problems with that? [Answer] I don't think so.

RT-3: 514-15. On further questions about her view on the death penalty, Ms. Huffman elicited a negative answer from Ms. Carrillo when she asked, "do you believe there are cases where the only penalty possible is the death penalty?" *Id*.: 516. Ms. Carrillo also admitted there are "some cases" where the appropriate penalty is life without parole. *Id*.

Mr. Vendrasco's initial focus was whether Ms. Carrillo was "totally against the death penalty." Ms. Carrillo responded in the negative. *Id*.: 517. After securing these answers, Mr. Vendraso elicited a positive response to the following: "And do you understand that race or nationality of the defendant, whether he is Mexican or anything other, is of really no significance in the trial. Do you understand that?" *Id*.: 518.

On general voir dire, Ms. Carrillo confirmed to the trial judge that she is a housewife with three children, two living at home, and that her husband is a truck driver. She could be impartial if selected as a juror. RT-5: 729. Her now-grown son had been picked up when he was 13 or 14 with some of his friends for stealing. She had no animosity toward law enforcement on account of this. *Id*.: 731. Ms.

---

[26] The peremptory challenge as to Ms. Torres is not contended by Carrera to amount to discrimination in selecting the jury because she is white. The individual voir dire recited here to inform the Court's decision about the type of questioning conducted by Ms. Huffman and Mr. Vendrasco during jury selection.

Carrillo told Mr. Vendrasco she thought that her son was using drugs at the time of his (juvenile) arrest. *Id*.: 732.   Though she confirmed she was against drugs, she assured him she would listen to the testimony of a witness even if that witness used drugs. *Id*.: 733.   Mr. Vendrasco exercised a peremptory challenge with respect to Ms. Carrillo during final jury selection.   *Id*.: 750.

Mary Dolores Garcia was passed for cause after lengthy questioning about her ability to impose the death penalty.   Voir dire by the trial judge commenced as follows:

> [Question by the judge]  If you, as a juror, are convinced that the death penalty should be imposed, could you vote that way? [Answer]  No. [Question] You could not vote for the death penalty under any circumstances? [Answer] No, I don't think so. [Question] You don't think so.  Now, the law provides that those are the only two penalties appropriate, and I will tell the jury to consider both penalties.  Now, would you refuse even to consider the possibility of a death penalty?  Let me ask you this way: I am not talking about this particular case right now because you don't know anything about this case, you don't know anything about the defendant here.  I am talking in general terms about any case, first degree murder with special circumstances.  Can you think of a case where the crime for instance is so vicious that the death penalty should be imposed? [Answer] Well, yeah, in that case, yeah.

RT-4: 540.

Ms. Huffman asked about the impact Ms. Garcia's Spanish surname would have on her evaluation of the case.

> [Question by Ms. Huffman] Miss Garcia, your last name is a Spanish surname, as is mine [Mendez] and as is Mr. Carrera['s].  If you were chosen as a juror in this case, would you be extremely harsh on Mr. Carrera because he has a last name that's Spanish?  [Answer] No. [Question] Do you feel that if you were in the jury room debating the case with the other jurors that the fact maybe you would be the only one with a Spanish surname in there, do you think that would cause you any problems with the other jurors?  [Answer] No.  [Question] You feel that you could look at the case, look at the evidence and the testimony as it comes in and make up your decision, and just because you have the Spanish surname it wouldn't cause you any problem at all?  [Answer]  No.

*Id*.: 541.

Mr. Vendrasco followed suit regarding Ms. Garcia's Hispanic heritage:

> [Question by Mr. Vendrasco] Miss Garcia, would you have any problem in reference to possibly being more lenient toward Mr. Carrera let's say if he is Spanish for one reason or another?  [Answer]  No.  [Question] His name or nationality have no effect on your decision.  Is that correct?  [Answer]  Right.

*Id*.: 542.

Regarding Ms. Garcia's ability to vote for the death penalty, Ms. Huffman elicited from her that she would give the sentencing factors stated by the trial judge "due consideration" before voting for

either penalty. *Id*.: 542. Mr. Vendrasco also elicited from her that there are circumstances which would lead her to vote for the ultimate penalty, as where the defendant committed the murder or murders in a particularly vicious fashion. *Id*.: 543. During general voir dire, Ms. Huffman elicited that Ms. Garcia speaks Spanish. RT-4: 649/59. Ms. Garcia agreed that she would listen to the official interpretation rather than try to interpret herself and further that if she perceived an error in the interpretation, she would bring that matter to the court's attention. *Id*.: 649/59-60. Mr. Vendrasco elicited that Ms. Garcia had a sister on probation, but that she thought she could be impartial. *Id*.: 649/65. A short time later, Mr. Vendrasco stuck Ms. Garcia on a peremptory challenge. RT-5: 659.

Alicia Torres Grijalva and the trial judge engaged in quite a lengthy dialogue about whether she would have a financial hardship if she were chosen. She wasn't sure her employer would pay her for prolonged jury service. RT-4: 618-19. During Ms. Huffman's questioning, Ms. Grijalva disclosed that she believed in the death penalty. *Id*.: 621. She would be inclined to vote for life without parole if the defendant had some type of mental problem, but this would be only grounds for a life without parole vote. *Id*.: 621-22. After confirming that Ms. Grijalva would not consider evidence of the a defendant's family background, youthfulness, and lack of criminal history to be mitigating, Ms. Huffman moved to challenge her for cause. *Id*.: 627. After Mr. Vendrasco confirmed that Ms. Grijalva would follow the court's instructions, including instructions on the burden of proof, the trial judge denied Ms. Huffman's cause challenge. *Id*.; 628-30. Neither attorney asked her about her Spanish surname or effect her Hispanic heritage (if any) would have on her impartiality as a juror. Ms. Grijilva's name was not called for general voir dire and peremptory challenges.

Barbara Louise Cota was asked by Mr. Vendrasco on death qualification voir dire if Carrera's ethnicity would present any issues. She responded it would not. RT-5: 847. On general voir for alternate juror selection, Ms. Cota informed Ms. Huffman that she does speak Spanish but that she would listen to testimony through the interpreter and bring to the court's attention the occurrence of any mis-translation. RT-6: 1056. Carrera conceded in his Reply Memorandum of Points and Authorities that Ms. Cota is Hispanic (Reply Memo of Ps and As, p. 30) and then denied Ms. Cota's Hispanic heritage in his evidentiary hearing motion. The Warden contends she is Hispanic. Ms. Cota was selected as a alternate juror.

Vincent B. Calaustro emerged from death qualification without being asked any questions about ethnicity, Hispanic heritage, or the Spanish language. *Id.*: 855-61. Likewise, the questioning of Mr. Calaustro on general voir steered clear of ethnicity, Hispanic heritage, and Spanish language issues. Rather, he described his family and his wife's occupation. RT-6:1068-70. Mr. Calaustro eventually was selected as an alternate juror spot on Carrera's jury. The Warden suggests he is Hispanic and Carrera maintains he is not.

Alice Hernandez disclosed on death qualification questioning by the trial judge that she could vote for life without parole or the death penalty, depending on the circumstances of the case. RT-6: 958-59. She told Ms. Huffman she believed in the death penalty. *Id.*: 959. Ms. Huffman also inquired about Ms. Hernandez's Hispanic origin:

> [Question by Ms. Huffman] Mrs. Hernandez, you carry a Spanish surname, and so do I [Mendez], so does Mr. Carrera. If you were the only person on the jury that went into deliberation with a Spanish last name, would you, because Mr. Carrera has a Spanish last name, would you hold him to a higher degree of let's say innocence because of that? [Answer] No. [Question] Would you hold him to a higher degree of guilt because of the Latin surname? [Answer] No. [Question] In other words, I am asking you, you wouldn't expect the District Attorney or make the District Attorney prove more to you before you could come up with a guilty verdict simply because of the last name? [Answer] No. [Question] And you wouldn't expect the District Attorney to prove less to you because of the last name? [Answer] No. [Question] You wouldn't, in other words, be intimidated by the fact that you are the only juror in the jury room with a Spanish surname? [Answer] No. [Question] And if you made your decision, unless it could be changed by discussion with the other jurors and proved to you to your satisfaction, you wouldn't change your vote simply because of the last name, would you? [Answer] No.

*Id.*: 961-62.

Mr. Vendrasco elicited that Ms. Hernandez worked for the Juvenile Probation Department as group counselor housekeeper: "[Question by Mr. Vendrasco] Where do you work? [Answer] I work for the Probation Department as a group counselor housekeeper. [Question] Is that in juvenile? [Answer] Yes." *Id.*: 963. She confirmed that she could vote for the death penalty if she "had enough proof," and that whether the defendant had a Spanish surname wouldn't be a factor of his criminal responsibility. *Id.*: 963. Ms. Huffman then reopened questioning about Ms. Hernandez's employment in the Kern County Juvenile Hall. She elicited that Ms. Hernandez had personal contact with juveniles housed at Juvenile Hall as part of her job. She worked with detainees in housekeeping. *Id.*: 964. While it was possible Ms. Hernandez would recall a specific name, for instance, Ramiro Ruiz, ordinarily she only

1  remembered a name if the juvenile presented problems.  *Id*.  She did not recall hearing any one at

2  Juvenile Hall talk about this case.  *Id*.: 965.

3         When Ms. Hernandez was seated in the jury box for general voir dire, the trial judge asked her

4  again about her employment with juvenile detainees at the Kern County Juvenile Hall.  *Id*.: 1032.  Mr.

5  Vendrasco struck her on a peremptory challenge a short time later without asking her any further

6  questions.  *Id*.: 1040.

7                  **(2)      Discussion About Hispanic Representation on the Venire and**

8                          **the Jury Panel During Voir Dire.**

9         The issue of racial and ethnic balance on the jury came up at the very beginning of jury selection,

10  on June 1, 1983.  The trial judge commented that a motion had been advanced by Ms. Huffman

11  regarding representation of minorities on the venire.  The trial judge counted 14 prospective jurors in

12  the first panel (of 60 total) with Spanish surnames.  Ms. Huffman responded that she was satisfied with

13  the proportion of Hispanic prospective jurors.  RT-2: 232-33.  During jury selection on June 6, 1983,

14  the trial judge ventured his opinion that there was a "fair representation" on the second panel of

15  prospective jurors.  Ms. Huffman concurred, but Mr. Vendrasco objected "to a representation like an

16  affirmative action [sic] on the panel."  RT-3: 522.  After the trial judge questioned and excused another

17  prospective juror (on the grounds of hardship), Ms. Huffman inquired further about Mr. Vendrasco's

18  "affirmative action" objection.  He responded, "My objection is that the defense attorney has not

19  established a prima facie case of discrimination, so we shouldn't even be getting into the issue of how

20  many people of Hispanic descent are on the jury panel."  *Id*.: 524.  Ms. Huffman ventured that the "fair

21  representation" comment pertained to her earlier motion regarding the proportion of Hispanic people

22  on the venire, and that the trial judge simply reaffirmed that concern "to show that the jury panel is being

23  selected – I mean balanced, and therefore I did not have to renew my motion."  *Id*.  The trial judge

24  concurred and further commented, "I think for the purposes of this particular case, whatever the selection

25  process is, we have ended up with a jury panel that is representative, and I think it makes everything else

26  moot."  *Id*.: 524-25.  Mr. Vendraso, still concerned, replied,

27         My only objection then would be when you are seeking to balance it in your own mind,
        whether you are expecting to come up with exact proportionate numbers or are you
28         looking just at just general balance.  I don't see any problem looking towards the general

1   balance, but before, if you are expecting a certain number of people to be Hispanics or
2   something, I think that has to be shown and proven.  That's my only objection. . . . If we
    are looking towards a general balance, I don't have any problem with that.

3   *Id.*: 525.

4   **(3)**      **Selected and Prospective Jurors Not of Hispanic Heritage.**

5   In addition to questioning people with Latin-sounding last names about the effect their Hispanic

6   heritage would have on the ability to serve as impartial jurors, a number of non-Hispanic prospective

7   jurors were questioned about the fact that Carrera was Hispanic and/or that some witnesses might not

8   speak English.  Ms. Huffman asked prospective juror Eugene Turner about his status as "a minority."[27]

9       [Question by Ms. Huffman] Mr. Turner, would you have any difficulties if you were
        chosen as a juror in this case due to the fact that Mr. Carrera is a minority and you are a
10      minority and maybe you would be the only minority in the jury?  Would that cause you
        any difficulties in the way you would want to vote? [Answer] By being a minority?
11      [Question] Right. [Answer] No, it wouldn't.

12  RT-4: 639.[28]  She also asked a number of non-Hispanic jurors if they would "hold it against" someone

13  who only spoke Spanish and had their testimony relayed through a court interpreter.  RT-4: 649/37-38

14  (Thelda Jean Young, who sat on Carrera's jury), *id.*: 649/53 (Murrill Wagoner, eventually stricken by

15  Ms. Huffman on a peremptory challenge), RT-5: 691 (Jettie Cargill, eventually stricken by Mr.

16  Vendrasco on a peremptory challenge), *id.*: 766 (James Elder, eventually stricken by Ms. Huffman), *id.*:

17  769 (Evelyn Glines, eventually stricken by Ms. Huffman); *id.*: 774 (Emmit Renfroe, eventually stricken

18  by Ms. Huffman).  Ms. Huffman asked one prospective juror if she would listen to the testimony of

19  Spanish-speaking witnesses through an interpreter just as she would listen to the testimony of anyone

20  else.  RT-6: 1015 (Dorothy Rankin, eventually stricken by Mr. Vendrasco).  Prospective juror Bonnie

21  Mangrum said that she would have a problem listening to testimony through an interpreter because she

22  believed if people live in the United States, they should speak English.  *Id.*: 1021-22.  Ms. Huffman

23  passed her for cause, but excused her on a peremptory challenge.  *Id.*: 1023, 1032.  Prospective juror

24  Clifton Garrett, a college professor at Bakersfield College, spoke fluent Spanish and French (in addition

25  to English).  Ms. Huffman elicited that Professor Garrett would bring to the court's attention any errors

26

27      [27] The record does not reveal the minority group of which Mr. Turner was a member.

28      [28] Mr. Vendrasco eventually struck Mr. Turner on a peremptory challenge.  RT-5: 669

1  in translation, should they occur. *Id*.: 1026-27. (Mr. Vendrasco excused him on a peremptory challenge

2  after ascertaining that he would suffer moral anguish to sit in judgment of someone else. *Id*.: 1028.).

3  Prospective jurors Marvin Felli, Thomas Yale, Francis Taylor, Gregory Brewkart confirmed to Ms.

4  Huffman that they would have no problems with an interpreter. *Id*.: 1037, 1043, 1045, 1048. All ended

5  up serving on Carrera's jury.

6  ## 2.   Carrera's Argument.

7  Carrera complains that Mr. Vendrasco's peremptory challenges as to six Hispanic prospective

8  jurors, Mary Garcia, Manuel Estrada, Maria Carrillo, Petra Celedon, Lawrence Martinez and Alice

9  Hernandez, should have prompted Ms. Huffman to object under *People v. Wheeler* 22 Cal. 3d 258. In

10  that case, the California Supreme Court concluded that "use of peremptory challenges to remove

11  prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a

12  representative cross-section of the community." *Id*. at 276-77. Carrera's points and authorities in

13  support of the Petition add that the equal protection prohibition against discriminatory jury selection

14  mandated under *Batson v. Kentucky*, 476 U.S. 79, also applies.[29] Even though *Batson* was decided in

15  1986, three years after Carrera's trial, he argues it is controlling because it was decided before the

16  conclusion of direct appeal proceedings and is retroactive. *Griffith v. Kentucky*, 479 U.S. 314, 322

17  (1987). He adds that the prohibition against racial discrimination on equal protection grounds in jury

18  selection also predated the trial under *Swain v. Alabama*, 380 U.S. 202 (1965). Had Ms. Huffman

19  challenged Mr. Vendrasco's peremptory strikes pursuant to *Wheeler*, the issue would have been

20  preserved under *Batson*.

21  To demonstrate Ms. Huffman's deficient representation, he makes a number of assumptions and

22  arguments. First, he notes that Ms. Huffman's strategy was to have Hispanics on Carrera's jury. It is

23  for this reason that she challenged the racial composition of the venire at the commencement of jury

24  selection. Inexplicably to Carrera, however, when she was satisfied the venire met fair cross section

25  requirements, she exercised no control over selection of the petit jury. Carrera surmises that she appears

26

27

28  [29] The Petition additionally alleges the discriminatory strikes were exacerbated by sustained cause challenges to Spanish surnamed prospective jurors "based on nonspecific opposition to the death penalty." No further argument on this allegation is advanced and the Court considers it abandoned.

1    not to have understood the distinction between starting off with a representative venire and prohibiting

2    the prosecutor from striking individual members of that venire on racially discriminatory grounds.  He

3    claims she admitted as much in her declaration.  Specifically, he argues Ms. Huffman had no strategic

4    reason to accept Mr. Vendrasco's challenges to Lawrence Martinez, Maria Carrillo, or Alice Hernandez.

5    As an ancillary matter, Carrera maintains that Ms. Huffman (as well as Mr. Vendrasco) disregarded the

6    duty to maintain a record of voir dire proceedings.

7    Carrera cites one Ninth Circuit case and three Eleventh Circuit cases for the proposition that an

8    ineffective assistance of counsel claim will lie for the attorney's failure to advance a *Batson* motion.

9    *Williams v. Woodford*, 384 F.3d 567, 583-85 (9th Cir. 2005) (implicitly approving the district court's

10   finding that trial counsel was constitutionally ineffective for not advancing a *Batson* motion at trial);

11   *Eagle v. Linahan*, 279 F.3d 926, 940 (11th Cir. 2001); *Hollis v. Davis*, 941 F.2d 1471, 1478 (11th Cir.

12   1991); *Goodwin v. Balcom*, 684 F.2d 794, 807 (11th Cir. 1982).

13   As Carrera correctly points out, under the first step in the *Batson/ Wheeler* analysis, the Court

14   is called upon to decide whether the objection to a peremptory strike is sufficient to state a prima facie

15   case.  A prima facie case, in turn is based on the removal of members of a cognizable racial group and

16   circumstances which raise an inference that the peremptory strikes were motivated by race.  *Batson*, 476

17   U.S. at 96; *accord Wheeler*, 22 Cal. 3d at 280 (same except the circumstances "must show a strong

18   likelihood" that the strikes were motivated by racial considerations).[30]   Carrera argues an inference of

19   discrimination under *Wheeler* and *Batson* could have been advanced on two separate bases.   First,

20   statistical disparities exist.  Mr. Vendrasco used peremptory challenges to strike a disproportionate

21   number of Hispanics from the panel, that is six out of eight (75% of ) qualified Hispanic prospective

22   jurors who were passed for cause.  *See Fernandez v. Roe*, 286 F.23d 1073, 1078 (9th Cir. 2002) (prima

23   facie case established when the prosecutor struck four out of seven Hispanics); *Miller-El v. Cockrell*,

24   537 U.S. 322, 342 (2003); *Turner v. Marshall*, 63 F.3d 807, 812 (9th Cir. 1995), *overruled on other*

25   *grounds, Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999).  Carrera also points to the disparity between that

26

27   _____
         [30] This particular requirement of *Wheeler* for measuring the sufficiency of a prima facie case was
28   struck down by the Supreme Court in *Johnson v. California*, 545 U.S. 162, 168 (2005), as overly
     demanding.

percentage of Hispanic jurors struck (75%) with the percentage of white jurors struck (26%), as well as with the low percentage of qualified Hispanic jurors on the venire (17%) in the first place. *See Turner*, 63 F.3d at 813.

Carrera maintains a second basis for an inference of discrimination is established by Mr. Vendrasco's differential voir dire questioning. Citing the questions posed to prospective jurors Lawrence Martinez, Maria Carrillo, and Mary Garcia, Carrera argues the questions Mr. Vendrasco reserved for Hispanic jurors reveals an underlying discriminatory purpose. *See Miller-El v. Cockrell*, 437 U.S. at 343; *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). As to each of these prospective jurors, Mr. Vendrasco is said to have asked pointedly ethnic specific questions about how each prospective juror's Hispanic heritage would affect impartiality, and particularly bias in favor of Carrera. In all other respects, he contends, these prospective jurors were qualified to serve on a death penalty case, both because they would consider voting for the death penalty and because they were able to serve. He maintains this type of questioning shows a discriminatory purpose because no white juror was questioned in this manner. In his Reply Memorandum of Points and Authorities Carrera argues that Mr. Vendrasco's discriminatory purpose is apparent in his objection to "affirmative action" type jury selection considerations. He claims this anti-affirmative action argument shows hostility to the equal protection rights of minority jurors.

Citing *Ford v. Georgia*, 498 U.S. 411, 416 (1991), Carrera argues the fact that two Hispanic people sat on Carrera's jury does not defeat the establishment of a prima facie case. Even one improperly challenged juror is the basis of a violation under *Batson*, 476 U.S. at 95-96. *See United States v. Bishop*, 959 F.2d 820, 827 (9th Cir. 1992) (holding that under the equal protection framework of *Batson*, the striking of one juror on racial grounds is a violation), *overruling on other grounds recognized, Boyde v. Brown*, 404 F.3d 1159, 1171, n. 10 (9th Cir. 2005)); *see also People v. Snow*, 44 Cal. 3d 216, 226 (1987) (passing some minority jurors may show non-discriminatory purpose, but is not conclusive in ruling on a *Wheeler* objection). He also refutes the notion raised in the Warden's

1   opposition papers that seated juror Richard Mara and alternate juror Vincent Calaustro were Hispanic,

2   but he concedes that alternate juror Barbara Cota was Hispanic.[31]

3      Carrera points out that once a prima facie case of discrimination in the jury selection process is

4   established, the burden shifts to the prosecution "to come forward with a neutral explanation" for the

5   peremptory strikes, *Batson*, 476 U.S. at 97, and a showing "that the peremptory challenges were not

6   predicated on group bias alone," *Wheeler*, 22 Cal. 3d at 281.  Carrera maintains the Warden cannot meet

7   this burden.  First, as noted from Mr. Vendrasco's April 29, 1988 declaration, he could not recall the

8   reasons he peremptorily challenged six Hispanic jurors in June 1983.  Carrera does not dispute the

9   notion that if Mr. Vendrasco could not recall the reasons for his peremptory strikes in 1988, he is not

10  likely to have perfected his memory nearly 20 years later.  But, he argues, the reason Mr. Vendrasco

11  cannot remember any race-neutral reasons for the strikes is because there weren't any.  Nor is the

12  passage of time an excuse for not having to demonstrate race-neutral reasons.  Carrera maintains he

13  brought the claim of ineffective counsel for failing to advance a *Wheeler/Batson* motion as soon as he

14  could and in timely post-conviction proceedings,[32] so there was no untoward delay and no basis for the

15  Warden to invoke the laches protections of former Rule 9 of the Rules Governing § 2254 Cases.[33]

16     He cites *United States v. Thompson*, 827 F.2d 1254, 1262 (9th Cir. 1987), for the proposition that

17  since Mr. Vendrasco cannot recall his race-neutral reason for striking six Hispanic jurors, the remedy

18  is to vacate the conviction and conduct a new trial.  He claims Mr. Vendrasco's failure to provide race-

19  ────────────────

20  [31] In his September 13, 2005 Reply Memorandum of Points and Authorities to the Petition, Carrera concedes this fact, but in his December 7, 2005 reply to the Warden's opposition brief to the evidentiary hearing motion, he states that Ms. Cota was not Hispanic.

21

22  [32] Carrera's first state habeas petition, which included the present claim, was filed December 31, 1987, a year and a half before his conviction and sentence were affirmed by the California Supreme Court on August 17, 1989 and just over four years after the Kern County Superior Court filed a commitment for his execution on October 14, 1983.  The Warden does not contest that the ineffective assistance of counsel claim was timely under California rules.

23

24

25  [33] Former Rule 9(a) of the Rules Governing § 2254 Cases provided:
    A petition may be dismissed if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred.

26

27

28  Rule 9 was amended and completely rewritten in 2004 to conform to AEDPA provision 28 U.S.C. § 2244(b)(3) and (4) concerning the filing of successive petitions.

neutral reasons for his strikes and the absence of any notes in the prosecution records raises an inference of discrimination. *Johnson v. California*, 545 U.S. 162 171, n. 6 (2005) (noting "the prosecutor's refusal to justify his strike in light of the court's request . . . would provide additional support for the inference of discrimination raised by the defendant's prima facie case"). Referring to the offered opinion of *Strickland* expert Mr. Jinkerson, he argues it is inconceivable that a trial lawyer, either defense or prosecution, would not maintain notes about jury selection. In his evidentiary hearing motion, he specifically asks the Court to draw an inference that even though no jury selection notes exist in the prosecution file, Mr. Vendrasco, in fact, wrote notes contemporaneous with voir dire, but destroyed or discarded those notes because they would have undermined his credibility on the issue of discriminatory purpose underlying the peremptory strikes.

Addressing the Warden's argument about race neutral reasons Mr. Vendrasco might have had or did have for exercising peremptory strikes, Carrera argues the Court should not consider these after the fact "conjured up" explanations. First, he maintains, the reasons supplied by the Warden are pretextual. Second, *Batson* only permits consideration of the prosecutor's actual reason, not someone else's conjectured reason for the peremptory strikes. *Johnson*, 545 U.S. at 172; *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004).

Under the equal protection analysis, even in the absence of prosecution evidence of race-neutral reasons for the peremptory strikes, Carrera points out that this Court still ultimately must decide if purposeful discrimination has been established. *Batson*, 476 U.S. at 98; (ultimately, the reviewing court determines the persuasiveness of the evidence); *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (same). Under the fair cross section analysis utilized in California, if the prosecution fails to sustain its burden of producing evidence after the objecting party establishes a prima facie case, the presumption of validity of the peremptory challenge is rebutted and relief must be granted. *Wheeler*, 22 Cal. 3d 282. Carrera argues that the failure of the Warden to rebut Carrera's prima facie case requires that his conviction be vacated and the case remanded to state court for a new trial.

### 3. Analysis.

To prevail on Claim 20, Carrera must demonstrate that Ms. Huffman's failure to raise an objection to the prosecution peremptory jury strikes of six Hispanic jurors was both constitutionally

1    deficient and prejudicial.  *Strickland*, 466 U.S. at 687.   To establish constitutionally deficient

2    representation, he must demonstrate that her conduct fell below an "objective standard of

3    reasonableness." *Id.* at 688.  The assessment of Ms. Huffman's performance, however,  must be made

4    from her perspective at the time of Carrera's trial, and must "eliminate the distorting effects of

5    hindsight." *Id.* at 689.  Further, there is a "strong presumption that counsel's conduct falls within the

6    wide range of reasonable professional assistance," and, accordingly, "[j]udicial scrutiny of counsel's

7    performance must be highly deferential." *Id.*  In the context of this case, the prejudice prong requires

8    a showing that had Ms. Huffman advanced a *Wheeler* motion during jury selection, she would have

9    prevailed, or at least have established a prima facie case.  *See id.* at 694  (to establish prejudice a habeas

10   petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors,

11   the result of the proceeding would have been different").  *Williams (Terry) v. Taylor*, 529 U.S. 362, 391

12   (2000).

13        Although Carrera argues the standards set forth under *Batson* apply to the selection of his jury,

14   that case was not in existence until three years after his trial was completed.  No challenge to the petit

15   jury selection process was preserved at trial.  Indeed that is the basis for Carrera's present ineffective

16   assistance of counsel claim.  Accordingly, even though *Batson* would be applicable had Ms. Huffman

17   advanced a *Wheeler* motion, *see Paulino*, 3741 F.3d at 1088, n. 4, the requirements for establishing a

18   *Batson* error claim are not controlling.  *See Randolph v. Delo*, 952 F.2d 243, 246 (8th Cir. 1991)

19   (counsel did not perform deficiently for failure to object under the precepts of *Batson* where jury

20   selection occurred two days before *Batson* was decided).

21        Rather, the Court must view Ms. Huffman's performance in the context of what the applicable

22   law was at the time of Carrera's trial, that is under *Swain v. Alabama* for equal protection claims and

23   *Wheeler* for fair representation claims under the Sixth Amendment.  Accordingly, the Court has no

24   occasion to consider the Warden's laches argument under former Rule 9(a) of the Rules Governing §

25   2254 Cases or Carrera's contention that the Court should draw an inference that Mr. Vendrasco in fact

26   did have a discriminatory purpose when striking six of the eight qualified Hispanic jurors.  Claim 20 is

27   not a *Batson* or even a *Wheeler* claim. It is an ineffective assistance of counsel claim.  Notwithstanding

28   Carrera's argument that Mr. Vendrasco should have maintained records of jury selection, the fact

1   remains, he did not do so, and it is manifest that he was not called upon to do so because no objection

2   to his peremptory strikes was interposed.

3       The Court concludes that under the facts presented and the legal landscape for petit jury selection

4   mandated under *Swain v. Alabama* and *People v. Wheeler*, Ms. Huffman was not required to advance

5   a *Wheeler* motion to fulfill her legal responsibilities to Carrera.  First, although a *Wheeler* motion would

6   have preserved an appellate claim under *Batson*, it would not have done so under *Swain*.  To have

7   established an equal protection violation under *Swain*, Ms. Huffman would have had to demonstrate that

8   Mr. Vendrasco struck qualified Hispanics (or other minorities) "in case after case, whatever the

9   circumstances, whatever the crime and whoever the defendant or the victim."  *See* 380 U.S. at 223.

10  *Swain* did not permit an equal protection challenge based the prosecutor's peremptory challenges in a

11  particular case.  There had to be a pattern and practice established over a period of time.  *Id*. at 224.  Not

12  until *Batson* was decided, twenty-one years later, did the Court substantially reduce the "crippling"

13  evidentiary burden for a criminal defendant to establish an equal protection violation in the jury selection

14  process.  476 U.S. at 92-93.[34]

15      A claim for discriminatory jury selection under California law at the time of Carrera's trial was

16  significantly less burdensome that required under *Swain*.[35]  Rather than being based on the Equal

17  Protection Clause, the right recognized in the 1978 *Wheeler* case was (and is) based on the impartial jury

18  guarantee in the Sixth Amendment.[36]  *Wheeler* held that "use peremptory challenges to remove

19  prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a

---

21  [34] As Carrera correctly points out, to prevail under the re-articulated equal protection standard

22  in *Batson*, the defendant must first establish a prima facie case of purposeful discrimination, that is, an
    inference that the prosecutor's peremptory challenges were exercised "to exclude veniremen from the
23  petit jury on account of their race."  476 U.S. at 96.  Among the "relevant circumstances" informing the
    establishment of a prima facie case are a pattern of strikes against members of a cognizable group, or
24  the prosecutor's racially differential questioning of potential jurors.  *Id*. at 97.  Once the defendant has
    made out a prima facie case, the burden shifts to the prosecutor to come forward with a race-neutral
25  explanation for challenging the stricken jurors.  *Id*. at 97.  This requires the prosecutor to articulate
    neutral explanations related to the particular case to be tried.  *Id*. at 98.  In the third step, the trial court
26  must then evaluate the prosecutor's explanation to determine the ultimate question of purposeful
    discrimination.  *Id*.

27  [35] It also was  broader and more demanding than a *Batson* claim.

28  [36] The *Wheeler* decision also is based on Article I, section 16 of the California Constitution.  22
    Cal. 3d at 265.

representative cross-section of the community." 22 Cal. 3d at 276-77. A prima facie case under *Wheeler*, as it existed at the time of Carrera's trial, required the offended party (either the defendant or the People) to establish that prospective jurors stricken were members of a cognizable group and "a strong likelihood that such persons [were] being challenged because of their group association rather than because of any specific bias." *Id*. at 280. If the court was satisfied a prima facie case had been made, the burden shifted to the offending party to show "that the peremptory challenges in question were not predicated on group bias alone," but "on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses – i.e., for reasons of specific bias." *Id*. at 281, 282.

*Wheeler* has since been overruled in one significant particular. As noted previously, in *Johnson,* 545 U.S. 162, the Court held that the standard of proof, "a strong likelihood," required by California courts under *Wheeler* was too rigorous;[37] the Constitution only requires sufficient evidence to permit an inference that discrimination has occurred. *Id*. at 170.

Besides having to show a strong likelihood of discriminatory purpose, California litigants advancing a *Wheeler* motion prior to 1987 were additionally burdened if the offending party left two or three members of the stricken cognizable group on the panel. In that event, the right to a representative cross section of jurors from the community was considered vindicated. *See People v. Davis*, 189 Cal. App. 3d 1177, 1191 (1987) (quoting *People v. Boyde*, 167 Cal App. 3d 36, 47 (1985), *overruled by People v. Snow*, 44 Cal. 3d at 225-26. After the 1987 decision in *Snow*, the California courts no longer tolerated the practice of attorneys shielding discriminatory jury strikes by leaving two or three jurors of a disputed cognizable group on the panel, but rather evaluated the presence of minorities on a jury panel as some evidence (but not conclusive evidence) of "the prosecutor's good faith in exercising his peremptoriness." *Id*. at 225.

Carrera points out that two Hispanic jurors sat on his jury, Antonio Chavez and Angelo Urrea. Carrera's Memorandum of Points and Authorities in support of the Petition discloses that Mr. Chavez

---

[37] Although the court in *Wheeler* states that the objecting party must show a strong likelihood that peremptory strikes were made because of group bias, 22 Cal. 3d at 280, on the next page of the opinion, the court instructs that the trial court faced with a jury selection objection "must determine whether a reasonable inference arises" that the peremptory challenges were made on the basis of group bias. *Id*. at 281. Much discussion about whether "a strong likelihood" and a "reasonable inference" have the same meaning for purposes of a *Wheeler* motion has ensued, with the final word handed down by the United States Supreme Court that they do *not* have the same meaning. *Johnson*, 545 U.S. at 168.

was the third juror and Mr. Urrea was the fifth.  His argument that neither seated juror Richard Mara nor alternate juror Vincent Calaustro were Hispanic is persuasive.  From the Court's review their respective voir dire statements, nothing in their answers, or even in the questions posed to them, suggests they were Hispanic or spoke Spanish.  With respect to Mr. Mara, his lack of Hispanic connection is indicated by his report that previously he had been assaulted by a "Mexican fellow" who spoke no English and that the ensuing court proceedings were conducted with the aid of a court interpreter.  His flat out denial of Hispanic heritage to Carrera's investigator also is very persuasive.  Mr. Calaustro's voir dire is simply devoid of any suggestion one way or the other about his ethnicity.  The Court does find, however, that alternate juror Barbara Cota spoke Spanish and is conceded by Carrera to be Hispanic or of Hispanic heritage in his September 13, 2005 Reply Memorandum of Points and Authorities (p. 30).

Looking at the petit jury selection process in light of the now discredited practice of trial courts discounting claims of discriminatory strikes when two or three jurors of a cognizable group were left on the panel, Ms. Huffman's declaration testimony that she still sees no basis for a *Wheeler* motion has more authority.  There were two confirmed Hispanics on the actual jury panel, and one likely Hispanic (or at least a Spanish speaker) sitting as an alternate.  While Carrera is correct that under *Batson*, the presence of Mr. Chavez and Mr. Urrea on the jury would not be dispositive of lack of discriminatory purpose in striking the other six Hispanics, at the time of Carrera's trial that was a practice sanctioned by California courts.  *See Boyde*, 167 Cal. App. 3d at 47; *Davis*, 189 Cal. App. 3d at 1191.  The fact that Hispanic jurors were left on the panel early in the selection process (third and fifth seats) was grounds to defeat a *Wheeler* motion.

Separate from the probability that a *Wheeler* motion would have failed because two Hispanic jurors left on the panel could demonstrate vindication of the fair representation requirement, Carrera has not sustained his burden of showing that Ms. Huffman could have demonstrated a strong likelihood of group bias based on the responses the six stricken Hispanic jurors gave on voir dire.  The strikes against three of those prospective Hispanic jurors, Petra Celedon, Manual J. Estrada, and Mary Dolores Garcia, has not generated individual, specific argument by Carrera.  Evaluation of their voir dire responses along with the responses of Lawrence Martinez, Maria Carrillo, and Alice Hernandez nonetheless is made for

1    the sake of completeness.  The record evidence does not establish a strong likelihood the peremptory

2    strikes against any of these jurors were motivated by discriminatory purpose or group bias.

3        Petra Celedon.  Ms. Celedon's voir dire responses made it clear she did not want to serve on

4    Carrera's jury.  She had applied for a summer job as a special education aide beginning July through

5    August 1983 and she was currently working as a special education aide.  On general voir dire, the trial

6    judge noted that she seemed bitter about her presence on the venire.  Ms. Celedon explained that she had

7    her mind on her work with her special education students.  The record evidence does not show that the

8    peremptory strike against her was motivated by a discriminatory purpose.

9        Manuel J. Estrada.  Although Carrera has terminated his focus from the peremptory strike against

10   Mr. Estrada because he was Ms. Huffman's residential letter carrier, there are at least two additional

11   reasons that would have supported Mr. Vendraso's peremptory challenge on non-discriminatory grounds.

12   The first is that Mr. Estrada was friends with prospective and ultimately seated juror Antonio Chavez.

13   They knew each other because they were both letter carriers for the Post Office.  Second, Mr. Estrada

14   voiced some distrust as to the judicial system because of his belief that law enforcement personnel would

15   "stick together."  Even though he seemed satisfied that the cohesiveness of law enforcement officers

16   would not be an issue in this case, the distrust expressed reasonably would have given Mr. Vendrasco

17   cause to exercise a peremptory strike against him.  Ms. Huffman would not have been able to show a

18   strong likelihood of discriminatory purpose for this strike.

19       Mary Dolores Garcia.  Ms. Garcia initially told the trial judge that she could not vote for the

20   death penalty.  Although she finally admitted that there could be a case so vicious that she could vote

21   for the death penalty, her residual doubt on this issue was grounds for a peremptory challenge on non-

22   discriminatory grounds.

23       Lawrence Martinez.  Besides being questioned by both attorneys about his Hispanic heritage and

24   ability to be impartial, Mr. Martinez was questioned by both attorneys, about the potential burden to him

25   of having to drive from his home in Delano to Bakersfield every day.  The trial judge further elicited

26   from him that he currently was disabled.  Carrera correctly maintains that the nature of Mr. Martinez's

27   disability is no where described as in any way connected with his ability to make the estimated 30 mile

28   drive from Delano to Bakersfield or to sit in the jury box for lengthy periods of time.  Carrera argues that

1 if Mr. Martinez could sit in a car for a 25 (or 30) mile drive to and from court everyday, he could sit in

2 the jury box listening to testimony.   Nonetheless, the fact that the trial judge elicited Mr. Martinez's

3 current occupation as disabled from being a truck driver, lends support to the notion that the Warden

4 didn't "conjure up" potential a race-neutral reason for the peremptory strike.   And though Mr. Martinez

5 assured the lawyers he could make the drive from Delano to Bakersfield, and even knew three driving

6 routes between the two locations, the distance and traffic patterns could give rise to concern over daily

7 punctuality.   The offer of proof regarding Mr. Martinez does not satisfy the strong likelihood of

8 discriminatory purpose or group bias..

9        Maria Carrillo.   Although Ms. Carrillo was death qualified, Mr. Vendrasco's initial concern with

10 her was whether she was totally against the death penalty.   This indicates he may have had doubts about

11 her ability to vote in favor of the death penalty.   She also had some experience with the legal system

12 when her son, as a juvenile, was arrested for stealing.   She felt that drugs were involved and in fact had

13 confirmed to Mr. Vendrasco that she was against drugs.   From the questions posed to her, it is apparent

14 that Mr. Vendrasco was concerned about whether Ms. Carrillo would credit the testimony of witnesses,

15 like Teresa Fout and Miguel Santana, who used drugs.   Focusing on the perpetrators of the present crime,

16 himself and Ruiz, Carrera points out there is no real comparison with the problems Ms. Carrillo's son

17 encountered.   Carrera was 20 years old at the time of the crime and Ruiz was 17.   In contrast Ms.

18 Carrillo's son was only 13 or 14 at the time of his legal problems.   Carrera further points out that two

19 white jurors who had sons with similar problems were seated.   Lois Costello's son had previously had

20 a drug problem, and had been in state prison for drug related offenses.   RT-5: 744-47.   Zelda Roux

21 disclosed she had an adult son  who was recently released from county jail after violating an undisclosed

22 court order.   Id.: 749.   But these two jurors were not similarly situated.   Although Ms. Costello had a

23 son who had been in trouble with drugs, she did not indicate she was against drugs.   On questioning

24 from Ms. Huffman, she specifically stated she would not disregard testimony of witnesses who had used

25 drugs.   Id.: 746.   Further, she had a friend in the Bakersfield Police Department and a nephew in law

26 enforcement in the state of Colorado.   RT-5: 744, 745.   Ms. Carrillo had no such law enforcement

27 connections.   Ms. Roux's disclosure about her son had nothing to do with drugs.   The nature of the

28 violated court order was not disclosed at all. Because of Mr. Vendrasco's initial question to Ms. Carrillo

concerning her opposition to the death penalty and her opposition to drugs, his peremptory strike does not establish a strong likelihood of group bias. Rather, there was grounds for individual bias because of concerns over her position on the death penalty and reluctance to credit the testimony of witnesses who used drugs.

Alice Hernandez. Ms. Hernandez explained that she was employed by the Department of Probation as a group counselor housekeeper and that she worked at Kern County Juvenile Hall. Ms. Huffman elicited that she had contact with juveniles as part of her job working with detainees in housekeeping. She stated she was not familiar with Ramiro Ruiz and ordinarily only remembered a name if the juvenile presented problems. Notwithstanding her denial of familiarity with Ruiz, her statement that she only became aware of juveniles who caused problems prompted the Warden to disclose in his opposition points and authorities the fact that Ruiz caused a lot of problems in Juvenile Hall. Citing to *People v. Gonzales*, 186 Cal App. 3d 591 (1986), the Warden provides persuasive evidence. This case, concerning Ruiz (or Ruiz-Gonzales), details the many disciplinary problems Ruiz experienced in Juvenile Hall and the reason he was deemed unfit for commitment to the California Youth Authority. *Id*. at 594. Instead he was committed to state prison. Since Mr. Vendrasco was the prosecutor in Ruiz's case as well as Carrera's case, he would have been aware of Ruiz's discipline problems. If Ms. Hernandez hadn't previously heard of Ruiz, it is not unreasonable for Mr. Vendrasco to have supposed she was bound to hear of him sooner or later. Not wanting a juror who was familiar with a co-perpetrator's misconduct is not discriminatory. Far from evidencing group bias, it shows individual bias, which is entirely proper under *Wheeler*. Carrera argues that Ms. Hernandez was only a "maid" or a "janitor" not a counselor who had interaction with juvenile detainees. This characterization conflicts with her voir dire answers. She said she actually "worked] with detainees in housekeeping," even though she didn't actually counsel them. RT-6: 964. Carrera further questions why Ms. Hernandez's familiarity with Ruiz would make a difference with respect her serving as a juror on Carrera's jury, since Carrera was an adult. In pondering this question, Carrera fails to acknowledge his own arguments throughout this case that Ruiz was the actual killer and the instigator of the murders for which he and Carrera were convicted. The prosecutor would not want a juror who might be sympathetic to the defendant because of exposure to or knowledge about a particularly violent co-perpetrator (Ruiz).

Carrera has failed to sustain his burden that Ms. Huffman could have shown a strong likelihood of discriminatory purpose or group bias from Mr. Vendrasco's peremptory challenge as to Ms. Hernandez.

Carrera also points to Mr. Vendrasco's "affirmative action" objection as evidence of his overall discriminatory mind set. In making this argument, however, Carrera has failed to include the full content of the excerpt. As Mr. Vendrasco explained after further discussion with Ms. Huffman and the trial judge, his concern was that Ms. Huffman and possibly the trial court were going to insist on "exact proportionate numbers" even before Ms. Huffman had made a prima facie case of discrimination. He explained that so long as the observations about the number of Hispanics on the various jury panels demonstrated a general balance, he was satisfied the defense and the court were not imposing too onerous a burden on the prosecution. Additionally, the exchange about a general balance and the fact that Ms. Huffman had not made a prima facie case lends support to the notion that a primary concern among the attorneys and the trial judge was whether Hispanics were fairly, or at least minimally represented on the jury so as to defeat a prima face case under *Wheeler*. *See Boyde*, 167 Cal. App. 3d at 47; *Davis*, 189 Cal. App. 3d at 1191.

Finally, Carrera's argument that Mr. Vendrasco engaged in differential questioning of Hispanic prospective jurors is unpersuasive. First, it is incorrect to conclude that only Mr. Vendrasco asked Hispanic jurors ethnic specific questions. Excerpts from the voir transcripts demonstrate that eight of twelve Hispanic jurors[38] were asked by Ms. Huffman about the effect of their ethnicity on juror impartiality.[39] Nine were asked similar questions by Mr. Vendrasco.[40] Seven Hispanic jurors received

---

[38] Not counting Mr. Mara or Mr. Calaustro as Hispanic or reputedly Hispanic, but including Ms. Marilyn Torres, whose husband was Hispanic, the total number of jurors with Spanish surnames was twelve. Ms. Huffman posed the ethnicity/impartiality question to Antonio Chavez, Tony Nunez, Angelo Urrea, Lawrence Martinez, Marilyn Torres, Maria Carrillo, Mary Dolores Garcia, and Alice Hernandez. Ms. Huffman mentioned Ms. Celedon's Spanish accent and asked her about her ability to listen to translated testimony, but did not ask her about ethnicity and impartiality. Similarly, she asked Ms. Barbara Cota about her ability to speak Spanish and if she would commit to listen to the translated testimony rather than rely upon her own interpretation, but not about ethnicity and impartiality. She did not ask either Manuel J. Estrada or Alicia Torres Grijalva about ethnicity or impartiality.

[39] Ms. Huffman also asked one juror, Eugene Turner, if his minority status would affect his ability to be impartial.

[40] Mr. Vendrasco asked the ethnicity impartiality question of Manuel J. Estrada, Tony Nunez, Angelo Urrea, Lawrence Martinez, Marilyn Torres, Maria Carrillo, Barbara Cota, Mary Dolores Garcia, and Alice Hernandez. He did not pose the question to Antonio Chavez, Petra Celedon, or Alicia Torres Grijalva,

overlapping questions about ethnicity and impartiality from both attorneys.[41]   Second, Carrera's complaint that Mr. Vendrasco asked ethnic specific questions only to Hispanic jurors, and not to white jurors, is senseless.  Asking a white juror if his shared Hispanic heritage with Carrera could affect his impartiality would have called into question Mr. Vendrasco's grasp on reality.  Third, the record demonstrates that Ms. Huffman asked 13 white jurors as to whether they would have any problem or harbor any ill-feelings if testifying witnesses only spoke Spanish and needed an interpreter.[42]

It is clear that both the prosecution and the defense were concerned with ethnicity issues in this case.  Mr. Vendrasco's ethnic specific questions, like Ms. Huffman's ethnic specific questions were directed to sort out impartiality issues.  Given the controlling precedent in 1983, Ms. Huffman could not have sustained her burden to show a strong likelihood of discriminatory purpose or group bias then required by *Wheeler*, or a pattern and practice of discrimination under *Swain*.  Claim 20 is denied on the merits.  No further evidentiary development concerning Ms. Huffman's performance will be entertained.

**C.    Claim 85: that the Jurors Committed Misconduct, the Prosecutor Committed Misconduct, and Carrera's Trial Attorney Was Ineffective in Connection with the Jurors' Examination of Partially Unburned Corduroy Pants Material.**

Carrera complains that during jury deliberations, some of the jurors manually pulled apart pieces of partially burned (and melted together) clothing that was part of a trial exhibit they were given to examine.  In the process of pulling this burned bundle of material apart, they discovered some material consistent with the description of corduroy pants said to have been worn by Carrera on the night of the crime.  Carrera claims that by pulling open the bundle, and discovering corduroy pants material on the inside, the jurors placed him at the scene of the crime.  The jurors then informed the prosecutor they had done this disassembling of material, but failed to inform Ms. Huffman, or the trial judge.  The juror misconduct claim is derived from the fact that the jurors considered new, extrinsic evidence which had not been introduced at trial.  Alleged prosecution misconduct arises because Mr. Vendrasco became aware the jurors "tampered" with the evidence in this manner and informed neither Ms. Huffman nor

---

[41] They are: Tony Nunez, Angelo Urrea, Lawrence Martinez, Marilyn Torres, Maria Carrillo, Mary Dolores Garcia, and Alice Hernandez.

[42] Only one prospective juror, Bonnie Mangrum, responded that she would have a problem with Spanish-speaking witnesses and she was excused on Ms. Huffman's peremptory challenge.

the trial judge.  Ms. Huffman is alleged to be constitutionally ineffective because she failed to examine the burned clothing bundle or cause it to be examined by a forensic expert.  He contends, generally, that an evidentiary hearing "is warranted" on the points raised in his various briefs.

### 1.    Facts Relevant to the Discovery of the Partially Burned Corduroy Pants Material.

The pertinent facts are derived from proceedings at Carrera's trial, declarations appended to Carrera's state exhaustion petition, and declarations submitted with his evidentiary hearing motion.

### a.    Trial Proceedings.

The summary of facts from the trial proceeding covers percipient witness observations about what kind of pants and jacket Carrera was wearing, trial witness accounts of the burned bundle of material marked as Exhibit 186, and excerpts of the summation arguments of the trial attorneys.

### (1)    Percipient Witness Testimony About Carrera's Clothing.

Santana testified that on the night of the crime, Carrera was wearing brown corduroy pants.  RT-9: 791.  Other witnesses questioned about Carrera's clothing testified that he was wearing gray corduroy pants.  Patience Sherrill, RT-8: 443; Tina Harris, *id.*: 480, Efrain Carrera,  *id.*: 523; Maria Carrera Nunez, *id.*: 572; Teresa Fout, RT-9: 670; and Carrera, himself, RT-12: 1427.  After Carrera returned to the party at the residence of Santana's sister, Carmen Santana,[43] several witnesses (excluding Carrera's siblings), testified they observed a blood stain on Carrera's pants.  Patience Sherrill, RT-8: 443; Tina Harris, *id.*: 471, 479; Teresa Fout, RT-9: 669;[44] Miguel Santana, *id.*: 796-97.  In addition, although Carmen Santana testified she didn't remember what anyone was wearing and didn't recall seeing a bloodstain on Carrera's pants, her brother, Santana, testified she was the one who brought the fact of the bloodstain on Carrera's pants to his (Santana's) attention.  RT-10: 880.  Three witnesses also observed Carrera wearing a brown jacket with a fur collar before Ruiz and Carrera left the party, but not when they returned.  Efrain Carrera, RT-8: 526; Teresa Fout, RT-9: 670; Miguel Santana, *id.*: 794.

---

[43] Carmen Santana lived a short distance from the Imperial 400 Motel.

[44] Teresa observed the bloodstain on Carrera's left pant leg, while all the other witnesses who testified about a bloodstain observed it on his right pant leg.

1

### (2)    Exhibit 186.

Santana testified that the day after the crime, he, Ruiz, and Carrera drove into the desert to burn items Carrera and Ruiz had worn or used during the crime, including a brown jacket with fur collar, dishwashing gloves, brown corduroy pants, a knife, and a pair of tennis shoes. RT-10: 822. The jacket had a lot of blood stains on it. *Id.*: 823. These items, partially burned, were recovered by authorities after learning about where they were located from listening to a jail tape made of a visit Carrera had with family members and friends. RT-11: 1075. Mr. Vendrasco marked a brown paper bag containing a bundle of burned clothing as Exhibit 186. When shown to Miguel Santana, he identified the contents as the brown corduroy pants he, Carrera, and Ruiz burned in the desert the day after the crime. RT-10: 830. The criminalist described the contents of Exhibit 186 as tan corduroy material with some fleecing adhered to it. RT-11: 1194.

### (3)    Guilt Phase Summation Excerpts.

With respect to Carrera's clothing, Mr. Vendrasco emphasized that various witnesses observed blood on Carrera's pants and that he had been wearing a brown jacket before leaving the party at Carmen Santana's house (i.e., before the crime), but not upon returning to Carmen Santana's house (i.e., after the crime). RT-14: 1951. He reviewed also that both Ruiz and Carrera changed their pants on the trip from Mojave to Rosamond (when the party at Carmen Santana's house ended). *Id.*: 1953. Mr. Vendrasco did not emphasize the color of the pants Carrera had been wearing (whether gray or brown). Ms. Huffman, however, did emphasize inconsistent evidence about the color of pants Carrera wore. She vehemently argued Miguel's testimony should not be credited about Carrera having worn brown pants because every other witness to testify on the subject stated Carrera had been wearing gray pants. *Id.*: 2014, 2017. She concluded the only reason Santana said Carrera had been wearing brown pants was because there was brown corduroy material found at the evidence destruction site. *Id.*: 2032.

### b.    Declarations Attached to Carrera's State Exhaustion Petition.

Carrera relies on two juror declarations attached to his October 27, 1995 state exhaustion petition: one of Gregory Brouckaert and one of Antonio Chavez.

1                              **(1)      Declaration of Juror Gregory Brouckaert.**

2              In his April 2, 1995 declaration, Mr. Brouckaert reports that the charred clothing exhibit (Exhibit

3     186) appeared to be a jacket make of synthetic material that had melted from being burned.  He reports

4     he was the juror "who found" the mostly unburned corduroy material inside the partially burned bundle

5     when the jurors were inspecting the exhibit.  He states he "pulled apart some melted and sealed seams

6     on the exterior of the bundle and discovered the unburned corduroy pants material on the inside."  He

7     describes the deliberative process that he and the other jurors "concluded" the corduroy pants material

8     belonged to Carrera because he must have "burned his own clothing to cover up his participation in the

9     crimes."  Mr. Brouckaert reports that he told Mr. Vendrasco the jurors had found the mostly unburned

10    corduroy material in the bundle after the trial.[45]

11                             **(2)      Declaration of Juror Antonio Chavez.**

12             Mr. Chavez's declaration, executed on April 1, 1995, also was attached to Carrera's state

13    exhaustion petition fled October 27, 1995.  He reports that the jurors wanted to look at the burned

14    clothing to help them in the guilt deliberations.  "The burned clothing was partially melted and stuck

15    together in kind of one hardened mass."  Mr. Chavez "ripped a piece of this burned mass apart and

16    discovered a new piece of material stuck inside which was not burnt."  He reports that it "looked like

17    a small piece of the top part of a pair of corduroy pants."  Then describing the deliberative process he

18    reports the jurors "decided that this corduroy material belonged to Mr. Carrera, and that this meant that

19    Mr. Carrera burned his pants to cover up some participation he had in the crimes."

20                     **c.       Declarations Attached to Carrera's Evidentiary Hearing Motion.**

21             Appended to his evidentiary hearing motion are two additional declarations in support of Claim

22    85: a declaration of Juror Lois Costello and a declaration of federal habeas counsel, Mr. Bedrick.

23                             **(1)      Declaration of Lois Costello.**

24             Ms. Costello reports that while "some of the jurors" were opening and pulling apart the bundle

25    of burned material (Exhibit 186) and examining the corduroy cloth, the bailiff was in the jury room.  The

26    brown corduroy cloth looked to Ms. Costello "to be from a pair of brown corduroy pants."  She further

27    reports that the discovery of the corduroy cloth within the bundle convinced her and three other jurors

28    ──────────

[45] He doesn't clarify whether he meant after the guilt phase or after the penalty phase.

1   of Carrera's guilt.  The states there "was no evidence at trial that th[e] bundle of burned material

2   contained unburned corduroy pants material."  The bailiff did nothing to stop the jurors from examining

3   the interior of the burned clothing bundle.

### (2)    Mr. Bedrick's Declaration.

5   Mr. Bedrick discusses the condition of the bundled material comprising Exhibit 186 and an offer

6   of proof as to proposed testimony of *Strickland* expert Mr. Jinkerson.

### (a)    Condition of the Bundled Material.

8   Pursuant to authorization from this Court, Mr. Bedrick traveled to Bakersfield to inspect the

9   prosecution files for Carrera's case.  Although the Court did not authorize Mr. Bedrick to further inspect

10  Exhibit 186,[46] he did so on his own time and at his own expense.  He discovered a seven by two inch

11  fragment of material from what appeared to be the waist band of a part of brown corduroy pants inside

12  or as a part of the Exhibit 186 bundle of clothes..

### (b)    Offer of Proof on Mr. Jinkerson's Opinion Testimony.

14  Mr. Bedrick offers that Mr. Jinkerson will testify that Ms. Huffman rendered constitutionally

15  deficient representation by failing to investigate, examine, and open Exhibit 186.

### 2.    Carrera's Argument.

17  Although the prosecution criminalist testified that the tan corduroy material he observed in

18  Exhibit 186 might have come from either pants or a jacket, Carrera maintains that because the fabric had

19  fleecing attached to it, it is more likely it came from a jacket.  He contends that until Mr. Brouckaert,

20  Mr. Chavez and possibly other jurors pulled the bundled mass of partially burned material apart, the

21  jurors would not have had any reason to believe that Exhibit 186 contained corduroy pants.[47]

22  Carrera argues that in this case, the jurors' examination of physical evidence takes on the

23  character of considering extrinsic evidence and of tampering with evidence.  He argues his case is

---

[46] In fact in the Court's July 12, 2005 order, the Court denied Carrera's discovery request for the production of the piece of partially burned and partially unburned corduroy material that is part of Exhibit 186.  July 12, 2005 Ord., at pp. 6-7.

[47] In his argument, Carrera repeatedly refers to the bundle of partially burned clothing has having been cut open.  Mr. Brouckaert stated he "pulled apart" some melted and sealed seams on the exterior of the Exhibit 186 bundle.  Similarly Mr. Chavez stated he "ripped a piece of this burned mass apart." No one described any juror "cutting" into or "cutting open" the clothing bundle.

1   analogous with the facts in *Mancuso v. Olivarez*, 292 F.3d 939 (9th Cir. 2002), where he says the Ninth

2   Circuit found the jury had tampered with the evidence and committed misconduct.  He explains that in

3   *Mancuso*, the jurors during deliberations discovered a file number purposefully obscured by tape

4   underneath a photograph of the defendant, William Mancuso.  By virtue of this file number, one or more

5   of the jurors concluded that the defendant had a past criminal record.  While Carrera concedes that the

6   court ultimately found the misconduct harmless, he maintains that the reason for this harmlessness

7   finding in *Mancuso* cannot apply in his case.  A substantial basis for the harmlessness finding in the

8   *Mancuso* case was that the trial judge actually examined the extrinsic evidence the jury considered.

9   Since the misconduct in Carrera's case was never brought to the attention of the trial court, Carrera

10  argues the jurors' consideration of extrinsic evidence here cannot be considered harmless.  He suggests

11  the jurors' consideration of the corduroy pants material should be assessed by a standard somewhere in

12  between structural error and trial error because the evidence was never subjected to quantitative

13  assessment.  *See Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991).  He maintains pulling apart the

14  clothing bundle is the practical equivalent to tampering with evidence and at a minimum it is altering

15  evidence.  Citing *Jeffries v. Wood*, 114 F.3d 1484, 1490 (9th Cir. 1997), he claims the revelation of the

16  interior pants material in the Exhibit 186 bundle was not addressed in open court and thus deprived

17  Carrera of his rights to confrontation and cross examination.

18        The claim of prosecutorial misconduct is derived from Mr. Vendrasco's failure to disclose the

19  fact that the jurors had pulled the Exhibit 186 bundle apart.  He claims Mr. Vendrasco's omission in this

20  regard "so infected the trial with unfairness as to make the resultant conviction a denial of due process."

21  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637,

22  647-48 (1974)).

23        With respect to Ms. Huffman's alleged professional incompetence, he argues prejudice resulted

24  because if she had bothered to learn about the presence of an unburned fragment in the burned clothing

25  bundle she could have emphasized during cross examination that all but one testifying percipient witness

26  observed Carrera to be wearing gray rather than brown corduroy pants.  She also could have shown the

27  piece of the brown corduroy waist band to the percipient witnesses so they could testify that the pants

28  worn by Carrera on the night of the crime did not match the color of that waist band.  If Carrera was

1   wearing gray pants on the night of the crime, then the burned brown pants garment found in the desert

2   were not his and he didn't burn them to destroy evidence of his participation in the crime.   Under

3   *Strickland*, he argues, the result of the guilt proceedings would have been different but for Ms.

4   Huffman's professional incompetence.   *See*  466 U.S. at 694.

5               **3.       Analysis.**

6       The Court was first presented with Carrera's request to further develop Claim 85 in a funding

7   request, which was denied in a confidential budgeting order on February 3, 2005.   He rephrased his

8   request in a discovery motion, seeking examination of Exhibit 186 in support of his juror misconduct

9   and prosecutorial misconduct claims.   The Court denied discovery for this purpose on July 12, 2005

10  because the import of the juror misconduct and prosecutorial misconduct claims would be to cast doubt

11  on the already determined fact that Carrera *was* present at the scene of the crime where Mr. and Mrs.

12  Hayes were robbed and murdered.   Separate and apart from the prior finding of Carrera's presence at

13  the scene of the crime, the Court questioned whether evidence given to jurors to examine during

14  deliberations assumed the character of extraneous evidence when jurors actually and carefully examined

15  it.   July 12, 2005 Ord., at pp. 6 and 7.

16      Carrera's present reliance on *Mancuso*, 292 F.3d 939, does not alter the conclusion that juror

17  misconduct did not occur in this case.   First, Carrera's recitation of the facts of *Mancuso* is not quite

18  accurate.   In *Mancuso*, the jurors were exposed to two separate extrinsic factors.   First a detective

19  testifying for the prosecution referred to a "parole search" at Mancuso's apartment, despite an in limine

20  motion prohibiting introduction of evidence concerning Mancuso's prior felony convictions or parole

21  status.   *Id*. at 948, 950.   Second a juror "tampered" with an exhibit that was a booking photograph of

22  Stephen Christensen, who Mancuso claimed was the actual perpetrator, and who had been arrested for

23  the crime on the same day Mancuso was.   Christensen's booking photograph was admitted with the

24  booking number covered with tape.   *Id*. at 949, 951.   By removing the tape covering Christensen's

25  booking number and comparing that number with the exposed booking number of the photographic

26  exhibit admitted of Mancuso, the juror surmised that Mancuso had a felony record because his booking

27  number was lower than Christensen's number.   *Id*. at 951.   Information about Mancuso's prior criminal

28  record was clearly extrinsic evidence in that case, and the trial judge endeavored to keep the information

from the jury. *Id*. at 950-51.  Accordingly, a harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) became necessary. In Carrera's case, however, the composition of the articles that comprised Exhibit 186 was not extrinsic. While it surely would have been preferable for Mr. Vendrasco to have asked the criminalist to pull the bundled material apart and comment on the types of garments that comprised it and subjected him (the criminalist) to cross examination, the fact the criminalist was not asked to do so and was not subjected to cross examination does not change the character of the interior garments as relevant.   It also would have been preferable for Ms. Huffman to have examined the bundle or have hired an expert to examine it to determine its composition.  Had she done so, she would have discovered material consistent with corduroy pants within the exterior jacket-material. Despite the failings of both the prosecution and the defense in this regard, Carrera offers no theory as to how Ms. Huffman would have been able to exclude evidence of corduroy pants contained within the bundle of material admitted into evidence and examined by the jurors.  There is no basis to suppose the jurors wouldn't have received this evidence had the trial attorneys performed as Carrera claims they should have.

Since the interior of the Exhibit 186 clothing bundle is not properly considered extrinsic evidence, the analysis of how to determine prejudice for jury consideration of extraneous information is inapposite. *See Mancuso*, 292 F.3d at 951-52.  Carrera's independent argument that had Ms. Huffman discovered the brown pants material within Exhibit 186 she would have had an opportunity to cross examine witnesses about the color of Carrera's pants on the night of the crime, and even show the witnesses the brown corduroy fragment to elicit testimony that Carrera hadn't worn that color of pants remains unavailing.  The ultimate argument would have been that since Carrera was not wearing brown corduroy pants on the night of the crime, he had no reason to burn brown pants to exculpate himself. As the summary of the facts reflect, although Ms. Huffman did not cross examine witnesses extensively about the color of Carrera's pants, she did make a cogent argument during summation that Santana's testimony about Carrera having worn brown corduroy pants was unbelievable.  The jurors still were not convinced.  Using the brown corduroy fragment during cross examination would have been helpful, but it is not dispositve, especially given the emphasis Ms. Huffman placed on Santana's lack of trustworthiness in her summation.

More importantly, the probative effect of the brown corduroy pant fragment is to corroborate the prosecution theory and already determined fact that Carrera was present at the scene of the crime where Mr. and Mrs. Hayes were robbed and murdered. In both the June 22, 2000 and October 4, 2004 orders, the Court determined that Carrera was present. June 22, 2000 Ord., pp. 45-47, 51; October 4, 2004 Ord., pp. 60-63. This conclusion is fully supported by the record, including evidence about the shoes Carrera wore the night of the crime, bloody shoe prints at the crime scene, blood observed on Carrera's pants (of whatever color) after the crime, the fact that Carrera (and Ruiz) changed their clothes after the crime, and Carrera's recitation of the events of the crime to Miguel Santana and Teresa Fout. The presence of corduroy material said to have been the fabric of pants worn by Carrera on the night of the crime was, at best, cumulative. To the extent that Juror Brouckaert, Juror Chavez, and Juror Costello aver that the discovery of the corduroy pant material affected their deliberative process, their declarations are inadmissible in these federal proceedings. Fed.R.Evid., Rule 606(b). Claim 85 is denied on the merits. Carrera's request for an evidentiary hearing on this claim is denied.

### D.    Claim 87: that Juror Misconduct Deprived Carrera of his Sixth Amendment Right to an Impartial Jury and Fourteenth Amendment Right to Due Process.

In Claim 87, Carrera mounts a three-sided attack on the robbery and murder verdicts. First he complains that one of his jurors prejudged guilt before guilt phase deliberations occurred. Second, he challenges the verdict because a courtroom bailiff commented to the same or another juror that Carrera was an escape risk. Third, the same or another juror allegedly reported during deliberations to the rest of the jurors that she had seen Carrera in shackles in the hallway outside the courtroom. He claims an evidentiary hearing generally is warranted to further develop these issues.

### 1.    Facts Relevant to Juror Misconduct Concerning Pre-Judgment and Shackling.

Juror Antonio Chavez's April 1, 1995 declaration provides the most support for the challenges in Claim 87. As further support, Carrera submits his own declaration executed on September 1, 2005 and appended to the evidentiary hearing motion. Also relevant are record excerpts concerning a court-initiated inquiry into an incident where jurors reportedly saw Carrera in shackles in the courthouse hallway and actual testimony about a pre-trial escape attempt in which Carrera participated. Finally, the

Court's February 3, 2005 order granting Carrera funding to further investigate and develop evidence for Claim 87 is relevant to the resolution of the claim.

### a.     Antonio Chavez's Declaration (Second Reference).

Mr. Chavez reports that before guilt phase deliberations, a female juror told him she believed Carrera had looked at her "with some kind of attitude," that this angered her and she would get back at him.  She further told Mr. Chavez that she had "already made up her mind" that Carrera was guilty. Next, he reports that "at the end of guilt phase deliberations"[48] a new bailiff stationed outside of the jury room was asked by one of the jurors why there were so many additional security personnel attending to Carrera's trial.  The bailiff responded that Carrera was a "rabbit" who may try to escape again.  Finally, during guilt phase deliberations a female juror told the rest of the assembled jurors that she had seen Carrera in the hallway in shackles and that the trial judge had questioned her about what she had seen. During the questioning by the judge, this female juror reported she became "very concerned" there may have to be a new trial because of what she saw.  She reported that after her session with the trial judge, he did not order a new trial.  Mr. Chavez does not identify the jurors who made the statements he relayed.  It is unclear whether there were three separate juror declarants, two declarants, or only one declarant.

### b.     Carrera's 2005 Declaration.

Carrera recalls the day during his trial when two female jurors saw him in shackles as he was being escorted into the courthouse hallway during lunch break.  This incident occurred shortly before the jury was excused to deliberate the guilt phase issues.  Although the customary procedure was for the deputies to wait to shackle and escort Carrera until the jurors had departed, on this day the two female jurors mentioned passed by Carrera in the hallway.  Carrera's restraints consisted of handcuffs attached to a waist chain and leg cuffs attached by a chain.  The restraints were clearly visible to the passing female jurors.

---

[48] It's not clear whether this means after the guilt verdict had been rendered.

1          **c.      Trial Court Inquiry into Incident Where Jurors Reportedly Saw**

2                 **Carrera in Shackles.**

3          Two jurors who passed Carrera in the courthouse hallway while he was in shackles are identified

4   as Zelda Roux and Frances Taylor.  RT-13: 1905-06; RT-14: 1937.  When questioned by the trial judge,

5   Juror Roux stated that she saw Carrera being escorted out of the courtroom, but that he was behind the

6   prosecutor and in front of a female bailiff.  She told the trial judge she did not see shackles.  RT-13:

7   1909-10.  Juror Taylor similarly denied observing Carrera in shackles when the trial judge questioned

8   her.  RT-14: 1937-38.

9          **d.      Evidence Introduced and Argument Made at Trial Regarding**

10                **Carrera's Pre-Trial Escape Attempt.**

11         Two Kern County sheriff's deputies were called to testify about Carrera's jail escape on April

12  23, 1983.  First, Deputy Sheriff Milton Grimes, who worked as a guard at the jail, testified that on the

13  night in question, at about 11:50 p.m., he conducted a "deck check" and heard a noise.  In the location

14  where the noise had sounded, Deputy Grimes observed a hole in the outside wall of a cell.  RT-11: 1148.

15  Seven inmates had escaped, including Carrera.  Bars had been cut and removed with a hacksaw blade.

16  *Id*.: 1149.  A 29-foot rope used by the inmates to leave the jail had been made out of bed sheets.  *Id*.:

17  1151.  The part of the wall missing was made out of 18 inch thick, nine inch square glass blocks.  Two

18  blocks were missing.  *Id*.: 1157.

19         Next, Deputy Sheriff Kenneth Eddy, who was working patrol on the night of April 23-24, 1983,

20  testified.  After receiving a broadcast that an escape from the jail had occurred, he and his partner went

21  to Bakersfield High School.  *Id*.: 1161.  Two men wearing jail coveralls were apprehended.  They

22  crawled out of the bushes.  *Id*.: 1162.  Carrera was one of them.  1163.  He was injured in that most of

23  the palm of his hands and fingers were bleeding.  *Id*.: 1164.  The site of the capture was approximately

24  five blocks from the jail.  *Id*.: 1165.[49]  During Mr. Vendrasco's guilt phase summation, he argued that

25

26  ─────────────────

27        [49] Charges were brought against Carrera for his jail escape.  After the preliminary examination
    hearing on the escape charge, trial was set, but twice continued until October 7, 1983, which was the
28  same day Carrera's motion for new trial and modification of the death sentence in the Hayes murder case
    was heard.  The jail escape trial was to be heard by the same judge presiding over the capital trial.
    Ultimately, the trial court dismissed the jail escape charges "in the interests of justice."  CT-6: 62.

Carrera's escape attempt demonstrated his consciousness of guilt for crimes against Mr. and Mrs. Hayes. RT-14: 1953.

### e. Order Granting Carrera Investigative Funds to Further Develop Claim 87.

In the February 3, 2005 funding order, the Court authorized Carrera investigative funds to develop all three challenges alleged in Claim 87. The Court found Carrera established a sufficient foundation for re-interviewing Juror Chavez, and making contact with Juror Roux, as well as Juror Taylor. Sixty hours investigative funds for Carrera's investigator to contact these jurors, as well as other jurors, was approved.

### 2. Carrera's Argument.

With respect to the juror who allegedly pre-judged Carrera's guilt (because she didn't like the way he looked at her), he cites to *Green v. White*, 232 F.3d 671, 678 (9th Cir. 2000), for the proposition that juror pre-judging constitutes prejudicial misconduct. He relies on *Dickson v. Sullivan*, 849 F.2d 403, 408 (9th Cir. 1988), for the proposition that a bailiff's improper comment to a juror about a defendant's past bad conduct cannot be considered harmless. Even though the jury ultimately learned during trial proceedings that Carrera had tried to escape from jail, he argues that the reinforcement of the perception of his dangerousness by authorities likely would have influenced the jurors on the issue of guilt. Finally, he relies on *Deck v. Missouri*, 544 U.S. 622, 624 (2005), for the proposition that the Constitution forbids the use of visible shackles unless there it "is justified by an essential state interest."

### 3. Analysis.

Finding the declaration of Mr. Chavez sufficient to authorize further investigation, the Court gave Carrera the opportunity and monetary means to further develop the facts presented in Claim 87. While the hearsay testimony of Mr. Chavez was grounds to prompt the Court to authorize investigative funds, it is not sufficient to establish the ultimate facts necessary to prove Carrera's claims. The Court does not discount that " bias or prejudice of even a single juror" violates a criminal defendant's "right to a fair trial." *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc). Nor does the Court dispute that actual juror bias "is sufficient to taint an entire trial," *Green*, 232 F.3d at 676, and that the presence of juror bias is a structural error not subject to harmless error analysis. *Dyer*, 151 F.3d at 973,

n. 2 (quoting *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977); *see Brecht*, 507 U.S. at 629

(structural errors infect the integrity of the entire trial process).  Similarly, with respect to extrinsic

evidence, the Court follows the precept that once it is determined that the jury was, in fact, exposed to

extrinsic evidence, the issue to be decided is whether that exposure had a "substantial and injurious

effect or influence in determining the jury's verdict." *Mancuso*, 292 F.3d at 949 (quoting *Brecht*, 507

U.S. at 637).  In this case, however, except for the fact that Carrera was in the courthouse hallway in

shackles at the same time two female jurors were in the hallway, the material underlying facts of Claim

87 remain unestablished and no specific offer of proof is presented.  With respect to the shackling claim,

only some of the underlying facts are supported.  The Court can only conclude from this that despite the

investigative authorization, Carrera was not able to learn the identities (or identity) of the jurors (or

juror) who related the information to Mr. Chavez forming the basis of Carrera's claim.

Four facts pertinent to the shackling issue are presented: (1) two female jurors, presumably Ms.

Roux and Ms. Taylor, were in the courthouse hallway while Carrera, in shackles, was being escorted by

sheriff's deputies; (2) Carrera specifically recalls that when he and the deputies passed these jurors, his

restraints were clearly visible; (3) both Ms. Roux and Ms. Taylor denied seeing Carrera's restraints when

questioned by the trial court; and (4) one of these ladies is said to have admitted to the other jurors she

had seen Carrera in shackles, but apparently she didn't want to derail the entire trial proceedings, so she

misrepresented what she had seen to the trial judge.   Notwithstanding these facts, Carrera has not

corroborated Mr. Chavez's hearsay declaration as to the identity of the juror who relayed seeing Carrera

in shackles to the other jurors and he has not established that the topic of Carrera's shackles was

discussed by the jurors during deliberations. *See Mancuso*, 292 F.3d at 951-52 (holding that the extent

to which jury discussed and considered extrinsic evidence is a factor to be considered in determining

prejudice).  More importantly, Carrera was not restrained by visible shackles during trial proceedings

in the courtroom.  This fact distinguishes Carrera's case from *Deck*,  where the defendant, Carman Deck,

was kept in visible, physical restraints throughout the entirety of his sentencing re-trial. 544 U.S. at 625.

*Deck* is further distinguishable because in that case the trial judge kept Deck restrained for the simple

reason that he had been convicted of capital crime, *id.*,[50] whereas Carrera actually had escaped from jail and authorities clearly had an "essential state interest" to keep him from escaping again.

The Warden relies on *Ghent v. Woodford*, 279 F.3d 1121, 1133 (9th Cir. 2002), for the proposition that brief, infrequent glimpses of a defendant in shackles outside the courtroom does not establish prejudice. *Ghent* is persuasive. In that case the Ninth Circuit found a preponderance of evidence supported the finding that *all* of the jurors saw the defendant, David Ghent, at the courtroom entrance in handcuffs and other restraints on *some occasions* during the trial. *Id.* These observations by all the jurors, however, was "not inherently or presumptively prejudicial." *Id.* The same conclusion must obtain as to Carrera. In light of the single sighting of Carrera in shackles, even coupled with disclosure of that sighting to all the other jurors, and the clear justification for authorities to escort Carrera in physical restraints to and from the courtroom, the shackling claim fails for lack of prejudice.

The alleged prejudice from Mr. Chavez's report that another juror was told by a bailiff that Carrera was an escape risk similarly must fail. Besides the obvious failure of proof from Mr. Chavez's hearsay declaration and failure to identify the juror who spoke to the bailiff about Carrera's security risk status, the fact remains that Carrera was a security risk. Evidence of this clearly was disclosed at trial. There is no grounds to suppose that the evidence presented about Carrera's jail escape was improper or inadmissible.

Finally, the juror pre-judging portion of Claim 87 (because she did not like the way Carrera looked at her) cannot be sustained. While the Court has no reason to doubt Mr. Chavez's veracity, his report of statements made by an unidentified fellow juror is simply insufficient under the Federal Rules of Evidence to establish the ultimate facts necessary in support of the claim. The fact that Carrera was given authorization to further his development of the claim, and still came up with no additional evidence (other than Carrera's declaration on the shackling issue) demonstrates to the Court's satisfaction that no additional evidence can be developed.

Claim 87 is denied on the merits. Carrera's motion for an evidentiary hearing regarding Claim 87 is denied.

---

[50] He also had been previously sentenced to death, but the death sentence had been set aside. 544 U.S. at 624-25.

**E.      Claims 88 and 89: that Carrera's Trial Attorney was Ineffective for Failure to Present a Mental Defense at Guilt Proceedings.**

In Claim 88, Carrera claims Ms. Huffman unreasonably failed to conduct an adequate investigation into his mental health and social background with the result being that no mental health experts were presented during the guilt phase proceedings and incomplete, inadequate mental state evidence was presented during penalty proceedings. He claims that historical evidence was available and would have provided a factual basis for "possibly" presenting a mental state defense. Petition, ¶ 157(c). Specifically (with respect to guilt phase proceedings), a mental state defense would have negated Carrera's "intent to kill." *Id*.: ¶ 157(f). He claims the mental health expert that Ms. Huffman did retain, Sidney Cohen, M.D., did not offer mental state evidence until after Carrera had been convicted of capital murder, but could have and should have testified on Carrera's lack of intent to kill. *Id*.: ¶ 157(j). In Claim 89, Carrera contends Dr. Cohen rendered ineffective psychiatric assistance in violation of *Ake v. Oklahoma*, 470 U.S. 68, because he failed to conduct an adequate interview in advance of his testimony and covered only the possible effects of LSD on a hypothetical person's mind but did not actually reach any conclusions about Carrera's mental state or the fact that LSD would have had a profound impact on him because of his compromised brain function and other mental impairments. *Id*.: ¶ 158(c), (d), (g).

Since the issuance of the October 4, 2004 order, and instructions to limit briefing to first degree robbery felony murder, Carrera has modified the argument for Claims 88 and 89. He now claims that if Ms. Huffman had conducted a reasonable investigation and provided adequate information to mental health experts, she could have presented a mental state defense to Carrera's intent to rob. He maintains that the combined impact of LSD, marijuana, and alcohol, together with his compromised brain function and small size rendered him so suggestible to directions from co-perpetrator Ramiro Ruiz that he didn't know what he was doing. He further claims Ms. Huffman was incompetent for pursuing an alibi defense at guilt proceedings rather than a mental state defense. The evidentiary hearing request is focused on developing expert testimony about Ms. Huffman's alleged professional incompetence for not investigating and developing a mental state defense. Carrera also seeks to present evidence of prejudice.

1   With respect to Claim 89, he no longer argues that Dr. Cohen's alleged incompetent mental health

2   examination amounts to a constitutional violation.[51]

3         **1.      Facts Relevant to the Availability of a  Mental State Defense.**

4         Carrera points to the testimony Dr. Cohen gave during penalty proceedings is the kind of

5   evidence that could have been presented at guilt proceedings to support a mental state defense.   The

6   factual basis for Dr. Cohen's opinions about the effect of LSD was taken from the testimony of a number

7   of lay witnesses, including Carrera, during guilt phase proceedings.   Through post-conviction

8   investigation, Carrera has developed additional mental state evidence.   In particular, he hired psychiatrist

9   Carlos Martinez, M.D. and neuropsychologist Karen Froming, Ph.D. to assess his social history and

10  organic impairments.   On August 25, 1995, Dr. Martinez executed a comprehensive 83-page declaration

11  chronicling Carrera's personal and family background.   On August 31, 1995, Dr. Froming executed a

12  22-page declaration also reviewing Carrera's family history, and, in addition, explaining the results of

13  the many psychological tests she administered during her examination.   Both Dr. Martinez's and Dr.

14  Froming's 1995 declarations are informed by the declaration testimony of 29 lay witnesses about

15  Carrera's social and family history.   All of these declarations are appended to Carrera's October 27, 1995

16  state exhaustion petition.   Dr. Froming executed a second declaration describing a potential mental state

17  defense on September 14, 2005 (and submitted with Carrera's evidentiary hearing motion).   On the

18  Warden's side, Ms. Huffman's July 11, 1996 declaration appended to the State of California's informal

19  reply to Carrera's October 27, 1995 state exhaustion habeas petition specifically addresses her trial

20  strategy with respect to a mental state defense.   Her professional opinion is, in part, informed by the

21  jailhouse tape recordings between Carrera and visitors on April 14, 1982, before Ms. Huffman's

22  appointment, and also by jailhouse "kites" or notes passed by Carrera to other inmates.   Finally, Mr.

23  Bedrick's October 13, 2005 declaration describes the offer of proof of Carrera's *Strickland* expert

24  Guyton Jinkerson on the issue of Ms. Huffman's failure to investigate and present a mental state defense.

25

26         [51] The Court considers this argument abandoned.   The claim also is non-cognizable. *Ake* stands
for the proposition that a criminal defendant who demonstrates his sanity at the time of the offense is
27  likely to be a significant factor in determining guilt is constitutionally entitled to the assistance of a
psychiatrist at state expense.  *Id.* at 83.   Analyzing this decision, the Ninth Circuit has found that *Ake*
28  does not permit a challenge to the adequacy of psychiatric expert assistance.  *Harris v. Vasquez*, 949
F.2d 1497, 1517-18 (9th Cir. 1990).

1    **a.    Trial Testimony Regarding Carrera's Use of Alcohol and Drugs.**

2    Lay witness testimony about Carrera's use of LSD, alcohol, and marijuana on the night of the

3    crime was elicited from Carrera's brother, Efrain, his sister, Maria, Teresa Fout, Santana, and Carrera

4    himself.  Efrain testified he saw Ruiz and Carrera smoking marijuana and drinking beer on the night of

5    the crime.  RT-8: 547.  Efrain also saw Ruiz, Carrera, and Santana using "acid" (LSD) on that night.

6    *Id*.: 550.  Maria testified that marijuana was been used by Santana, Ruiz, Carrera, and Efrain Carrera,

7    and that everyone at the party was drinking beer.  *Id*.: 567.  Teresa testified that Ruiz appeared to be high

8    on acid.  RT-9: 699.  At about 4 to 5 p.m. in the afternoon before the crimes, Santana observed Ruiz and

9    Carrera each take a "half hit of acid."  He (Santana) did as well, but earlier in the day.  RT-10: 812.

10   Santana didn't experience any effect from the drug.  *Id*.  He also did not observe any effect in the

11   appearance or behavior of Ruiz or Carrera.  *Id*.: 813.  Santana, Carrera, and Ruiz had been drinking and

12   smoking "pot" (marijuana).  *Id*.: 845.  Carrera testified that he borrowed $10 in food stamps from his

13   sister, Maria, for the purpose of purchasing acid.  RT-12: 1412-13.  He stated the he, along with Ruiz,

14   Santana, and his brother Efrain all used acid on the afternoon of the crime, then drank beer and used

15   marijuana.  *Id*.: 1418-18, 1421.  According to his own testimony, the LSD Carrera ingested had little or

16   no effect on him.  He didn't hallucinate; he just "got the effect of tenseness."  *Id*.: 1484.  He consumed

17   LSD, marijuana, and 2 1/2 to 3 six-packs of beer, but none of this affected his memory.  *Id*.: 1485.

18   Dr. Cohen testified that LSD can make a person very suggestive, and even more so when LSD

19   is combined with beer and marijuana.  The combination of these substances can cause a subject to lose

20   decision-making ability.  RT-15: 54-56.  LSD often makes a person paranoid so that he might believe

21   he is under attack when he is not.  *Id*.: 58.  LSD intoxication also could make it difficult for one to

22   understand the nature and consequences of behavior.  *Id*.: 60.  LSD has a more powerful effect on a

23   small person, like Carrera.[52]  *Id*.: 70.  On cross examination, Mr. Vendrasco elicited from Dr. Cohen that

24   he (Dr. Cohen) was aware substances sold on the street and represented to be LSD might be substantially

25   diluted.  Consistent with Carrera's testimony, Dr. Cohen confirmed that LSD intoxication can be

26   accompanied by a sense of tenseness in the subject.  *Id*.: 61.  Dr. Cohen agreed, however, that if the

27   subject reports that he was not affected by ingested LSD he (Dr. Cohen) would "respect his subjective

28

---

[52] It is undisputed that Carrera was 5' 4" tall and weighed 130 lbs at the time of his arrest.

evaluation." *Id*.: 64.  On (re-)cross examination Dr. Cohen also described that a person under the influence of LSD would have his judgment "in abeyance so that he would just accept what the other person suggested." *Id*.: 74-75.

### b.    Mental Health Expert Declarations.

Since Dr. Martinez was a medical doctor practicing psychiatric medicine, he offered multiple diagnoses of Carrera's organic, mental, and psychological impairments at the time of the crime in addition to providing a comprehensive social history.[53]  Both Dr. Martinez and Dr. Froming describe the abject poverty in Carrera's childhood, beginning in his birth place, Corrales, Mexico, and continuing to the Mojave Desert in California.  A recurring problem for Carrera's immediate family was lack of food and resulting malnutrition among the children.  The experts suggest that Carrera's compromised brain function may have its origins in lack of proper nutrition, both prenatal and postnatal as well as through early childhood.

The family history of Carrera's father, in particular, is punctuated by alcoholism and mental illness, resulting in disturbing violence and just plain sadness.  The experts describe in great detail the horrible violence suffered by Carrera and his mother at the hands of his father.  According to accounts relayed by the experts, Carrera's mother was beaten by her husband (Carrera's father) and mother-in-law (Carrera's grandmother) when she was pregnant with Carrera.  The experts suggest Carrera may have suffered brain damage in utero as the result of these beatings.  Carrera's mother also suffered a miscarriage later on, when Carrera was a little boy and had two younger siblings, due to the severity of a beating her husband and mother-in-law inflicted.  Carrera himself was subjected to all manner of beatings by his father, from fists, to dampened leather belts, to boards.  In addition, Carrera's father tried to hang young Carrera from a tree, and on more than one occasion struck him with or threw at him bottles which broke on his face.  Through all of this, Carrera, as the oldest child in his family, tried to assume the roles of caretaker of his father and protector of his mother and younger siblings, roles he never could master.  Complicating the abuse and dysfunction of Carrera's family was the fact that the family immigrated from Mexico and had to suffer relentless discrimination in the new Mojave Desert

---

[53] Carrera reports that Dr. Martinez is deceased.

home.  Due to lack of resources, coupled with this pervasive discrimination, Carrera never fully assimilated into the culture of his new home.

The experts also document that Carrera was exposed to neurotoxins as a child, by second-hand exposure to his father (who worked recovering metal from railway cars) and living in the vicinity of his father's polluted work place.  Separately, Carrera was personally exposed to toxic chemicals as a farm worker in the presence pesticides and when he worked for a mining company using solvents to recover precious metals from discarded computers.

Dr. Martinez found that Carrera suffered from severe depression due to his ineffectual helplessness at trying to control his environment and dysfunctional family.  Within a year before the crime, two additional stressors were inflicted on Carrera.  First, Carrera's girlfriend, who became pregnant with his child and who he desperately wanted to marry, moved away and deprived Carrera of his greatest hope of being a successful family man.  When the girlfriend came back to Kern County and permitted Carrera to visit with his daughter, Carrera had hoped she would stay, but she did not, and his hopes were dashed again.  Second, a close friend and mentor of Carrera's was killed in a farm accident.  Both of these events led Carrera to increase his alcohol intake and resort to drugs, including marijuana and PCP.  Then, as Dr. Martinez described it, Carrera "was convinced to try LSD for the first time around April 1, 1982" because marijuana was in short supply and Carrera used drugs to self-medicate himself in order to assuage his depression.  Dr. Martinez portrayed Carrera as a young man who exercised little will to resist the suggestions of others, at least regarding the drugs he used. Despite having a frightening experience with LSD following his first usage of the drug, Carrera ingested LSD a second time on April 7, 1982, just before the robbery-murders of Mr. and Mrs. Hayes.

Dr. Martinez also discusses Carrera's co-perpetrator, Ramiro Ruiz.  Ruiz, a boy the family hardly knew, was invited by Carrera's father to come live in his apartment (along with Carrera, a younger brother, and a cousin).  Ruiz, however, and according to the expert accounts, unlike Carrera, was a gang-member type.  He was very tough and purposefully tried to scare acquaintances through threats and with knives he carried around with him.

In her 2005 declaration, Dr. Froming reiterates that the psychological testing she conducted on Carrera  revealed organic brain impairments strongly supporting the conclusion that he has left frontal-

basal ganglia dysfunction.  She continues that this finding suggests cerebral impairment and the possibility of a lateralized lesion.  In addition, she states that Carrera suffers from a severe motor disorder and a moderately severe attention and memory disorder affecting his behavior and cognition. Drawing on Dr. Martinez's assessment of Ruiz together with Dr. Cohen' penalty phase testimony about the impact LSD can have on a person of Carrera's size who has ingested marijuana and alcohol, Dr. Froming opines that Carrera could have accompanied Ruiz to the Imperial 400 Motel, at Ruiz's suggestion or direction, without the personal intent to commit robbery.  The combination of his pre-existing mental impairments, drugs and alcohol further could have caused him to follow Ruiz's instructions all without the personal intent to commit robbery.

### c.   Lay Witness Declarations.

There are three categories of lay witness declarations: (1) family members; (2) neighbors/ friends; and (3) educators at Mojave Elementary School in the 1960's and 1970's.  The family member declarations reveal three facts pertinent to Carrera's social history.  First, life in the Mexican town of Corrales, Durango, where Carrera was born, was miserable for residents who owned no land.  Food supplies, living accommodations, and basic medical care were inadequate.  Carrera was born on August 29, 1961, and moved to Mojave, California in 1963.  Second, relatives describe a history of depression and alcoholism, particularly on the paternal side, of Carrera's family.  Carrera's paternal grandfather is described by many relatives as unusual and sad, who drank excessively to escape his troubles.  Carrera's father, Miguel Carrera, also drank excessively, but when he drank, he was violent and abusive.  Carrera's mother, Maria Elena, also had a very sad existence, having been raised in poverty and suffered the death of her father at a young age and the abandonment by her mother when she was a young teenager, when her mother (Carrera's maternal grandmother) remarried.  Third, growing up in Mojave with an abusive alcoholic father in the face of continued extreme poverty, poor living conditions, lack of educational opportunities, and discrimination was incredibly difficult.  Carrera's mother, siblings, and other family members recount episodes of unbelievable violence perpetrated on Carrera and Carrera's mother by his father, Miguel Carrera, all consistent with the descriptions given my Dr. Martinez in his lengthy social history declaration.

1   The friends and neighbors also described Miguel Carrera's violent and regular drunkenness as

2   well as the fact that both of Carrera's parents worked extremely diligently during their marriage to make

3   a living for their four children.   Nearly all the percipient witnesses who described Miguel Carrera,

4   including Maria Elena (Carrera's mother), averred that he was a good man who tried to provide for his

5   family.   The home life was certainly conflicted between love and duty on one hand and fear and violence

6   on the other.   Finally, the educators all associated with Carrera's grammar school, two school teachers,

7   a music teacher, a school nurse, a principal, and an ESL instructor, all describe how nearly impossible

8   it was for Spanish-only-speaking children in Carrera's generation to succeed in school with so little

9   assistance in learning English.   One teacher expressed frustration she experienced at the time when

10  Mexican and/or Mexican-American children would converse with each her solely in Spanish, a language

11  she could not understand.   The impression from these declarations is that the learning environment was

12  less than inviting and at times hostile to children in Carrera's age group.   A listing of the declarations

13  is provided in the Appendix to this order.

### d.   Summary of Jailhouse Tape Recordings.

15  On April 14, 1982, one day prior to Carrera's arraignment, two separate audio tape recordings

16  were made of conversations at the jail he had with visiting friends and family members.   These

17  recordings eventually were admitted into evidence during guilt phase proceedings.   CT-2: 279; RT-2:

18  76.[54]   Transcripts of the tapes, translated into English, were marked Exhibit 216 and Exhibit 217, and

19  read for the jury by a Spanish-English interpreter.   RT-11: 1331-35.   The reading was not transcribed,

20  but the transcript exhibits are part of the record.   CT-5: 34-51 (Exhibit 216); CT-5: 52-65 (Exhibit 217).

### (1)   Summary of Exhibit 216.

22  Carrera's sister, Maria, was the first person recorded.   She and Carrera discussed what she should

23  tell authorities.   He informed her that he told authorities he bathed at her (Maria's) house on the night

24  of the crime because he went to bed with Tina (Harris).[55]   He related that he was mad at "Mike"

---

[54] Ms. Huffman moved to suppress the jailhouse tape recordings as a infringement of Carrera's privacy rights under *DeLancie v. Superior Court*, 31 Cal. 3d 865.   Her motion was denied since *DeLancie* was decided after the tape recordings were made and the decision was found to be non-retroactive. *See* CT-1: 166; CT-1: 166; CT-2: 31.

[55] This was part of Carrera's alibi – that he was having sex with Tina Harris, rather than participating in the robbery with Ruiz.   Tina Harris was 12 years old at the time.

(Santana) because Santana was the one who "put the finger" on him (Carrera).  He instructed Maria to bring "the girls" (possibly Tina and Sherry Harris) to where Santana was "and have them come to an agreement in what to say."  Further Maria was to tell Santana that he (Santana) didn't see anything and that the only thing Carrera talked to Santana about was work.  CT-5: 35.  Next, Carmen Santana was on the telephone with Carrera.  He repeated the instructions to Carmen that she should tell her brother Miguel Santana the only thing he (Santana) and Carrera talked about was work.  *Id.*: 36. Carmen asked Carrera if he left "any proof," and Carrera replied that he did not.   He instructed Carmen to tell authorities he didn't go out on the night of the crime, but stayed at her house to watch the children (Carmen's children and Maria's children) while Carmen (and Maria) went to the arcade.  *Id.*: 37A.  His brother Armando was next to speak with him.  Their conversation focused on shoe prints left at the crime scene.  *Id.*: 38-39.  Carrera assured Armando that the authorities didn't "have proofs."  *Id.*: 40. He said to Armando that "they" (possibly the authorities) were going to blame it (the crime) on Teresa because she took acid and was very crazy (intoxicated) the night of the crime.  Cursing, Carrera lamented that Ruiz purchased new tennis shoes after the crime and that this fact presented a "complication."  *Id.*: 42.  He told Armando to tell authorities he (Armando) obtained LSD from a female hitchhiker.  *Id.*: 44. Carrera then spoke with Maria again, reminding her to tell authorities he (Carrera) came to her (Maria's) house, that they were drinking, that he borrowed ten dollars or food stamps to purchase tv dinners, and then that Maria and Carmen left for the arcade, leaving their children in the care of Carrera, and that when they returned at 10 p.m., he was still at Maria's house (or Carmen's house). He added that Maria and Carmen should tell authorities Carrera wanted to go out too, but he was too intoxicated on acid.  *Id.*: 45. Maria related that Teresa told authorities Carrera was stained with blood, and Carrera responded that the authorities didn't have any proof of this because they couldn't find anything.  *Id.*: 45-46.  Maria also related that Ruiz had his pants at home and washed them, but the blood stain did not come out.  Carrera told Maria she was to blame Ruiz and Teresa or just Ruiz for the crime.  *Id.*: 46  Maria stated Teresa told authorities that the old man (Mr. Hayes) was hit on the head with a battery Ruiz and Carrera stole.  *Id.*: 46-47.   Carrera then commented that the battery was going to be useful to show that Teresa was hallucinating because of the acid she took.  Carrera instructed that the visiting friends/ family members were to say that Armando gave Teresa the acid.  *Id.*: 47-48.  Armando then confirmed the plan to tell

authorities he gave Teresa acid.  Carrera instructed both Armando and Maria to tell authorities they wouldn't lie for their brother.  Carmen was to be instructed likewise.  *Id.*: 48.  Carrera told Maria to tell Sherry and Tina Harris also to confirm that Teresa had taken acid and that Carrera didn't leave Carmen's house.  With respect to Ruiz, he told Maria: "Let Ramiro find out on his own, I told him to lighten up and he doesn't lighten up, well, that is up to him."  He stated his (Carrera's) footprints wouldn't be found and that the only proof of the crime was Ruiz's (bloody) pants.  *Id.*: 49.  Maria then asked Carrera what shoes they (friends/ family members) could tell authorities he was wearing.  Carrera responded, the orange striped blue Nike shoes Efrain gave him.[56]  *Id.*: 50.

### (2)    Summary of Exhibit 217.

The first visitor on this tape was Rafael (presumably Rafael Carrera, Carrera's cousin).  Carrera and Rafael discussed the fact that Teresa was the only "proof" against him.  CT-5: 52.  In the ensuing conversation with his father, Carrera said that Teresa was the one who said he (Carrera) was the perpetrator of the crime.  *Id.*: 54.  He relayed to his father that authorities didn't have any evidence (proof) against him and he would be all right so long as Santana didn't incriminate him.  *Id.*: 55.  Carrera encouraged his father to sell a stolen stereo that had been in Carrera's possession (at his father's apartment).  *Id.*: 56.  Carrera repeated his lament about Ruiz's shoe print at the crime scene to his father.  *Id.*: 58.  To the next visitor, "Augustin," Carrera  said, "you see the f—ing things I get into," followed by "killing people like crazy. The bad thing is they weren't 'placas.'"  Then Carrera laughed.  The interpreter indicated that "placas" is slang for badges or police officers.  *Id.*: 59-60.  To Armando, Carrera repeated the instruction to direct Tina and Sherry (Harris) to tell authorities that Teresa was intoxicated on acid the night of the crime.  Carrera confirmed to Armando that he burned the clothes.  *Id.*: 61.  Giving Armando detailed instructions as to where to find the burned clothes, Carrera instructed his brother to put them in a bag and dispose of them in "the mines."  He then relayed to Armando that he (Carrera) told authorities he had a drinking problem "to mislead" them.  *Id.*: 62.  Armando again confirmed he would tell authorities he (Armando) gave Teresa acid on the night of the crimes, but that he didn't know it was acid.  *Id.*: 64-65.

---

[56] This was, in fact, the trial testimony of Efrain Carrera (RT-8: 525), Maria Carrera Nunez (*id.*: 572), and Carrera himself (RT-12: 1427).

1          **e.      Jailhouse "Kites" Passed by Carrera to Other Inmates.**

2          Jailhouse informant Julius Jones testified about a letter (or "kite") he (Jones) was to deliver to

3   Ruiz on April 18, 1983 (less than two months before trial).[57]  The letter was marked as Exhibit 222 and

4   admitted into evidence.  RT-10: 969-70; CT-2: 457.  On cross examination, Jones testified that at the

5   time the letter was passed to him, he and Ruiz were in the same cell area.  RT-10: 983-84.  Jones did not

6   deliver the letter to Ruiz, as promised, but rather gave it to Investigator Tom Mireles.  *Id.*: 973.  Later,

7   Jones, himself, received a kite purportedly from Carrera, instructing him to keep his mouth shut and he

8   would get $5,000.  *Id.*: 974.  The kite to Jones was marked as Exhibit 223 and admitted into evidence.

9   *Id.*: 975; CT-2: 457.

10          The Exhibit 222 letter was read into evidence by Investigator Mireles over Ms. Huffman's

11   objection, RT-10: 1013, as follows:

12          Kite me back and tell me if it's okay.  That way I can tell my lawyer this tonight.  Send
            this back so I can write it down for me [sic].  [¶]  Smiley [Ruiz's nickname], here's what
13          we will say in court.  We'll say que [sic] we want to pull a robbery but half way there we
            split up and I went to get a battery and you went to get some money at the motel.  Then
14          we met where Pin and Patience [friends at the party] picked us up, but I didn't know
            what happened or where you got the money from.  But you told me you had some
15          problems getting the money and I couldn't get a battery.  We'll say I was no where
            around the motel when you were there, and if they'll ask you who was there with you,
16          make up a name and say he took off to Mexico but you don't [know] what part and you
            don't know where the vato [sic] was living or put the blame on Teresa.  The next
17          morning I went with you and helped you get rid of some clothes, but that I didn't know
            what was going on 'til Teresa told me next morning.  That way they won't be able to
18          place me at the crime and get me for helping you destroy evidence, and I'll say the
            snitches said I was with you because we left together but I didn't know the people were
19          dead and the stuff they found wasn't mine.  Que piensas de esto, [sic] or if you have a
            better idea, let me know.  If they ask me why I didn't say nothing, I'll tell them that you
20          were going to confess and tell them I wasn't with you.  Let me know if it sounds okay.
            Kite back.

21

22   *Id.*: 1014-15.[58]

23

24

25   _____

26          [57] Jones also testified about Carrera's inculpatory statements.  That testimony was the subject of
     the Court's October 4, 2004 order and is not recounted here.

27          [58] An investigator with the Kern County District Attorney's Office testified that after comparing
28   Exhibit 222 with an exemplar obtained from Carrera, Exhibit 222 was written in Carrera's handwriting.
     RT-11: 1128-36.  The investigator could not come to a conclusion regarding Exhibit 223, but also could
     not eliminate Exhibit 223 as being written by Carrera.  *Id.*: 1137-38.

f.      **Ms. Huffman's Declaration Describing her Guilt Phase Defense Strategy.**

In addressing Carrera's claim that she inadequately investigated his mental health and social background, Ms. Huffman avers that during her interviews with him, he did not reveal any information upon which she could build a mental state defense based on an abusive upbringing.  Referencing the taped recordings of his custodial interviews and jailhouse visits, Ms. Huffman further avers Carrera's statements and actions near the time of his arrest did not support a defense of diminished capacity.  The jailhouse tapes indicated to her that Carrera's "level of functioning was reasonably high."  Further, the jail "kites" which surfaced closer to the time of trial continued to militate against a mental state defense.  Similarly, in Ms. Huffman's view, Carrera's involvement in destroying evidence after the murders negated the choice of a mental state defense.  She avers: "For these reasons, among others, I presented a defense of petitioner's non-involvement and his impairment from the use of LSD the day of the murders [at penalty proceedings].  I focused sharply on Teresa Fout's credibility and possible involvement, in petitioner's stead, and brought in shoe print and shoe sizing evidence to build this defense [at guilt proceedings]."  Huffman Decl., ¶ 5.  She continues: "Further, it was my judgment that any effort to portray petitioner as a hapless victim of socioeconomic and mental forces common to the Mexican immigrant experience would have opened up some highly prejudicial areas revealing petitioner to be a socially adept, articulate, academically capable, engaging individual."  *Id.*, ¶ 8.

g.      **Offer of Proof of *Strickland* expert Guyton Jinkerson.**

Mr. Bedrick's declaration, submitted with Carrera's evidentiary hearing motion offers several testimonial conclusions he anticipates Mr. Jinkerson would draw.  First, competent trial counsel, trying a capital case, would have consulted mental health experts and investigated Carrera's mental health, drug use, and mental health history prior to guilt phase proceedings.  If Ms. Huffman and done so, she would have developed mental state evidence consistent with penalty phase testimony of Dr. Cohen, and the declaration testimony of Drs. Martinez and Froming. Second, competent counsel was obligated to choose the most effective defense strategy between an alibi defense and a mental state defense.  Given the strength of the prosecution case that Carrera was present at the crime scene, pursuing an alibi defense rather than a mental state defense was unreasonable.  Ms. Huffman was constitutionally ineffective for

1    not adequately investigating Carrera's mental health and for selecting an alibi defense as her defense

2    strategy.  Finally, if Ms. Huffman had presented a mental state defense at the guilt proceedings, there

3    is a reasonable probability Carrera would not have been convicted of first degree robbery felony murder.

### 2.    Carrera's Argument.

5    Carrera maintains that the penalty phase testimony of Dr. Cohen, alone, was sufficient to have

6    presented a mental state defense during guilt phase proceedings, and that Ms. Huffman's failure to do

7    so was constitutionally incompetent under *Strickland*, 466 U.S. at 688.  Citing *Siripongs I*, 35 F.3d at

8    1314, he claims Ms. Huffman's declaration testimony, that she made a strategic choice not to pursue a

9    mental state defense, was not reasonable because she failed to investigate such a defense and therefore

10   her decision was uninformed.   He further claims Ms. Huffman rendered incompetent professional

11   assistance by relying on the jailhouse visit tape recordings and the jailhouse "kites" because these events

12   post-dated Carrera's LSD intoxication by many days.

### 3.    Analysis.

14   As the result of the Court's October 4, 2004 order, neither mitigation evidence nor mental state

15   evidence undermining intentional murder are at issue.  The only relevant mental state defense pertains

16   to whether Carrera harbored the mens rea necessary to commit robbery.  In the February 3, 2005 funding

17   order as well as the August 19, 2005 discovery order, the Court further limited mental state evidence to

18   Carrera's use of drugs and alcohol at the time of the crime, since evidence of a difficult family history

19   and depression while relevant to capital sentence selection as mitigating factors, do not constitute a

20   defense to robbery.[59]  In the present motion, Carrera has utilized evidence of his family background,

21   recent depression, and small size, to magnify the mind-numbing affects of LSD, marijuana, and alcohol

22   on his ability to have conceived or participated in the robbery plan at the Imperial 400 Motel.  Although

23   Carrera's character is no longer at issue for purposes of development of a mental state defense to the

24   robbery felony murder charge, the declarations of friends and particularly family members describe a

---

26   [59] Funding for the development of evidence that he sustained organic brain damage in part or in
     full as the result of exposure to neurotoxins, specifically was denied.  The Court conducted independent
27   research to determine whether there is any precedent for mounting a mental state defense to the charge
     of robbery based on exposure to toxic chemicals such as pesticides or solvents.  The only case of which
28   the Court presently is aware where a defendant's exposure to toxic pesticides was proffered as a defense
     involves penalty phase proceedings for capital sentencing.  *See Caro v. Woodford*, 280 F.3d 1247 (9th
     Cir. 2002).  The issue now before the Court involves Carrera's defense to the crime of robbery.

well-loved, conflicted young man who was deeply hurt by his parents' divorce, longed to have a family with his girlfriend, and remained devoted to his father's well-being.

The evidence of Carrera's scheming to exculpate himself shortly after his arrest, in both the tape recordings of the jailhouse visits and the "kite" to Ruiz, however, undermines development of a mental state defense. Carrera's own attempts to establish an alibi shown by this evidence, coupled with the fact that he assisted in the burning of bloody clothes he was said to have been wearing when he and Ruiz returned to the party (after the murders) does, as the Warden argues, make a mental defense implausible. While post-crime conduct of a defendant trying to deflect responsibility for his part in a crime does not invariably rule out some sort of mental disability at the time of the crime, in Carrera's case the quantity of such attempts close in time to his arrest supports Ms. Huffman's strategic decision not to present a mental state defense.

Carrera is entirely correct to point to caselaw that strategic decisions cannot defeat an ineffective assistance of counsel claim if the decisions are uninformed or unreasonable. *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998) (*Siripongs II*), ("the relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable"); *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994) (to be strategic, the decision about developing or not developing a defense must be "an informed one"). Ms. Huffman's decision to present an alibi defense instead of a mental state defense was both informed and reasonable. First of all, she averred that Carrera did not reveal any information upon which she could build a mental state defense based on his family background. "Trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired," *Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003), but in the absence of such evidence the duty cannot be imposed. Second, Carrera devised the alibi defense before Ms. Huffman began representing him. He told his sister and brothers that they were to confirm he stayed at Carmen Santana's house (with a brief appearance at Maria's house to have sex with Tina Harris and eat tv dinners) during the time Mr. and Mrs. Hayes were murdered. He also devised another idea that Ruiz would confirm he (Ruiz) was responsible for the crime, either acting alone or in concert with a person who disappeared to Mexico or with Teresa. Had Ms. Huffman presented a mental state defense to show that Carrera simply went along with Ruiz's suggestion to

accompany him to the Imperial 400 Motel and participate in the murderous robbery of Mr. and Mrs. Hayes, Mr. Vendrasco would have undermined the defense by presenting Carrera's post-arrest attempts to exculpate himself.  Carrera does not explain how a person who was so confused and prone to suggestion would be so concerned with destroying evidence and designing an alibi.

As she avers in her declaration, Ms. Huffman could not devise an explanation either.  She reasonably chose to pursue a defense that was most consistent with finding gaps in the circumstantial evidence placing Carrera at the scene of the crime and the somewhat confused testimony of Teresa Fout. It is not ineffective for counsel to forego a mental state defense that would have been inconsistent with claimed innocence.  *Doe v. Woodford*, 508 F.3d 563, 569 (9th Cir. 2007) (citing *Siripongs II*, 133 F.3d at 734.)  Moreover, this Court must accord a heavy measure of deference to trial counsel's informed strategic decisions.  *Strickland*, 466 U.S. at 691; *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003).  Even after Drs. Martinez and Froming examined and commented on Carrera's mental functioning at the time of the crime, there is still little connection offered between Carrera's reported mental impairments (basal ganglia dysfunction, cerebral impairment, and lateralized lesion) and his cognitive abilities the night of the crime.

Carrera's reliance on *Siripongs I*, 35 F.3d 1308, is misplaced.  In that case the district court initially accepted the Warden's assertion that trial counsel's failure to investigate a mental state defense was reasonable and tactical.  The Ninth Circuit, however, held that the record did not contain any evidence supporting the trial attorney's omission.  *Id*. at 1314.  It was not until the case was remanded for an evidentiary hearing that evidence was developed supporting trial counsel's decision not to present mental state evidence.  *Siripongs II*. 133 F. 3d at 734-36.  Evidence supporting Ms. Huffman's tactical decision in this case already exists.  Carrera supplied this with his conversations to friends and family members at the jail and in his "kite" to Ruiz.  Ms. Huffman did not render ineffective legal representation.  Accepting Carrera's offers of proof from Dr. Cohen's penalty phase testimony as well as the declarations of the late Dr. Martinez, Dr. Froming, and Mr. Bedrick (as to Mr. Jinkerson's proposed testimony), the Court finds Carrera still has not presented a colorable claim warranting further evidentiary development.  Claims 88 and 89 are denied on the merits.

1  **VI.      Order.**

2       Carrera's motion for an evidentiary hearing is denied.  Accepting all the offers of proof as true,

3  he has not presented a colorable claim entitling him to habeas relief.  The Court further declines to

4  exercise its discretionary authority to conduct an evidentiary hearing.  Claims 3, 18, 40, 20, 85, 87, 88,

5  and 89 are denied on the merits.

6  IT IS SO ORDERED.

7

8  Dated:   ____March 11, 2008____

                                          ____/s/ Anthony W. Ishii____
9                                               Anthony W. Ishii
                                          United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Appendix**

2

3   Twenty-nine lay declarations are attached to Carrera's October 27, 1995 state exhaustion petition.  The

4   identities of the declarants and their relationship to Carrera are listed.

5   1.      Armando Carrera – brother, born September 11, 1963

6   2.      Aurelia Carrera – paternal aunt, Uncle Manuel's wife

7   3.      Efrain Carrera – brother, born February 4, 1966

8   4.      Francisco Carrera – paternal uncle, in Corrales

9   5.      Manuel Carrera – paternal uncle, in California (wife - Aurelia)

10  6.      Maria De la Luz Carrera – cousin, daughter of Manuel Carrera

11  7.      Miguel Angel Carrera – father, born July 19, 1937

12  8.      Rafael Carrera – orphaned paternal cousin, born August 2, 1961

13  9.      Erma Esparza – great aunt, married to maternal uncle Manuel Esparza

14  10.     Rose Marie Hernandez – sister-in-law (Armando's wife)

15  11.     Maria Alicia Lizarrago – sister, born August 22, 1962 (referred to at trial as Maria Carrera

16          Nunez)

17  12.     Miguel Medina – maternal uncle (younger brother of Maria Elena), born September 2, 1957

18  13.     Pedro Medina – maternal step-grandfather (step-father of Maria Elena; Miguel Medina's father)

19  14.     Francisco Montenegro – husband of maternal aunt Marta

20  15.     Marta Montenegro Montenegro – maternal aunt

21  16.     Socorro Montenegro Peña – maternal aunt

22  17.     Maria Elena Montenegro Santamaria – mother (with remarried last name), born March 6, 1941

23  18.     Guadalupe Carrera Unzueta – paternal aunt (Miguel's older sister)

24  19.     Joel A. Cardona – minister in Rosamond

25  20.     Tomás Lozano Garcia – childhood friend

26  21.     Magdalena Garza – former girlfriend/ mother of Carrera's daughter, Erika

27  22.     Susie Navarro – adult neighbor the Carrera family

28  23.     Roberta Perkins – school nurse in Mojave and  neighbor of the Carrera family

24.     Helen Skibe Valadez – adult friend of Carrera's mother and Susie Navarro

25.     Rebecca Barton – teacher in Mojave

26.     Fermon L. Bowlin – teacher in Mojave

27.     John Gardner – music teacher in Mojave

28.     Sally Swenick, Ed.D. – school principal in Mojave

29.     Betty Vondriska – ESL teacher in Mojave