1

2

3

4

5

6 IN THE UNITED STATES DISTRICT COURT FOR THE

7 EASTERN DISTRICT OF CALIFORNIA

8

9 CONSTANTINO CARRERA,    ) Case No. 1:90-CV-00478-AWI
              )
10      Petitioner,   ) DEATH PENALTY CASE
              )
11   vs.       ) MEMORANDUM DECISION AND ORDER:
              ) (1) GRANTING WRIT OF HABEAS CORPUS
12 ROBERT L. AYERS, JR., as Warden  ) AS TO CLAIMS 2, 2A, AND 44;
of San Quentin State Prison,    ) (2) DIRECTING STATE COURT TO VACATE
              ) DEATH ELIGIBILITY SPECIAL
13      Respondent.  ) CIRCUMSTANCE FINDINGS;
              ) (3) DENYING PENALTY PHASE CLAIMS AS
14 _____) MOOT;
              (4) DENYING REMAINING GUILT PHASE
15               CLAIMS ON THE MERITS; AND
              (5) DENYING A CERTIFICATE OF
16               APPEALABILITY

17

18

19

20

21

22

23

24

25

26

27

28

Table of Contents

I.      Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.     Brief Summary of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

III.    Prior Findings Made. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

IV.     Applicable Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

V.      Claims at Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

        A.      Claims 1 and 28: that the Prosecutor Committed Misconduct for Presenting
                Contradictory Evidence and Arguing Contradictory Theories as to Carrera's Criminal
                Responsibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

                1.      Facts Relevant to Elicitation of Contradictory Testimony and Presenting
                        Contradictory Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

                2.      Carrera's Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

                3.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

        B.      Claim 4: that Carrera's Trial Attorney was Ineffective for Failing to Request Jury
                Instructions Regarding the Crime of Accessory After the Fact and When a Robbery is
                Complete. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

        C.      Claims 5, 6, 7, 8, 27, 28, and 53: that Carrera Was Denied the Right to Full and Proper
                Cross Examination Through Trial Error, Prosecutorial Misconduct, Ineffective
                Assistance of Counsel, and Denial of Appellate Review. . . . . . . . . . . . . . . . . . .   13

        D.      Claims 9, 12, 13, 14, 15, 19, 29, 30, 31, 32, 33, and 34: that the Prosecutor Committed
                Misconduct by Improper Questioning and Argument and Carrera's Trial Attorney was
                Ineffective for Not Objecting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

                1.      Facts Relevant to Mr. Vendrasco's Alleged Improper Questioning and Argument.
                        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

                        a.      Teresa Fout. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

                        b.      Carmen Santana. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

                        c.      Julius Jones. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

                        d.      Carrera. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

                        e.      Summation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

                2.      Carrera's Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

                3.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

        E.      Claim 16: that Carrera's Trial Attorney was Ineffective for her Failure to Move to
                Suppress the Jailhouse Visit Tape Recordings on the Grounds that Carrera's Warrantless
                Arrest Lacked Probable Cause and was Therefore Illegal. . . . . . . . . . . . . . . . . . .   24

1.     Facts Relevant to the Legality of Carrera's Arrest. . . . . . . . . . . . . . . . . . . 24

2.     Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

F.    Claim 35: that the Trial Court Committed Prejudicial Error by Admitting Improper Hearsay Statements by Co-Perpetrator Ramiro Ruiz. . . . . . . . . . . . . . . . . . . . . . . 26

1.     Facts Relevant to Alleged Trial Error for Admission of Ruiz's Hearsay Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

2.     Carrera's Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

3.     Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

G.    Claim 37: that Carrera's Due Process Rights Were Violated Because the Jury Was Not Instructed that the Testimony of the Jailhouse Informants Should be Regarded with Care, Caution, and Distrust. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

H.    Claim 42: that Carrera's Due Process Rights were Violated Because the Trial Court Overruled Defense Objections to 25 Gruesome Color Photographs of the Victims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

I.      Claims 48 and 49: that the California Supreme Court Violated Carrera's Due Process Rights for Not Considering his Initial State Habeas Petition on the Merits and Refusing to Consider the Entire Transcript of Ruiz's Trial. . . . . . . . . . . . . . . . . . . . . . . . . 31

J.     Claims 47 and 54: that the Multiple Instances of Prejudice Identified on Direct Appeal Amounted to Cumulative Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

K.    Claims 92 and 93: that Carrera's Trial Attorney Was Ineffective for Failing to Request Instructions and the Trial Court Erred for not Sua Sponte Reading Instructions About Late-Arriving Aiders and Abettors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

L.    Claim 84: that the Prosecutor Committed Misconduct for Presenting False and Misleading Evidence from Teresa Fout and Carrera's Trial Attorney was Ineffective for Failing to Test the Teresa's Credibility on Rebuttal. . . . . . . . . . . . . . . . . . . . . . . 33

1.     Facts Relevant to Teresa Fout's Testimony and Credibility. . . . . . . . . . . . 33

2.     Carrera's Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

3.     Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

M.    Claim 90: that Carrera's Trial Attorney Was Ineffective Due to Conflicts of Interest Arising from Her Prior Representation of Carmen Santana and from Serious Personal/ Financial Problems. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1.     Facts Relevant to Ms. Huffman's Alleged Conflicts of Interest. . . . . . . . . 35

a.    Court Records Concerning Carmen Santana's Dissolution Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

b.    Transcript Excerpts Summarizing Examination of Carmen Santana. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

c.     Transcript Excerpts Summarizing Examination of Miguel Santana in Carrera's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

d.     Summary of Ms. Huffman's Summation in Carrera's Case. . . . . . 38

e.     Transcript Excerpts Summarizing Examination of Miguel Santana in Ruiz's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

f.     July 11, 1996 Declaration of Ms. Huffman. . . . . . . . . . . . . . . . . 39

2.     Carrera's Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

3.     Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

VI.     Certificate of Probable Cause of Appealability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

VII.     Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

This matter is before the Court on the resolution of the remaining guilt phase claims currently before the Court in the third amended petition filed by Petitioner Constantino Carrera ("Carrera"). This order follows the denial of an evidentiary hearing as to Claims 3, 18, 40, 20, 85, 87, 88, and 89 on March 11, 2008 and the granting of relief as to the special circumstance findings on October 4, 2004 as to Claims 2, 2A, and 44. Resolution of Carrera's claims is informed by his points and authorities as well as those filed by Respondent Robert L. Ayers, Jr., as Warden of San Quentin State Prison (the "Warden").

## I.     Procedural Background.

Carrera was convicted and sentenced to death for the robbery and robbery felony murders of Jack and Carol Hayes by the Kern County Superior Court. Judgment of death was entered by the Superior Court on October 14, 1983. The California Supreme Court affirmed Carrera's conviction and death sentence on August 17, 1989. *People v. Carrera*, 49 Cal. 3d 291 (1989), and the United States Supreme Court denied his petition for certiorari on February 19, 1990.

During the pendency of his direct appeal, Carrera commenced post-conviction proceedings by filing a petition for habeas corpus in the California Supreme Court on December 31, 1987.[1] In response to an order to show cause as to why Carrera's judgment should not be set aside, the State of California filed a return to Carrera's state habeas petition on or about June 23, 1988. On February 22, 1989, the California Supreme Court vacated the order to show cause and dismissed Carrera's state petition. Litigation concerning the dismissal of the state habeas petition continued from a motion to vacate the February 22, 1989 dismissal order addressed to the California Supreme Court to a petition for certiorari filed in the United States Supreme Court.

Carrera's initiation of federal habeas proceedings followed the adverse ruling of the United States Supreme Court on his certiorari petition. He commenced this action in federal court on July 31, 1990 by the filing of an initial petition for habeas corpus. Following appointment of counsel a first amended petition was filed on August 23, 1991 and a second amended petition was filed on September 14, 1993, the latter of which was partially unexhausted. The Court ordered Carrera to exhaust state remedies on

---

[1] The state petition was amended January 19, 1988.

May 3, 1994 following which Carrera filed an exhaustion petition in the California Supreme Court on October 27, 1995 and a subsequent state petition on June 25, 1997. On August 13, 1998, the California Supreme Court denied both pending state petitions (in separate orders). Carrera filed his third amended petition in federal court on November 6, 1998. The third amended petition was amended on March 10, 1999 to delete Claim 79, which was determined to be unexhausted. The third amended petition is the operative petition (hereafter "Petition").

On October 4, 2004, the Court issued a Memorandum Order granting summary judgment as to an instructional omission challenge in Claim 44 of the Petition and finding entitlement to relief under prosecutorial misconduct allegations in Claims 2 and 2A. These rulings are directed to the death eligibility special circumstance findings of Carrera's jury. The rendering of this order had the effect of eliminating from the Court's consideration any further special circumstance challenges Carrera may have as well as all penalty phase challenges. Following issuance of the October 4, 2004 order, Carrera filed a confidential request for investigative funding to compile offers of proof for his anticipated request for an evidentiary hearing as to selected remaining guilt phase claims. The Court issued a confidential funding order on February 3, 2005 in which some requests were authorized and some were declined. Carrera then pursued further evidentiary development through discovery requests pertinent to various claims, including some for which investigative funding had been denied.[2] These requests generated two discovery orders, limiting the scope of further evidentiary development. The first of these orders was filed on July 12, 2005. The second was filed on August 19, 2005. On March 11, 2008, the Court denied Carrera further evidentiary development as to specified guilt phase claims. That order also denied the same specified claims on the merits. Accordingly, only record based claims pertaining to the jury's verdict that Carrera committed robbery and robbery felony murder remain to be litigated. The October 4, 2004 order as well with its precursor, the June 22, 2000 order, are summarized in the March 11, 2008 order denying Carrera's evidentiary hearing motion. Mar. 11, 2008 Ord., pp. 3-4.

---

[2] One claim involved the jurors' examination of a bundle of partially burned clothing, which contained unburned corduroy pants material inside. *See* discussion of Claim 85, Mar. 11, 2008 Ord., pp. 43-51. Another involved evidence about personal and financial problems encountered by trial counsel Donnalee Huffman (previously Mendez). *See* discussion of Claim 90, at Part V.M., *infra*.

## II.      Brief Summary of the Case.[3]

Carrera and Ramiro Ruiz-Gonzales ("Ruiz") were convicted following separate trials of robbery and first degree murder for the April 12, 1982 stabbing deaths of motel managers Jack and Carol Hayes and robbery of approximately $239 in cash from the office of the Imperial 400 Motel in Mojave, California.  Carrera was 20 years old and Ruiz was 17 years old at the time of the crime.  The evidence presented at Carrera's guilt phase trial included testimony that he cut Mrs. Hayes on the arm or wrist early in the encounter, but after Ruiz initially stabbed her.  The character of Ruiz's initial stab was never developed.  There also was evidence that Mr. Hayes was stabbed in his head, and that the force of this blow caused the knife blade to break and remain embedded in his skull.  During the guilt phase proceedings of Carrera's trial, the jury determined the robbery-murder and multiple murder special circumstances to be true, making him eligible for the death penalty.[4]  Essential to both special circumstance findings was that Carrera actually participated in the killing of Mr. and Mrs. Hayes, or, to the extent he was only an aider and abettor in the murders, he intended to kill Mr. and Mrs. Hayes.  The jury returned a verdict that Carrera should suffer the death penalty at a separate penalty phase trial.

The key players at Carrera's trial were his co-perpetrator Ruiz, his appointed defense attorney Donnalee Huffman (previously Mendez), the prosecutor, Deputy District Attorney Michael Vendrasco, friend-witness Teresa Fout (age 14 at the time of the crime), friend-witness Miguel Santana (age 19 at the time of the crime), jailhouse informant-witness Julius Jones, and jailhouse informant-witness Thomas Hill a.k.a. Morse.  Teresa Fout and Miguel Santana mainly gave evidence about the sequence of events on the night of the crime and how Carrera later described the circumstances of the crime to them (individually).  The inmate witnesses gave the only account of Carrera's specific intent to kill as well as his participation as a principal in the stabbing deaths of both Mr. and Mrs. Hayes.  Testimony of all four witness was relied on by Mr. Vendrasco to establish Carrera's criminal responsibility for robbery and murder.  Santana also was a key witness against Ruiz at his separate trial.

---

[3] This summary of the case is taken verbatim from the March 11, 2008 order denying Carrera's motion for an evidentiary hearing.

[4] Since Ruiz was a minor at the time the crime was committed, he could not be eligible for the death penalty under California law.

**III.     Prior Findings Made.**[5]

In the June 22, 2000 and October 4, 2004 orders, the Court determined from the record that Carrera entered the Imperial 400 Motel accompanied by Ruiz and that, at a minimum, he participated in the robbery effort.  This conclusion is supported by statements of percipient witnesses at a party gathering on the night of the crime about Carrera's and Ruiz's absence from the party and the substance of what Carrera told Teresa Fout and Miguel Santana as to the robbery, including the fact that when Carrera entered the motel, he had in his possession a knife or knives and rubber gloves, and that he cut Mrs. Hayes on the wrist.  The Court further found that Teresa did *not* participate in the crime and that Miguel Santana's participation was limited to an accessory after the fact for assisting in the destruction of evidence.  The Court declined to adopt Carrera's view that Santana acted as a "look-out" during the robbery murders.

What the October 4, 2004 order did that the June 22, 2000 order did not do was determine that the *Beeman* (*People v. Beeman*, 35 Cal. 3d 547 (1984)) instructional omission was not harmless in light of the prosecutorial misconduct committed by Mr. Vendrasco in several respects.  First he elicited contradictory evidence during the separate trials of Ruiz and Carrera as to which young man asked Miguel Santana if he (Santana) had the guts or nerve to kill someone.  Attributing the question to Ruiz at Ruiz's trial and Carrera at Carrera's trial, Mr. Vendrasco argued that asking this question meant the questioner harbored a plan to commit murder.  Oct. 4, 2004 Ord., at pp. 8-9 (Carrera asking the question), 25 (arguing Carrera's intent to kill), 31-32 (Ruiz asking the question and arguing Ruiz's intent to kill).  Second, he argued inconsistently at the two trials that Santana's testimony about one of the perpetrators obtaining a larger knife during the attack on Mr. Hayes supported the theory that Carrera obtained the larger knife at Carrera's trial, and Ruiz obtained the larger knife at Ruiz's trial.  *Id.*, pp. 33-34.  Third and fourth, he concealed the fact of inducements to inmate witnesses Julius Jones and Thomas Hill/ Morse.  *Id.*, p.106.  The Court concluded that although the inmate testimony was exaggerated and

---

[5] This summary of prior findings made is taken verbatim from the March 11, 2008 order denying Carrera's motion for an evidentiary hearing.  Findings made in the March 11, 2008 order are explained in the context of the ensuing analysis.

1   uncorroborated as to the extent of injuries inflicted on the victims and the amount of money stolen, Mr.

2   Vendrasco nonetheless relied on it.

3       In light of these findings, the Court could not consider the instructional omission under *People*

4   *v. Beeman*, harmless because all evidence relative to Carrera's actual killing or intent to kill Mr. and

5   Mrs. Hayes was derived from evidence elicited as the result of alleged prosecutorial misconduct.[6]  The

6   Court did not foreclose the possibility that with proper instructions, omission of misleading argument,

7   and introduction of withheld impeachment evidence, Carrera's intent to kill and/or actual participation

8   in the murders could be established beyond a reasonable doubt.  Oct. 4, 2004 Ord., at pp. 116-118.

9   Evidence in support of this prosecution theory, includes that Carrera lied on the witness stand about his

10  involvement in the robbery, relied on a dishonest defense strategy – to falsely inculpate Teresa Fout in

11  the murders, invoked an uncorroborated alibi of having sexual intercourse with a 12-year old girl at the

12  time of the crime, and bragged about killing Mr. and Mrs. Hayes to friends and family members visiting

13  him in the jail.  The evidence as to whether Carrera cut Mrs. Hayes after she was severely wounded or

14  just mildly wounded by Ruiz also is not clear.  At his trial, the only credible evidence, from Miguel

15  Santana and Teresa Fout, about when he cut Mrs. Hayes in relation to Ruiz's murderous attack was

16  simply unclear.  At Ruiz's trial, however, it was not unclear.  Santana there testified that Ruiz said

17  Carrera cut Mrs. Hayes after she was so severely wounded she was lying on the floor pleading for her

18  and her husband's lives.[7]

19  **IV.    Applicable Legal Standards.**

20      As fully explained in the March 11, 2008 order, this action is not subject to the review provisions

21  of the Anti-terrorism and Effective Death Penalty Act of April 24, 1996 ("AEDPA"), codified in

22  amended 28 U.S.C. § 2254.  *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003).  Mar. 11, 2008 Ord.,

23  pp. 4-5.  Under this prior law, the only standard relevant to the present motion is for determining the

24

25          [6] The California Supreme Court already determined *Beeman* error had occurred.  *Carrera*, 49
26  Cal. 3d at 309.  In determining the error was harmless, the California Supreme Court did not take into
    account the factual background of the prosecutorial misconduct claims developed from extra-record
27  evidence during post-conviction proceedings.

28          [7] Although testimony of Ruiz's statements at Carrera's retrial would be inadmissible, the fact that
    testimony was given demonstrates how confused the recitation of the events were.

presumption of correctness of state court rulings.  Former 28 U.S.C. § 2254(d) directs that *written* state findings are presumed correct.

> In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit –
>
> (1)  that the merits of the factual dispute were not resolved in the State court hearing;
>
> (2)  that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
>
> (3)  that the material facts were not adequately developed at the State court hearing;
>
> (4)  that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
>
> (5)  that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
>
> (6)  that the applicant did not receive a full, fair, and adequate hearing in the State court proceedings; or
>
> (7)  that the applicant was otherwise denied due process of law in the State court proceeding;
>
> (8)  or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

Mixed questions of law and fact, however, like pure questions of law, are reviewed *de novo*.  *See Thompson v. Borg*, 74 F.3d 1571, 1573 (9th Cir. 1996).  A state court's determination of lack of prejudice is a mixed question of law and fact, because although historical facts found by state courts are entitled to a presumption of correctness under (former) § 2254(d), when state courts apply legal standards to historical facts, those decisions are not factual findings, and accordingly are subject to *de novo* review.  *Id*.

**V.    Claims at Issue.**

Claims 21, 45, 50, 51, and 52 were denied on summary judgment June 22, 2000. Reconsideration with respect to these was denied on October 4, 2004.  On the other hand, Claims 2, 2A, and 44 as to the invalidity the death eligibility special circumstance findings were found to entitle Carrera to habeas relief in the October 4, 2004 order. Guilt phase Claims 10, 11, 17, 22, 23, 24, 25, 26, 36, 38, 39, 41, 43, 46, 46A, and 91 were voluntarily dismissed by Carrera on February 28, 2001 (in his Memorandum of Points and Authorities in Support of the Petition – guilt phase issues).  As a result of the March 11, 2008 order, guilt phase Claims 3, 18, 40, 20, 85, 87, 88, and 89 were denied on the merits. On June 27, 2001 Carrera voluntarily dismissed penalty phase Claims 59, 63, 72, 74, 75, 76, 77, and 80 (in his Memorandum of Points and Authorities in Support of the Petition – penalty phase issues).  As a result of the October 4, 2004 order granting relief as to special circumstances, all claims arising from challenges to Carrera's sentence are moot and will not be considered, including Claims 55, 57, 65, 67, 71, 56,[8] 64, 68, 70, 60, 73, 78, 61, 62, 69, 82, 83, 86, 88, 89,[9] and 81.

The remaining guilt phase claims and claim groupings for which further evidentiary development is not requested are resolved in this order based on the state record.  They are (in the order presented by Carrera) are Claims 1 and 28, Claim 4, Claims 5, 6, 7, 8, 27, 28, and 53, Claims 9, 12, 13, 14, 15, 19, 29, 30, 31, 32, 33, and 34; Claim 16, Claim 35, Claim 37, Claim 42, Claims 48 and 49, Claims 47 and 54, Claims 92 and 93, Claim 84,  and Claim 90.

**A.    Claims 1 and 28: that the Prosecutor Committed Misconduct for Presenting Contradictory Evidence and Arguing Contradictory Theories as to Carrera's Criminal Responsibility.**

Claims 1 and 28 allege prosecutorial misconduct for Mr. Vendrasco's elicitation of contradictory evidence from Miguel Santana at Ruiz's and Carrera's respective trials designed to be the most

---

[8] The order these claims herein recited tracks the order they were presented in Carrera's points and authorities.

[9] Claims 88 and 89 also challenge the special circumstance findings at Carrera's trial, and thus were considered in the March 11, 2008 evidentiary hearing motion order.

inculpatory to the defendant being tried.[10]   The discrepancies fall into four categories.  The first is whether Santana learned about the crime from just Ruiz, just Carrera, or from both.  The second revolves around who asked Santana the "guts to kill" question, Ruiz or Carrera.  The third is whether Ruiz went into the kitchen to obtain a larger knife during his attack on Mr. Hayes or Carrera obtained the larger knife.  The fourth category relates to the color of shoes Carrera wore on the night of the crime.  In the October 4, 2004 order, the Court already has reviewed and resolved the fact of the inconsistent prosecutorial theories relative to the "guts to kill" question and whether it was Ruiz or Carrera who went into the kitchen to obtain a larger knife during the attack on Mr. Hayes.  These evidentiary categories support Carrera's alleged intent to kill, and, accordingly are only relevant to the special circumstance findings which required this mental state.  In light of the October 4, 2004 order, discrepancies concerning the guts to kill and larger knife issues as well as prejudice relative the intent to kill special circumstance findings will not be further discussed.  To the extent the claimed inconsistencies as to who told Santana the story of what happened and what color shoes Carrera was wearing have any bearing on the robbery and robbery felony murder convictions, further discussion is warranted.

> **1.**  **Facts Relevant to Elicitation of Contradictory Testimony and Presenting Contradictory Argument.**

On direct examination (at Carrera's trial), Santana testified that after going to Rosamond and checking into a motel with Ruiz, Carrera, and Teresa Fout, he (Santana) was in one of the motel rooms with Carrera.  Carrera then told Santana what happened at the Imperial Motel 400 and Santana relayed that account to the jury.  RT-9: 804-07.  During cross examination, Ms. Huffman elicited that both Carrera and Ruiz told him (Santana) what happened: "[Question] Mr. Santana, you stated yesterday that Tino [Carrera] is the one that told you what happened in the motel; is that right? [Answer] They both did." RT-10: 863.  Anticipating that Ms. Huffman was going to ask Santana what Ruiz said that might have been different from what Carrera said, Mr. Vendrasco objected to the elicitation of any statements Ruiz might have made as hearsay.  *Id*.  Ms. Huffman then requested a bench conference which was not

---

[10] Claim 28 separately alleges Mr. Vendrasco's elicitation of contradictory testimony from Santana prevented Ms. Huffman's effective cross examination and thus a denial of his confrontation rights under the Constitution.  In that context, claim 28 is discussed with Claims 5, 6, 7, 8, 27, and 53, Part V.C., *infra*.

reported, but for which the parties did agree upon a settled statement.  Under that settled statement, Ms. Huffman argued she should be allowed to cross-examine Santana for impeachment purposes as to what he said Ruiz told him regarding the crime, in that it differed from what he said Carrera told him, as a prior inconsistent statement.  Mr. Vendrasco maintained this did not constitute an inconsistent statement and the trial judge sustained Mr. Vendrasco's hearsay objection.  CT-9: 55-56 (Appellant's Request to Correct the Transcript and Settle the Record); *id.*: 65 (July 19, 1985 Minute Order Granting the Request to Correct the Transcript and Settle the Record).

With respect to the shoes, other than Carrera and his siblings, only Teresa Fout and Miguel Santana gave credited testimony about what kind and color shoes he (Carrera) wore on the night of the crime.[11]  Teresa's testimony was consistent that Carrera was wearing gray Trax shoes with black stripes from the preliminary examination hearing of both Ruiz and Carrera (a single hearing), to Ruiz's trial, to Carrera's trial. CT-1: 84 (preliminary examination hearing); CT-2: 308 (Ruiz's trial); RT-9: 670, 688, 748 (Carrera's trial – direct and re-direct examination).

Santana's testimony, however, was inconsistent.  On direct examination at Ruiz's trial, Santana testified that Carrera had been wearing brown Trax tennis shoes.  CT-11: 818-19.  On cross examination (by Ruiz's attorney) the testimony was confused as to what he recalled:

> [Question] Before Tino changed, what kind of shoes did he have on? [Answer] Tino? [Question] Yes. [Answer] Tennis shoes. [Question] Do you recall what color they were? [Answer] Brown. [Question] Going back to your interview with Sergeant Montgomery on May 31, 1982, do you recall telling Sergeant Montgomery that before he changed, Tino had a pair of brown pants and blue Trax tennis shoes? [Answer]  No.  They are blue Trax he has. [Question] So, Tino was wearing blue Trax not brown?  [Answer] Ramiro was wearing brown.

*Id.*: 865.

At Carrera's trial, on direct examination, Santana testified Carrera had been wearing gray Trax tennis shoes.  RT-9: 793.  On cross examination, he confirmed this.  RT-10: 898.  Then referring to a transcript from his prior testimony, he stated he previously testified Ruiz had been wearing blue tennis shoes.  *Id.*: 899.  He explained that although he initially testified at Ruiz's trial that Carrera had been wearing brown Trax shoes (and Ruiz wore the blue-gray shoes), he changed his testimony.  *Id.*: 900.

---

[11] Carrera, his sister Maria, and his brother Efrain testified he had been wearing blue Nikes with orange stripes on the night of the crime.

On cross examination, he told Ms. Huffman he did not recall what he told Sergeant Paul Montgomery April 15, 1982 or May 31, 1982 about the color of Carrera's shoes.  Then, a few lines later, he said he *did* recall telling Sergeant Montgomery that Carrera had been wearing blue, or gray-blue Trax shoes on April 15, 1982.  *Id*.: 901.  Shortly thereafter, he testified that he remembered telling Sergeant Montgomery on May 31, 1982 that Carrera had been wearing blue shoes.  Finally, he clarified that when he testified at Ruiz's trial that Carrera had been wearing brown Trax, that testimony was incorrect.  Carrera had been wearing gray-blue shoes, "something like that."  *Id*.: 902–03.   He repeated that the brown Trax testimony was incorrect and that Carrera had been wearing gray-blue Trax.  *Id*.: 904.  On re-cross, re-direct, and further re-cross, Ms. Huffman and Mr. Vendrasco elicited that Santana testified at Ruiz's trial Carrera wore brown Trax shoes, but in fact, at the time he so testified, he wasn't sure what color shoes Carrera had been wearing.  *Id*.: 948-50.  Lieutenant Paul Montgomery [12] was called on rebuttal to confirm that when he interviewed Santana on April 15, 1982, Santana said Carrera had been wearing gray Trax shoes.  RT-13: 1737.

### 2.    Carrera's Argument.

Because of the many discrepancies in evidence and argument between the two trials, and because these discrepancies were based on Santana's contradictory testimony, Carrera argues his testimony was not worthy of belief.  Further, while Mr. Vendrasco knew of the discrepancies, he kept the information from the jury.  Under *Giglio v. United States*, 405 U.S. 150, 154-55 (1972), however, "the jury was entitled to know of it."  Carrera claims that since there is a reasonable likelihood juror awareness of Santana's false testimony could have affected the judgment, a new trial is required.  He further relies on *Napue v. Illinois*, 360 U.S. 264, 269 (1959), where a witness falsely denied he had been promised a benefit in exchange for his testimony and the Supreme Court held the witness's resulting lack of credibility warranted a new trial.[13]  Next, he cites *Nguyen v. Lindsey*, 232 F.3d 1236, 1240 (9th Cir. 2000), for the proposition that when the prosecutor pursues fundamentally inconsistent theories in

---

[12] Between the investigation of the Hayes murders in April 1982 and the trial in June and July of 1983, Sergeant Montgomery was promoted to the rank of lieutenant.

[13] The benefit Santana is said to have received is immunity from prosecution.

1    separate trials against separate defendants charged with the same murder, a due process violation can

2    result "if the prosecutor knowingly uses false evidence or acts in bad faith."

3    **3.    Analysis.**

4    After reviewing the relevant facts and the controlling precedent, the Court concludes there is no

5    merit to Carrera's contentions.  Both *Giglio*, 404 U.S. 150 and *Napue*, 360 U.S. 264, involve unreliable

6    witnesses who received undisclosed benefits for their testimony, which the prosecutor concealed.

7    Neither holding applies in this case since there was no benefit given to Santana for his testimony other

8    than an informal grant of immunity for being an accessory after the fact, which was disclosed to the jury.

9    The claim of inconsistent theories under *Nguyen*, 232 F.3d 1236, likewise is unavailing because Carrera

10   has done nothing more than suggest an inconsistency in Santana's testimony concerning the source of

11   his information about the crime.  At Ruiz's trial, Santana was asked what Ruiz told him.  At Carrera's

12   trial he was asked what Carrera told him.  It is not implausible that both Ruiz and Carrera told Santana

13   what happened and that they did so separately and together.  Moreover, in prior orders, the Court already

14   has found that Santana's testimony at Ruiz's trial was based on what Santana said Ruiz told him, and

15   his testimony at Carrra's trial was based on what he said Carrera told him.  June 22, 2000 Ord., p. 11;

16   Oct. 4, 2004 Ord., at pp. 12-13.

17   Even if the Court were to find an inconsistency, the error is harmless.  Carrera has advanced no

18   specific argument as to how the alleged inconsistencies tend to exculpate him with respect to the robbery

19   and robbery felony murder convictions.  Moreover, based on the Court's extensive review of the

20   evidence, the notion that revealing an inconsistency in the source of Santana's information would have

21   altered the robbery finding is unavailing.

22   The inconsistent testimony about the color of Carrera's shoes is even less compelling.  As the

23   recitation of the testimony on this subject reveals, Ms. Huffman took Santana to task for his oscillation

24   about what color shoes Carrera wore on the night of the crime.  The inconsistency was fully exposed to

25   the jury by all the attorneys involved, Ms. Huffman, Ruiz's trial attorney, and Mr. Vendrasco.  At Ruiz's

26   trial, his (Ruiz's) attorney elicited Santana's confusing testimony that Carrera had worn brown shoes,

27   then blue shoes and that Ruiz had worn brown shoes.  Ms. Huffman elicited at Carrera's trial that the

28   prior testimony about Carrera having worn brown shoes was incorrect.  Finally, the inconsistency about

*Carrera's* shoe color doesn't amount to a contradictory theory of criminal responsibility between the two trials.  Carrera has not demonstrated that the color of shoes he was said to have worn during Ruiz's trial supports or detracts from Ruiz's culpability.  *Nguyen*, 232 F.3d 1236, involves inconsistent theories of culpability (like the identity of the perpetrator), not mere evidentiary facts (like shoe color).  There were no inconsistent theories of culpability, just confusion on Santana's part about what color shoes Carrera wore.

To the extent Claims 1 and 28 address the "guts to kill" question and whether Ruiz or Carrera obtained a larger knife during the attack on Mr. Hayes, they are subsumed in the Court's October 4, 2004 order concerning Claims 2, 2A, and 44.  To the extent Claims 1 and 28 address the source of Santana's knowledge about the crime and his inconsistent testimony about the color of Carrera's shoes, they are denied on the merits.[14]

**B.     Claim 4: that Carrera's Trial Attorney was Ineffective for Failing to Request Jury Instructions Regarding the Crime of Accessory After the Fact and When a Robbery is Complete.**

Claims 4 is closely related to Claim 45 for which summary judgment was denied in the Court's June 22, 2000 order.  Carrera claims that since he presented an alibi defense at trial and admitted only to assisting Ruiz and Santana burn clothing the day after the robbery-murders, his jury should have been instructed on the crime of accessory after the fact and additionally an instruction should have been given explaining that the robbery had come to an end long before the evidence destruction activity.  Claim 45 alleges trial error for the same omissions.

The analysis of Claim 45 in the June 22, 2000 order applies here and is adopted on the issue of prejudice.  There is no possibility the jurors could have convicted Carrera of robbery (and robbery felony murder) on the belief that his only overt act was helping to destroy evidence.  Based on the evidence presented, the instructions given, and the argument of counsel, the jury reasonably rejected the notion that Carrera was not present at the crime scene.  *See Carrera*, 49 Cal. 3d at 311 (holding "that the jury necessarily rejected defendant's version of the events").  June 22 2000 Ord., pp. 45-46, 51.  The state

---

[14] The Warden did not file points and authorities in opposition to Claims 1 and 28.  Nor does Carrera's reply memorandum of points and authorities make further mention of these claims.

1  court's written factual findings are fully supported by the record.  (Former) 28 U.S.C. § 2254(d).  Claim

2  4 is denied on the merits.[15]

3      **C.      Claims 5, 6, 7, 8, 27, 28, and 53: that Carrera Was Denied the Right to Full and**

4          **Proper Cross Examination Through Trial Error, Prosecutorial Misconduct,**

5          **Ineffective Assistance of Counsel, and Denial of Appellate Review.**

6          In this group of claims, Carrera complains Ms. Huffman did not conduct an adequate cross

7  examination of either Miguel Santana or Teresa Fout.  With respect to Santana, the inadequate cross

8  examination is attributed to ineffective assistance of counsel, trial error, and prosecutorial misconduct.

9  With respect to Teresa, the inadequate cross examination is attributed to ineffective assistance of

10 counsel.  Carrera argues the omitted cross examination should have explored who was present (Teresa,

11 Santana, Carrera and/or Ruiz) when the events of the crime were being recounted and who (Carrera

12 and/or Ruiz) recounted the story.  Carrera claims the inability and/or failure to cross examine Santana

13 and Teresa resulted in the abridgement of Carrera's constitutional right to confront witnesses.  Carrera

14 also complains that the California Supreme Court failed to accurately characterize Carrera's appellate

15 argument about denial of cross examination.  The alleged constitutional violation is said to be prejudicial

16 because of the presentation of differing factual accounts between the two trials.  Again, the identified

17 differences relate to who, Carrera or Ruiz, asked Santana the "guts to kill" question, whether Carrera or

18 Ruiz obtained the larger knife from the kitchen during the attack on Mr. Hayes, and who, Carrera or

19 Ruiz, wore gray Trax shoes.

20         The Court already has found that Santana's testimony at Ruiz's trial was based on what Santana

21 said Ruiz told him, and his testimony at Carrra's trial was based on what he said Carrera told him.  June

22 22, 2000 Ord., p. 11; Oct. 4, 2004 Ord., at pp. 12-13.  Accordingly, on July 12, 2005, the Court denied

23 Carrera's discovery request for files maintained in the Kern County District Attorney's Office regarding

24 Santana so as to facilitate Carrera's development of the claim that Ms. Huffman was not allowed to

25 conduct adequate cross examination of Santana at trial.  July 12, 2005 Ord., at pp. 4-6.

26

27

28         [15] The Warden did not file an opposition to Claim 4 and Carrera's reply points and authorities
   also omits further mention of the claim.

Second, both the June 22, 2000 and October 4, 2004 orders, discount the significance of Teresa Fout's testimony.  June 22, 2000 Ord., at pp. 13-14; Oct. 4, 2004 Ord., at pp. 16-17.  Even Mr. Vendrasco argued to the jurors that they could discount Teresa's testimony at trial.  RT-14: 1984.  Finally, the Court determined that Carrera is entitled to relief on the "guts to kill" and larger knife issues in the October 4, 2004 order.  The issue of who was wearing gray Trax shoes is addressed above in connection with Claims 1 and 28, Part V.A., *supra*.  The alleged confrontation clause violation is harmless in light of the prior rulings.  *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (holding confrontation clause violations are subject to harmless error analysis).  For the same reason there is no prejudice for alleged ineffective counsel or for improper prosecutorial conduct.  *See Strickland v. Washington*. 466 U.S. 688, 694 (1984) (to establish prejudice a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"); *Donnelly v. DeChirtoforo*, 416 U.S. 637, 643 (1974) (improper prosecutorial conduct must "so infected the trial with unfairness as to make the resulting conviction a denial of due process"), *quoted by Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  There being no actionable claim, Carrera's challenge to the adequacy of appellate review also must fall.

Claims 5, 6, 7, 8, 27, 28, and 53 are denied on the merits.

**D.**      **Claims 9, 12, 13, 14, 15, 19, 29, 30, 31, 32, 33, and 34: that the Prosecutor Committed Misconduct by Improper Questioning and Argument and Carrera's Trial Attorney was Ineffective for Not Objecting.**

In this group of claims Carrera alleges Mr. Vendrasco improperly questioned various witnesses (including Carrera, himself) and presented improper argument during summation for the purpose of suggesting facts that were not established by admitted evidence.  He claims the misconduct was so frequent and pervasive that a new trial is warranted.  He further alleges that to the extent Ms. Huffman did not object to Mr. Vendrasco's misconduct, she provided constitutionally ineffective counsel.

1.     **Facts Relevant to Mr. Vendrasco's Alleged Improper Questioning and Argument.**

Carrera provides detailed accounts of Mr. Vendrasco's alleged misdeeds in the conduct of his summation and witness examination of and regarding Teresa Fout, Carmen Santana, Julius Jones, and Carrera.  Each instance is set out below.

### a.     Teresa Fout.

First, Mr. Vendrasco asked Teresa if she remembered telling authorities how many knives Carrera told her he and Ruiz brought with them to the Imperial 400 Motel.  After responding that she did not remember giving authorities a number, he then asked, "You don't recall telling Lieutenant Montgomery that Tino [Carrera] said he had and Ramiro [Ruiz] had five knives and scissors with them."  Again, Teresa responded, "No."  RT-4: 697.  Carrera points out that no evidence was ever introduced that Teresa had made such a statement to authorities.

Next Mr. Vendrasco, calling Teresa on rebuttal (July 19, 1983), asked her if Carrera was the father of her baby.[16]  Ms. Huffman objected due to the impossibility of the suggestion, since Carrera had been arrested and in custody since April 12, 1982.  Mr. Vendrasco then suggested that Teresa became pregnant by Carrera during the very brief period he escaped from the Kern County Jail.  Ms. Huffman objected that the brief time which Carrera was out of the jail was not enough time.[17]  Next, Mr. Vendrasco asked Teresa if she had been pregnant before and although she answered, "No," he continued to ask her whether she became pregnant between April 7, 1982 (the night of the crime) and April 12, 1982 but then had a miscarriage or an abortion.  Ms. Huffman's objections were all sustained.  The trial judge further commented he didn't see the relevance of Mr. Vendrasco's questioning.  RT-13: 1884-86.

### b.     Carmen Santana.

Mr. Vendrasco played a tape recording of an interview Lieutenant Montgomery conducted of Carmen Santana on the theory that the tape recording constituted impeachment of Carmen's prior

---

[16] At that time, Teresa was in the ninth month of her pregnancy.  RT-11: 1261.

[17] Carrera escaped from the Kern County Jail on April 23, 1983.  RT-11: 1148-57 (testimony of Deputy Sheriff Milton Grimes); *id.*: 1161-65 (testimony of Deputy Sheriff Kenneth Eddy).

1    inconsistent statements.  In the tape, Carmen denied that Carrera's sister, Maria Carrera Nunez said that

2    some knives had been missing from her (Maria's) kitchen.  CT-9: 145.[18]

3                                  **c.     Julius Jones.**

4          The primary purpose of jailhouse informant Julius Jones's testimony was to recount Carrera's

5    inculpatory statements about his participation in both homicides as well as his intent to kill.  As

6    determined in the October 4, 2004 order, none of that testimony is credited by the Court because of the

7    undisclosed inducements Jones received for his testimony.  Jones also gave testimony about receiving

8    a threat/ inducement purportedly from Carrera <u>not</u> to speak to authorities.  Jones described a "note" that

9    appeared in his cell, with $15 attached, telling him to "keep [his] mouth shut," and if he did so, he would

10   receive $5,000.  RT-10: 974-75.  The note, marked as Exhibit 223, however, was unsigned and Jones

11   could not identify it.  He testified that he gave it to a jail correctional officer.  *Id*.: 975.  Notwithstanding

12   Jones's inability to identify the note, Mr. Vendrasco called a handwriting expert to compare Exhibit 223

13   with a handwriting exemplar obtained from Carrera.  The handwriting expert could not state that Carrera

14   wrote Exhibit 223, but he also could not eliminate Carrera as the author.  RT-11: 1137-38.[19]

15         Mr. Vendrasco also questioned Jones about attempts made to poison him by the placement of

16   toxic substances in his food.  In response to further direct examination Jones also testified that at the

17   time he was poisoned, Carrera was no longer a jail "trusty," meaning that Carrera would not have had

18   an opportunity to place toxic substances in his food.  RT-10: 976-77.  There were no further attempts

19   to substantiate that Carrera tampered with Jones's food.

20                                 **d.     Carrera.**

21         During Mr. Vendrasco's cross examination of Carrera, there were numerous objections

22   interposed and sustained on the grounds that the questions were overly argumentative, assumed facts not

23   in evidence, or otherwise were improper.  Carrera cites to nine such transcript excerpts.

24   _____

25        [18] After carefully reviewing the entirety of Carmen Santana's testimony at RT-9: 603-46, the
     Court cannot discern how the substance of this interview could have been impeachment evidence.
26   Carmen Santana did not testify about her awareness that knives were or were not missing from Maria's
     kitchen.

27        [19] Exhibit 223 also is discussed in connection with Claims 88 and 89 in the March 11, 2008 order
     regarding Ms. Huffman's alleged failure to develop and present a mental state defense.  *See* Mar. 11,
28   2008 Ord., p. 66.

Mr. Vendrasco asked Carrera, "So how many people did you discuss the case with before deciding on what to testify to?"  Ms. Huffman objected to the word, "deciding,"and her objection was sustained on the grounds that the question was argumentative.  RT-12: 1480.

Next, Mr. Vendrasco asked, "So you were not being truthful when you talked to certain individuals in the jail on tape, but all of a sudden now you are being truthful; is that correct?"  Again, Ms. Huffman objected and the objection was sustained on the same grounds.  *Id*.: 1489.

The very next question posed by Mr. Vendrasco was, "Is there some reason for the transformation?"  Ms. Huffman objected to use of the word, "transformation,"and the trial court sustained the objection, commenting, "All of these questions are argumentative in the way they are being phrased."  *Id*.

Mr. Vendrasco asked, "Is that why three or four individuals are all saying that you admitted the crime?"  Ms. Huffman objected on the grounds that the questioned assumed facts not in evidence and the objection was sustained.  *Id*.

He asked Carrera, "Are you afraid of being prosecuted for perjury?"  Ms. Huffman's objection (no grounds stated) was sustained.  *Id*.: 1492.

He asked, "I would say going back towards Carmen's house, you never testified that you were jogging at that time?"  Carrera answered, "I haven't testified, but yes, I jogged."  Having determined that Carrera jogged, Mr. Vendrasco asked, "Did you have a jogging outfit on at the time?"  The trial court sustained Ms. Huffman's objection to this question.  *Id*.: 1528.

Mr. Vendrasco asked, " How is it that witnesses remember hearing the trunk open when you first got out and then close just before you got back in the car?"  Ms. Huffman objected and the trial court sustained the objection explaining, "That's asking him to comment on why some witnesses testified, and he can't do that."  *Id*.: 1531.

Mr. Vendrasco asked, "So then three people then just made it up, or just, in your opinion, they just guessed about coming back with black leather shoes?"  Ms. Huffman objected, and the trial court sustained the objection on the same grounds.  *Id*.: 1532.

Next, Mr. Vendrasco asked, "Then you know how to lie pretty good, don't you?"  Carrera responded, "I don't know how to take that, Counsel."  Mr. Vendrasco's follow-up question was, "Well

1   you are a pretty proficient liar, aren't you?"  This question prompted an objection by Ms. Huffman on

2   the grounds that it was argumentative, and the trial court sustained it on that ground.  *Id*.: 1553.

3       After over twenty objections were sustained, Ms. Huffman moved for a mistrial on the grounds

4   of prosecutorial misconduct for Mr. Vendrasco's badgering of Carrera.  The trial court denied the motion

5   "at this time."  *Id*.: 1555.

6       In addition, Carrera points to two occasions where Mr. Vendrasco asked objectionable questions

7   to which Ms. Huffman did not interpose an objection:

8       Mr. Vendrasco asked Carrera if recalled that Teresa Fout, Miguel Santana, *Tina Harris*, *Carmen*

9   *Santana*, and *Efrain Carrera* had testified he (Carrera) wore gray Trax shoes on the night of the crime,

10  *id*.: 1515, whereas only Teresa Fout and Miguel Santana testified to this fact.

11      Next, Mr. Vendrasco injected the death penalty into his guilt phase cross examination when he

12  asked Carrera whether naming the true murderers and being called a "snitch" in prison was worse than

13  "going to the gas chamber."  *Id*.: 1517.

14                    **e.      Summation.**

15      Carrera recounts ten instances where Mr. Vendrasco made improper argument on summation.

16      As he did when cross examining Carrera, on summation Mr. Vendrasco injected the fact that the

17  death penalty was at stake (during guilt phase proceedings) when he told the jury: "He is not beyond

18  getting other people to actually lie for him in court.  When he realizes his life is at stake, he could easily

19  work through his brother, et cetera, family members, to get others to put the blame on others."  RT-14:

20  1958.

21      Mr. Vendrasco argued Carrera attempted to escape from jail for the purpose of intimidating

22  witnesses to dissuade their testimony, *id*.: 1958-59, when no evidence was introduced to that effect.

23      Mr. Vendrasco claimed that Carrera admitted to Santana, Teresa, and the two jailhouse

24  informants that he (Carrera) and Ruiz robbed and killed the victims, *id*.: 1961, when in fact Santana and

25  Teresa testified Carrera admitted only to cutting Mrs. Hayes once on the wrist.

26      In summarizing the testimony of Santana, Teresa, and the jailhouse informants, Mr. Vendrasco

27  referred to "unique details only the murderer would know, such as the lady being slashed on the wrist

28  or wrist cut off," *id*., when this "fact" was only recounted by jailhouse informant Julius Jones.

He argued that Carrera threatened to "shank" Robert Fout while both were in jail, as an example of the threats Carrera made.  RT-14: 1971.

He claimed Carrera tried to silence other witnesses by having others beat them up.  RT-14: 1971.

He equated Carrera's denigration of people who "snitch" as characteristic of gang membership, thus suggesting Carrera was part of a gang.  *Id*.: 1980.

Contrary to the charging documents, he described the dead bodies as "a torture situation."  This comment in turn elicited an objection from Ms. Huffman, which the trial judge sustained as exceeding "proper argument."  *Id*.: 2000.

He argued there was a decision by both Carrera and Ruiz to kill before they entered the motel.  *Id*.: 2004.

He argued that Carrera asked Santana, "Have you ever killed before?" notwithstanding the fact that the question posed to Santana was whether he (Santana) had the "guts to kill."

## 2.    Carrera's Argument.

Referring to the ABA Standards for Criminal Justice, § 3-5.8, Carrera recites that, "The prosecutor should not make arguments calculated to appeal to the prejudices of the jury . . . [and] should refrain from argument which would divert the jury from its duty to decide the case on the evidence." He further points out that the Ninth Circuit looks to the ABA Standards for evaluating prosecutorial misconduct.  *See Sandoval v. Calderon*, 231 F.3d 1140, 1150-52 (9th Cir. 2000), *amended and superseded*, 241 F.3d 765, 776-78 (9th Cir.) (same proposition).  Carrera also relies on *Alcorta v. Texas*, 355 U.S, 28, 31 (1957) for the proposition that if evidence is presented which "taken as a whole" gives the jury a "false impression of the true facts, the defendant's due process rights are violated.  *See also Downs v. Hoyt*, 232 F.3d 1031, 1038 (9th Cir. 2000) (quoting *Alcorta*, 355 U.S. at 31).  He claims that the misconduct committed by Mr. Vendrasco in his summation "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly*, 416 U.S. at 643; *see also Darden*, 477 U.S. at 183 (holding due process rights are violated if prosecutorial misconduct renders trial "fundamentally unfair").

Regarding the questions posed to Teresa, he argues that the "baseless" claim that Carrera had five knives and scissors was "highly prejudicial in every aspect of this case."  He maintains that the

suggestion Carrera, age 20 at the time of the crime, had sexual relations with Teresa, age 14 at the time of the crime, showed him to have bad character.  As with the questions to Teresa about five knives and scissors, the suggestion elicited from questioning Carmen Santana that Carrera brought multiple knives with him to the Imperial 400 Motel was unduly prejudicial.  He claims the misconduct is magnified because there was no evidence regarding missing knives and thus no prior statement to impeach.

The questions posed to Julius Jones suggested that Carrera would threaten, poison, or injure other inmates to influence testimony.  This was done solely by insinuation because, Carrera argues, the actual testimony adduced did not support the theory of threats and/or bribes underlying Mr. Vendrasco's questions.  Carrera claims Mr. Vendrasco asked these questions to give some substance to his later argument that there was evidence Carrera threatened people in jail.

His argumentative and harassing questions to Carrera repeatedly accused him of lying and thus improperly accused Carrera with the commission of perjury which had not been charged.  Further asking Carrera why his answers were different than the testimony of other witnesses, was improper because Carrera would not have been capable of answering this question, as the trial judge found.  *See also United States v. Sanchez*, 176 F.3d 1214, 1219 (9th Cir. 1999) (holding that determinations of credibility are for the jury, not for witnesses). Mr. Vendrasco's injection of the death penalty into guilt phase proceedings suggested that Carrera would and did lie in order to avoid the death penalty.

Without addressing each alleged misstatement during summation individually, Carrera asserts Mr. Vendrasco over stated the crime and falsely attributed to Carrera conduct he did not perform and a mental state he did not harbor.  All of this gave the jurors a false and misleading impression of Carrera's bad character (including possible gang membership) and culpability.

### 3.    Analysis.

While the Court finds Carrera' citation to *Donnelly*, 416 U.S. 637, and *Darden*, 477 U.S. 168, to be on point for the standard to determine a due process violation for improper prosecutorial conduct, the Court finds *Alcorta*, 355 U.S. 28, inapposite.  *Alcorta* pertains to the presentation of false evidence, in line with *Napue*, 360 U.S. 264, and *Brady v. Maryland*, 363 U.S. 83 (1963).[20]  Under *Napue*, *Brady*,

---

[20]   Both of these cases refer to *Alcorta* to illustrate examples of a prosecutor presenting false evidence.  *Napue*, 360 U.S. at 269; *Brady*, 363 U.S. at 87.

1   and cases following, relief for prosecutorial presentation of false testimony is available if the false

2   testimony was material to the judgment.  Materiality under these cases requires only that the false

3   testimony "may have had an effect on the outcome of the trial," or there is "any reasonable likelihood"

4   it could have affected the verdict.  *See Brady*, 363 U.S. at 87; *Napue*, 360 U.S. at 272; *United States v.*

5   *Agurs*, 427 U.S. 97, 103 (1976).  In contrast, prosecutorial misconduct which mischaracterizes the

6   evidence entitles the offended party to relief only if the trial was rendered fundamentally unfair.  *Darden*,

7   477 U.S. at 183.

8         Carrera's culpability for intentional murder having already been analyzed, and a ruling entered

9   in his favor, the focus for the present claims is directed to his robbery and robbery felony murder

10  convictions.  With that focus in mind, the "facts" which Mr. Vendrasco's suggestive questioning and

11  misleading summation brought before the jurors include that Carrera engaged in sexual relations with

12  14 year old Teresa, that he tried to influence testimony through threats, poisoning, injury, and bribes (and

13  even that he escaped from jail to intimidate witnesses), that he committed perjury on the stand, that his

14  dislike for "snitches" was similar to gang-member views, and that the scene of the crime was particularly

15  brutal and gruesome.  The California Supreme Court agreed with Carrera that "the prosecutor may have

16  stepped over the line of permissible argument" in many respects and that some of his statements "were

17  not simple hyperbole or slight exaggerations in the heat of argument; they were misstatements of the

18  record and potentially prejudicial to defendant's case." 49 Cal. 3d at 320.  Specifically, the California

19  court found there was no basis for suggesting that Carrera "sought to escape in order to intimidate

20  witnesses."  *Id*.  Nonetheless, the state high court also found the misstatements "were not so extreme

21  or so divorced from the record that they could not have been cured by prompt objections and

22  admonitions."  *Id*.  Since Ms. Huffman's failure to object or request a curative instruction involved a

23  claim of ineffective assistance of counsel, a claim outside the record, the California court declined to

24  address the issue on direct appeal.

25        On habeas, this Court addresses Carrera's extra-record claims.  First, the Court finds that none

26  of the facts suggested by Mr. Vendrasco's questions and argument rendered Carrera's robbery and

27  robbery felony murder convictions fundamentally unfair.  The suggested fact that Carrera engaged in

28  sexual relations with Teresa was simply far-fetched.  Carrera was arrested on April 12, 1982 and Teresa

was in her nine month of pregnancy in July of 1983, 15 months later.  His escape from the jail was in April of 1983, only three months before Teresa's July 1983 testimony.  Attributing her pregnancy to Carrera was ludicrous.  As to a possible earlier pregnancy, Teresa testified her pregnancy in July 1983 was her first, and she further denied having had a miscarriage or therapeutic abortion from any previous sexual encounter with Carrera.  She denied having any sexual relations with Carrera.[21]  Besides the effective refutation of Mr. Vendrasco's suggested evidence from Teresa, the intimation that Carrera had bad character because he did or may have engaged in sexual relations with a 14 year old girl is completely diluted in light of his alibi that at the time Mr. and Mrs. Hayes were robbed and murdered, he was having sex with 12 year old Tina Harris.  *See* CT-5: 35 (translated transcript of Exhibit 216, one of two tape recordings or jailhouse visits); RT-13: 1749 (rebuttal testimony of Lieutenant Montgomery recounting the substance of Carrera's alibi), discussed in the Mar. 11, 2008 at pp. 4, 63, 69.  Although the Court does not credit this alibi, and neither did his jury, he is the one who initially suggested it during his interview with Lieutenant Montgomery and in conversations with his visitors at the jail.  Any impression jurors may have had of his bad character for engaging in sexual relations with female minors was of his own making.

Next, the threats/ poisoning/ injury/ bribes suggestions as well as suggestions that Carrera didn't like snitches and was perjuring himself on the witness stand, including because of his fear of the death penalty, were little more than embellishments on Carrera's credibility as a witness and believability of his defense theory of deflecting blame on Teresa as Ruiz's co-participant in the robbery and murders.  The Court does not agree that equating Carrera's dislike of "snitches" with sentiments harbored by gang members reasonably could have influenced any juror to believe he was criminally responsible for robbery and robbery felony murder or that he was a gang member.  With respect to the threats and bribes suggestion, Mr. Vendrasco's argument was grounded on evidence elicited from Teresa's brother, Robert Fout.  Contrary to Carrera's contention, Robert Fout did testify that Carrera threatened to come the next morning and "shank" him (Fout) when they were both in the Kern County Jail.  Carrera reportedly said

---

[21] Ironically, Efrain Carrera, Carrera's younger brother, admitted to being the father of Teresa's baby in his June 20, 1995 declaration attached to Carrera's October 27, 1995 state exhaustion petition. Efrain Carrera avers that "in August of 1983, Teresa Fout gave birth to my daughter."  This is the first mention of the paternity of Teresa's child in the record.

1    "'you better make that move [22] or I'm going to come in the morning and shank you.'" RT-9: 763.  The

2    argument as to the "shank" threat was proper.

3         Mr. Vendrasco's reference to the crime scene photographs as depicting "a torture situation," may

4    have been a poor choice of words, but it could not have reasonably influenced the jurors to believe

5    Carrera was charged with torture.  Mr. Vendrasco was referring the jurors to the crime scene photographs

6    admitted as exhibits and which depicted the appearance of the victims when authorities first commenced

7    their investigation.  The pathologist's testimony about the victims' wounds indicate that the photographs

8    necessarily were gruesome and bloody.  Mrs. Hayes sustained from 20 to 30 knife wounds, including

9    quite a few to the back of her head and two slashing wounds on her right forearm, with the most serious

10   being to her chest and upper abdomen.  RT-11: 1276-79 (testimony of Kern County technical

11   investigator Jeff Green); *id*.: 1291, 1298 (testimony of pathologist Silvia Comparini, M.D.).  There were

12   14 to 15 large wounds on Mr. Hayes, including his chest and his brain.  *Id*.: 1295, 1298 (testimony of

13   Dr. Comparini).  The torture comment was harmless.

14        The Court discounts prejudice from the suggested facts that Carrera carried multiple knives to

15   the Imperial 400 Motel, that multiple witnesses, not just Teresa Fout and Miguel Santana, observed

16   Carrera wearing gray Trax shoes on the night of the crime, and that Teresa Fout and Miguel Santana,

17   as well as the jailhouse informants testified Carrera actively participated in both homicides and harbored

18   the intent to kill.  Eliminating inferences regarding Carrera's actual participation in the murders and his

19   intent to kill, the fact that he may have brought multiple knives to the motel is equally probative of his

20   intent to commit a robbery as bringing a single knife.  The color of Carrera's shoes, as recounted by

21   Teresa and Santana is sufficient, when combined with other circumstantial evidence, to place Carrera

22   at the Imperial 400 Motel on the night of the robbery-murders.  The inaccurate suggestion that other

23   witnesses besides Teresa and Santana said Carrera had been wearing gray Trax shoes was harmless.  It

24   was merely cumulative.

25        The last allegedly misleading argument Carrera claims was not based on admitted evidence is

26   that Carrera cut Mrs. Hayes's hand off during the attack.  Contrary to this contention, the Court finds

27

28        [22] It is not at all clear from the transcript what "that move" means.

the argument was properly based on the testimony of jailhouse informant Julius Jones who testified that Carrera said he (Carrera) chopped or cut the lady's hand off.  RT-10: 963, 1000.  Although it was improper for Mr. Vendrasco to have attributed this statement to Santana, Teresa, Thomas Hill/ Morse *and* Julius Jones, there was evidentiary support for the argument in the record.  It was not an argument which suggested facts not in evidence.  While the believability of Jones's testimony is not at issue in connection with the present argument (since that issue already has been covered in the October 4, 2004 order), the prosecutor was entitled to argue his theory of the case based on witness testimony.

The misdeeds and alleged misdeeds attributable to Mr. Vendrasco did not render Carrera's convictions for robbery and robbery felony murder fundamentally unfair and Ms. Huffman was not ineffective for failing to object.  Claims 9, 12, 13, 14, 15, 19, 29, 30, 31, 32, 33, and 34 are denied on the merits.

**E.      Claim 16: that Carrera's Trial Attorney was Ineffective for her Failure to Move to Suppress the Jailhouse Visit Tape Recordings on the Grounds that Carrera's Warrantless Arrest Lacked Probable Cause and was Therefore Illegal.**

Carrera complains that Ms. Huffman should have moved to suppress the jailhouse visit tape recordings on the grounds that his April 12, 1982 warrantless arrest which preceded the visits lacked probable cause.  In support of this claim, he points to two interviews Lieutenant (then Sergeant) Montgomery conducted prior to the arrest, one with Teresa Fout, and one with Teresa's friend Patience Sherrill.  Carrera claims that at the time of his arrest, Teresa was known to be an unreliable source of information, having changed her story of how she learned of and/ or participated in the crime. Accordingly, there was no probable cause for the arrest, and the incriminating statements Carrera made to jail visitors should have been suppressed.  The Warden claims that Carrera's arrest on April 12, 1982 was not planned, but proper, and that Teresa's credibility issues did not come to light until after Carrera was in custody.

**1.      Facts Relevant to the Legality of Carrera's Arrest.**

When Teresa was first interviewed at the Mojave Substation about the Imperial 400 homicides, she revealed to Lieutenant Montgomery that Ruiz and Carrera told her they had stabbed two people.  She also reported that she saw blood on Carrera's pants and that Ruiz and Carrera changed their clothes

during the trip from Carmen Santana's house in Mojave to Rosamond.  CT-1: 25-27.  During the interview, Lieutenant Montgomery drove Teresa to the location where Ruiz and Carrera were said to have changed clothes.  Lieutenant Montgomery was looking for discarded bloody clothing, since his investigation of the crime scene led him to the conclusion that the perpetrators of the crime would have had blood on their clothing and shoes.  After leaving the clothes changing site (and not finding any discarded clothing), Lieutenant Montgomery and Teresa were passed by a gold Cadillac driven by Ruiz with Carrera as a passenger.  Concerned Ruiz and Carrera may have seen Teresa in the company of a sheriff's deputy, Lieutenant Montgomery called for back up so Ruiz and Carrera could be arrested.  *Id.*: 27.  In the interim, investigating officers continued interviewing numerous witnesses.  On the same day Teresa Fout and Patience Sherrill were interviewed, two more female witnesses, Mildred Shane (who was Teresa's step-sister) and Cheryl Nickel (a friend), came into the Mojave Substation where they were interviewed by Deputy Gerald Coffee and Sergeant Doug Ward.  *Id.*: 28.  Both told authorities what Teresa told them the day after the murders.  As Carrera points out, the information these witnesses reported differed in several details from the account Teresa gave.  The next day, April 13, 1982, authorities picked up a note written by Teresa stating she had been with Carrera and Ruiz when they went to the Imperial 400 Motel, but that she stayed in the car.  CT-1:17.  Also on April 13, 1982, at 1440 hours, Lieutenant Montgomery and Sergeant Howard Thurston commenced their interview with Carrera.  *Id.*: 29.  In a May 28, 1988 declaration executed by Lieutenant Montgomery, he explains:

> [O]nce Carrera was arrested on April 12, 1982, I and the other investigating officers at the Mojave Substation worked almost around the clock in interviewing witnesses and writing reports about the investigation results.  These reports had to be prepared for the district attorney so that a complaint could be filed, an arrest warrant could be issued, and Carrera could be arraigned.  The bulk of the reports were not even typed up until April 14, 1982.  Once typed, the reports had to be transported to the district attorney's office some 65 miles away [in Bakersfield]. . . . We were so busy investigating this case that we did not even attempt to interview Carrera until April 13, 1982 at 2:40 p.m.[23]

At 1730 hours on April 13, 1982, Sergeants Thurston and Ward interviewed Miguel Santana.  *Id.*: 31-32.  Then, on April 14, 1982, Carrera's jailhouse visits with friends and family were recorded.  On the same

---

[23] This declaration was appended to the State's June 23, 1988 return to an order to show cause issued by the California Supreme Court in connection with Carrera's original state habeas proceedings.

1   day, Judge Carey F. Scott issued an arrest warrant based on information conveyed to him (Judge Scott)

2   by Lieutenant Montgomery. *Id.*: 37.

3            **2.      Analysis.**

4            In the March 11, 2008 order, the Court has discussed the fact of Carrera's April 12, 1982

5   warrantless arrest, his April 13, 1982 statement to authorities, and the April 14, 1982 issuance of an

6   arrest warrant. *See* Mar. 11, 2008 Ord., at pp. 6-7; 11-12. The only new information brought to light

7   by the parties respective arguments regarding Claim 16 pertains to whether authorities knew of Teresa's

8   credibility problems at the time of Carrera's April 12, 1982 arrest. Contrary to Carrera's contentions,

9   there is no indication that Lieutenant Montgomery did know or could have known about the

10  discrepancies in Teresa's various accounts of the crime when he effectuated Carrera's and Ruiz's arrest.

11  In light of the record and the prior discussion of the arrest, the Court finds that the April 12, 1982

12  warrantless arrest was not illegal. The record further reflects that Carrera's continued custody, until an

13  arrest warrant issued on April 14, 1982 was proper and not illegal. Accordingly, there was no basis for

14  Ms. Huffman to have moved for suppression of the jailhouse visit tape recordings on the basis of

15  Carrera's alleged illegal arrest. Claim 16 is denied on the merits.

16       **F.      Claim 35: that the Trial Court Committed Prejudicial Error by Admitting**

17              **Improper Hearsay Statements by Co-Perpetrator Ramiro Ruiz.**

18          Carrera complains that the trial court's admission of Ruiz's hearsay statements was prejudicial

19  error. The statements were admitted during the examination of Miguel Santana's younger brother Jose

20  Santana. Carrera further maintains that the California Supreme Court determination that the error was

21  harmless is unsupported by the record under former 28 U.S.C. § 2254(d).

22            **1.      Facts Relevant to Alleged Trial Error for Admission of Ruiz's Hearsay**

23                  **Statements.**

24          Jose (or Joe) Santana was called to the witness stand and questioned on June 22, 1983 about a

25  conversation he had with Ruiz on January 31, 1982 (a little more than three months before the crime).

26   Ms. Huffman objected to the question on the grounds that it called for hearsay (Ruiz's statements) and

27  evidence not relevant to Carrera's case. After an unreported bench conference, the trial court deferred

28

ruling on the objection until the following day.  RT-8: 557-58.  A settled statement of the unreported

bench conference revealed:

> The District Attorney made an unreported offer of proof at the bench (RT-8: 558) that
> witness Joe Santana would testify that co-defendant Ruiz told him that Ruiz was angry
> at the Imperial 400 Motel for firing him as an employee and that he "would get back at
> them."  In response to defense counsel's hearsay [and relevance] objection[s], the DA
> argued that he would be able to "tie it up later." [As to the hearsay objection, t]he District
> Attorney also argued (1) that this was a statement of intent, and (2) that it was a
> statement of a co-conspirator in furtherance of a conspiracy.  The trial judge accepted this
> representation [regarding relevance and the DA's ability to tie it up later] and admitted
> the hearsay testimony over objection [on state of mind exception to the hearsay rule].

CT-9: 55, 64-65.

The next day, in a reported chambers conference, Ms. Huffman argued against the evidence

because Ruiz's statement of mind in January was too remote to indicate Ruiz's statement of mind in

April. RT-9: 650-51.  She also argued the statement constituted unexcepted hearsay which was intended

to connect Carrera to Ruiz's state of mind.  *Id.*: 651-52.  The trial court clarified that Ruiz's hearsay

statement(s) would not be admissible under a conspiracy theory, but would be considered under the

theory that Carrera aided and abetted Ruiz.  The relevance of Ruiz's statement mind, then, became his

(Ruiz's) intent to commit the crime Carrera aided and abetted.  *Id.*: 652.  The trial court further found

that the offer of Ruiz's state of mind was for a non-hearsay use, showing a motive Ruiz had for

committing the crime, and was not too remote.  *Id.*: 653.

On direct examination, Mr. Vendrasco then elicited from Joe Santana, then age 15,  that

sometime in January 1982, Ruiz talked to Joe at the Mojave Park  about the fact that Ruiz lost his job

and the Imperial 400 Motel and said "he [Ruiz] would get even."  This revelation was followed by Joe's

further explanation, "but you [Mr. Vendrasco] told me I said that in a letter, and I don't remember saying

it.  I might have, but I don't remember."  *Id.*: 657.  Mr. Vendrasco then had Joe clarify that although he

didn't remember Ruiz making the statement to him (Joe), he did remember relaying that information to

authorities.  *Id.*

On cross examination, the issue of whether Joe actually had reported Ruiz's "get even" statement

clouded up again:

> Question [by Ms. Huffman]: When did you tell the police officers that Mr. Ruiz made
> that statement to you?  Answer: Sometime in January, but I don't remember saying it.
> Question.  You don't remember saying it?  Answer: No.  They told me that I said it, that

they had proof of it, so I went along with it because I didn't know if they had proof or not.  Question: So you don't really know whether Mr. Ruiz told you this or not?  Answer: Yeah, because they said they had – they said they had proof I had wrote it in a letter.  Question: That you wrote it in a letter.  Answer: Yeah.  Question: Did they ever show you the letter you wrote it in?  Answer: No, they didn't.  Question: You don't remember making the statement at all, do you?  Answer: No, I don't.  Question: Do you remember Mr. Ruiz making a statement to you at any time?  Answer: No.

*Id.*: 659-60.

Joe's faulty memory, and specifically his lack of memory about whether Ruiz ever spoke to him was confirmed on re-direct examination.  When Mr. Vendrasco asked Joe how he knew he spoke to Ruiz at a specific location (Mojave Park) if he didn't recall the conversation.  Joe responded, "You told me that we [Joe and Ruiz] were talking."  Finally Joe testified that although Ruiz told Joe he (Ruiz) had been fired from the Imperial 400 Motel, he did not tell Joe he "was going to get even."  *Id.*: 660.

During her summation, Ms. Huffman argued about the Ruiz "get even" statement:[24]

Joe Santana got on the stand and he, if you recall, said Mr. Vendrasco was asking questions, well, didn't you have a conversation with Ramiro Ruiz about him working at the Imperial 400 Motel, and he said yes, and he said well, do you recall him saying something to you about getting back at the motel and Mr. Santana sat on the stand and he said no, I don't recall that, but I am saying that because you told me you could prove it if I didn't get up here and say that that's what he said.  Now that's unusual.  But I believe that boy was being honest.

RT-14: 2025.

On rebuttal, Mr. Vendrasco argued:

As far a Joe Santana's testimony, he admitted on the stand that he talked to Ramiro [Ruiz] when Ramiro quit his job.  The only thing he doesn't remember Ramiro saying was that he was going to get back at the motel.  All right.  You can consider his testimony and the bias, interest, motive, and he did in fact admit to having a discussion with Ramiro in reference to losing the job at the motel.

*Id.*: 2046.

## 2.    Carrera's Argument.

Carrera argues that Ruiz's state of mind was totally irrelevant because as an aider and abetter, he (Carrera) had to have his *own* intent to commit the crime.  *See Beeman*, 35 Cal. 3d at 561.  He claims the prejudice resulting from the admission of Jose's testimony about Ruiz's out of court statement allowed the jury to draw the inference that Ruiz's vengeful motive to "get even" with the Imperial 400

---

[24] Mr. Vendrasco did not bring up this issue during his summation.  He did respond to Ms. Huffman's argument on rebuttal.  *See infra.*

Motel was either communicated to or shared by Carrera.  He further complains that Mr. Vendrasco

argued evidence about Ruiz's vengeful state of mind suggested it was evidence of Carrera's state of

mind.

### 3.  Analysis.

The starting place for analysis of Claim 16 is the decision of the California Supreme Court.

> Defendant also objects to the trial court's ruling permitting Santana's younger brother to
> testify that three months prior to the killings Ruiz told him he had lost his job at the
> Imperial 400 Motel and allowing the prosecutor to bring out that the witness had told
> police that Ruiz had said he "would get even."  Even assuming that the statement should
> not have been allowed into evidence, the testimony was equivocal – as the witness
> testified he did not recall either that Ruiz had made that statement or that he had told
> police of it – and any error was harmless.

49 Cal. 3d at 322-22.

Carrera maintains that the California court's conclusion about the equivocal nature of Joe's

testimony is not supported by the record because Joe testified he remembered making the statement to

authorities after they told him he previously reported Ruiz conveyed vengeful thoughts.  While Carrera

is correct that Joe testified in this manner, he also testified that he didn't recall telling authorities about

Ruiz's "get even" statement and didn't recall Ruiz making the "get even" statement.  In the end, Ruiz's

state of mind statement amounted to little.  Mr. Vendrasco didn't even mention it in his summation.  It

was not until after Ms. Huffman pointed out that ultimately Joe did not endorse Mr. Vendrasco's theory

that Ruiz previously told Joe he (Ruiz) wanted to get even with the Imperial 400 Motel that Mr.

Vendrasco mentioned the issue on rebuttal.   But even on rebuttal, Mr. Vendrasco did not make a

compelling argument.  He pointed out that Joe did not remember Ruiz saying he (Ruiz) wanted to get

back at the motel.  This concession undercuts the notion that Ruiz committed the robbery and murders

consistent with a vengeful intent and similarly eliminates the inference that Carrera went along with

and/or agreed in a scheme to "get even."  The factual finding of the California Supreme Court is fully

supported by the record and will not be disturbed on federal habeas.  *See* former 28 U.S.C. § 2254(d).

The Court fully concurs, that even if the trial court erred for admitting Ruiz's statement, the error was

harmless because it was equivocal and of so little weight.

In addition to being equivocal, admission of the Ruiz "get even" statement was separately

harmless because for purposes of establishing Carrera's intent to rob, plenty of other evidence existed

in the record that did not require the jury to rely on Ruiz's communicated state of mind.  As noted in previous orders, Carrera accompanied Ruiz to the Imperial 400 Motel with one or more knives and rubber dishwashing gloves, and he cut Mrs. Hayes on the wrist in furtherance of the robbery effort. Claim 35 is denied on the merits.

**G.      Claim 37: that Carrera's Due Process Rights Were Violated Because the Jury Was Not Instructed that the Testimony of the Jailhouse Informants Should be Regarded with Care, Caution, and Distrust.**

Claim 37 is not presented in terms of trial error or ineffective assistance of counsel – but rather as a straight due process claim.  Carrera complains that the absence of instructions warning the jury to view the jailhouse informants' testimony with care, caution, and distrust conferred on the informants undeserved credibility.  In light of the October 4, 2004 order finding Carrera is entitled to relief on Claims 2, 2A, and 44 as to the death eligibility special circumstance findings, this additional attack on the informants' credibility is superfluous.[25]   Claim 37 is denied as moot.

**H.      Claim 42: that Carrera's Due Process Rights were Violated Because the Trial Court Overruled Defense Objections to 25 Gruesome Color Photographs of the Victims.**

As he did on direct appeal, Carrera contends the trial court abused its discretion in admitting 25 of the 51 crime scene photographs, specifically of the victims' wounds, offered by the prosecution.  *See* 49 Cal. 3d at 328.  He maintains that excessive enlargement of the photographs inaccurately distorted reality, rendering them unnecessarily gruesome and appalling.  He maintains Ms. Huffman's objection to the admission of these 25 photographs under California Evidence Code § 352 should have been sustained because in light of the fact that only one of the total 35 to 40 stab wounds inflicted on both victims properly was attributable to Carrera (and the others attributable Ruiz).

Noting that admission of victim photographs is within the discretion of the trial court, the California Supreme Court declined to find an abuse of discretion.  "If they served no other purpose, the enlarged photographs helped to clarify the testimony of the medical expert – who testified on the basis of another's notes and autopsy report, as the author had since died  – on the location and nature of the

---

[25] The Warden did not file an opposition to Claim 37 and Carrera's reply memorandum of points and authorities also omits further mention of the claim.

1  wounds." *Id*. at 329.  The court also found that the photographs supported the prosecution theory of

2  willful, deliberate and premeditated murder and were "relevant to establish the manner in which the

3  killings were committed." *Id*. (footnote omitted).  Finally, the state court found the photographs were

4  clinical enlargements, many of which were "disassociated from a human body," and that Carrera's

5  contention that the enlargements turned 'ordinary knife wounds into gapping holes' seriously overstated

6  the likely impact of these photographs on the jurors." *Id*.

7       The Court agrees that showing the jurors the 25 admitted photographs may have been

8  unnecessary to explain the location and nature of the victims' wounds.  However, the fact that a primary

9  purpose of the photographs was to establish the manner in which the killings were committed, and the

10  Court already has found Carrera is entitled to relief on the issues of his intent to kill and his actual

11  participation in the homicides, the admission of the photographs is irrelevant to his participation in the

12  robbery supporting robbery felony murder.[26]  Claim 42 is denied on the merits.

13      **I.**    **Claims 48 and 49: that the California Supreme Court Violated Carrera's Due**

14             **Process Rights for Not Considering his Initial State Habeas Petition on the Merits**

15             **and Refusing to Consider the Entire Transcript of Ruiz's Trial.**

16       Carrera complains that the California Supreme Court erroneously and wrongfully vacated its

17  order for the People of the State of California to show cause why a writ of habeas corpus should not be

18  granted which thereby denied Carrera the opportunity to further develop his claims.  He contends the

19  California court also created a "Catch-22" situation when it refused to consider his ineffective assistance

20  of counsel and prosecutorial misconduct arguments on direct appeal and then refused to augment the

21  record to include the relevant extra-record documents on state habeas.  Specifically, the extra-record

22  documents which would have supported the ineffective counsel and prosecutorial misconduct claims

23  were trial transcripts from Ruiz's trial.  Citing *Smith v. Robbins*, 528 U.S. 259 (2000), he claims the

24  California court impermissibly denied him "a fair opportunity to obtain an adjudication on the merits

25  of his appeal." *Id*. at 277.

26

27

28         [26] Claim 42 is not mentioned in the Warden's points and authorities.

1    Assuming for the sake of argument that the California court should have but failed to address

2    each and every point he raised on direct appeal and state habeas, the complained of omission was

3    harmless.  This Court has considered Carrera's post-conviction arguments as well as his extra-record

4    proffered excerpts from Ruiz's trial (including examination of witnesses and Mr. Vendrasco's

5    summation).  Except for the Claims 2, 2A, and 44 pertinent to the death eligibility special circumstances,

6    the Court has determined that Carrera's Petition, and each remaining claim contained therein, must be

7    denied on the merits.  Since this Court has done what Carrera claims the California court failed to do,

8    there is no prejudice.[27]  Claims 48 and 49 are denied on the merits.

9    **J.    Claims 47 and 54: that the Multiple Instances of Prejudice Identified on Direct**

10   **Appeal Amounted to Cumulative Prejudice.**

11   Carrera maintains the California Supreme Court failed to accord sufficient weight to the

12   cumulative effect of multiple trial errors on direct appeal.  Besides complaining about the inadequacies

13   of the California court review, Carrera also urges this Court to find that cumulative prejudice should

14   entitle him to relief.  In the Petition, Carrera mentions both guilt phase issues and penalty phase issues.

15   Petition, p. 95.  Neither of the parties' argument acknowledges the Court's October 4, 2004 order

16   granting relief as to the special circumstance findings.[28]  The Court concludes that none of the errors

17   mentioned by Carrera, even as accumulated, entitle him to relief on the robbery or robbery felony murder

18   convictions.   As the Court previously found, evidence of his participation in the robbery was

19   overwhelming: witnesses testified as to his absence from the Santana residence during the time period

20   Mr. and Mrs. Hayes were robbed and murdered, they observed blood on his clothing, he admitted

21   participation in the robbery to his friends, he was actively involved in post-crime destruction of evidence,

22   and following his arrest, he alternately attempted to deflect blame from himself and bragged about the

23   crime.  *See* Oct. 4, 2004 Ord., pp. 62-63.  Claims 47 and 54 are denied on the merits.

24

25

26   [27] Claims 48 and 49 are not mentioned in either the Warden's points and authorities or in
     Carrera's reply points and authorities.

27

28   [28] The Warden's points and authorities were filed May 16, 2005 and Carrera's reply points and
     authorities were filed September 13, 2005.

**K.** **Claims 92 and 93: that Carrera's Trial Attorney Was Ineffective for Failing to Request Instructions and the Trial Court Erred for not Sua Sponte Reading Instructions About Late-Arriving Aiders and Abettors.**

Like Claim 4, *see* Part V.B., *supra*, Claims 92 and 93 are closely related to Claim 45, which the Court previously addressed on Carrera's motion for summary judgment. Carrera alleges his jury should have been instructed that he could not be convicted as an aider and abettor to murder or for felony murder where his only criminal act was to assist in the destruction of evidence the day after the crime. The analysis of Claim 45 in June 22, 2000 order is dispositive. There is no possibility the jurors could have convicted Carrera of robbery (or robbery felony murder) on the belief that his only overt act was helping to destroy evidence after the crime. Based on the evidence presented at trial, as well as the instructions given and argument of counsel, the jury reasonably rejected the notion that Carrera was not present at the crime scene and did not at least participate in the robbery. *See* June 22, 2000 Ord., pp. 45-46, 51; Oct. 4, 2004 Ord., pp. 62-63. Claims 92 and 93 are denied on the merits.

**L.** **Claim 84: that the Prosecutor Committed Misconduct for Presenting False and Misleading Evidence from Teresa Fout and Carrera's Trial Attorney was Ineffective for Failing to Test the Teresa's Credibility on Rebuttal.**

In this two-part argument regarding prosecution witness Teresa Fout, Carrera assails the prosecutor for knowingly presenting false testimony because of internal inconsistencies and contradictions in her testimony. Carrera further criticizes Ms. Huffman for not developing and presenting evidence from a third-party witness Susie Navarro, with incriminating facts about Teresa's purported involvement in the robbery-murders for which Carrera was convicted.

**1.** **Facts Relevant to Teresa Fout's Testimony and Credibility.**

The factual basis for Claim 84 includes testimony and documents by and about Teresa Fout, including statements made to homicide detectives investigating the crime, trial testimony, and a declaration of adult acquaintance Susie Navarro filed in the California Supreme Court with Carrera's October 27, 1995 state exhaustion petition. The Court already has reviewed much of this evidence, including the fact that Teresa gave conflicting accounts of her participation in the crime. She told her step-sister, Mildred Shane and friend Cheryl Nickel that she was present with Carrera and Ruiz at the

time of the murders, and witnessed the murders, CT-1: 28, she wrote a note confirming that she had been with Carrera and Ruiz, but waiting in the car, at the time of the murders, CT-1:17, she also told authorities she learned of the crime from a non-existent person named "Pancho," *id*.: 29, and then that she learned of the crime from Tina Harris, *id*.. During direct examination at the trial, Teresa denied her previous accounts that she had been with Carrera and Ruiz at the time of or had witnessed the murders, RT-9: 682, and on cross examination, she denied she had learned of the crime from "Pancho," *id*.:724-25,. On two occasions (a day apart) she told a friends at a park that she assisted in the killings, and personally had thrown scissors at the female victim, but that Carrera was taking the rap for her. RT-13: 1646-47 (testimony of 14 year old Maria Valadez); *id*.: 1651-53 (testimony of her 13 year old sister, Rebecca Ann Valadez); *id*.: 1657 (testimony of their step-sister, 18 year old Lenore Answorth); *id*: 1663 (testimony of Helen Valadez, mother of Lenora Answorth and step-mother to the Valadez girls). On rebuttal, she denied making such admissions. RT-13: 1886-87. Not mentioned by Carrera, but still relevant to Claim 84 is Mr. Vendrasco's summation where he conceded that Teresa gave inconsistent accounts about the crime and her participation in the crime. He said the jury could discount her testimony and rely solely on the other witnesses (particularly Miguel Santana and the jailhouse informants). He also insisted that despite evidence of Teresa's previous admissions to participating in the crime, the admissions were not credible. RT-14: 1982-85. The new piece of evidence, Ms. Navarro's declaration, submitted with Carrera's state exhaustion petition, describes that Teresa admitted to assisting Ruiz in the murders.

### 2. Carrera's Argument.

Carrera claims that because Teresa's varying accounts of the crime was so fraught with contradictions and inconsistencies, her account of Carrera's participation in the robbery-murders must be called into serious question. He faults Mr. Vendrasco for presenting such misleading testimony and Ms. Huffman for not developing Ms. Navarro's testimony to further attack Teresa's credibility.

### 3. Analysis.

Neither the inconsistencies in Teresa's various accounts, nor the development of Ms. Navarro's declaration testimony affect the Court's prior finding that Carrera participated in the robbery of Mr. and Mrs. Hayes and that Teresa was not involved, other than to obfuscate investigative efforts by the Kern

County Sheriff's Department. Mr. Vendrasco candidly admitted that Teresa's rendition of the facts suffered from credibility problems. His presentation of her testimony therefore cannot be said to be material. *Brady*, 363 U.S. at 87; *Napue*, 360 U.S. at 272. There is no reasonable probability that Ms. Navarro's testimony would have made a difference to the jury's verdict as to Carrera's guilt had Ms. Huffman presented it. Accordingly, the ineffective claim under *Strickland*, 466 U.S. at 694 also must fail. Teresa was not a credible witness – both because she changed her story so many times and because her mode of expression was difficult to understand due to grammatical and syntactical problems. The jury did not credit testimony actually presented that Teresa was said to have admitted that she stabbed the victims. Nor did the jury believe Carrera's testimony that he did not go with Ruiz to commit the robbery, but rather, he saw Ruiz leave the party the company of Teresa. One more witness testifying that Teresa said she committed the murders or assisted Ruiz in committing the murders is simply cumulative and as unpersuasive as the other evidence of Teresa's culpability already presented to the jury. Claim 84 is denied on the merits.

**M.      Claim 90: that Carrera's Trial Attorney Was Ineffective Due to Conflicts of Interest Arising from Her Prior Representation of Carmen Santana and from Serious Personal/ Financial Problems.**

In Claim 90, Carrera alleges Ms. Huffman rendered substandard representation in his case due to two separate conflicts of interest. The first is derived from the fact she concurrently represented witness Carmen Santana in dissolution proceedings, and the second stems from her continued representation of Carrera even though she was allegedly distracted by serious financial difficulties and personal problems. In the Court's February 3, 2005 funding order, the Court declined to authorize any investigative funds for the purpose of learning more about Ms. Huffman's personal and financial problems. This prohibition was reiterated in the July 12, 2005 order denying discovery for development of the same evidence.

**1.      Facts Relevant to Ms. Huffman's Alleged Conflicts of Interest.**

The relevant facts for Claim 90 are derived from documentation concerning Ms. Huffman's representation of Carmen Santana in dissolution proceedings, the transcript excerpt of Carmen Santana's trial testimony, transcript excerpts of Santana's testimony (case in chief and rebuttal) in Carrera's case,

a summary of relevant portions of Ms. Huffman's summation in Carrera's guilt phase case, excerpts of Santana's testimony in Ruiz's case, and one of Ms. Huffman's declarations submitted to the California Supreme Court by the State in response to Carrera's October 27, 1995 state exhaustion petition.

### a.    Court Records Concerning Carmen Santana's Dissolution Proceedings.

Carrera collected numerous court filings relative to Carmen Santana's dissolution proceedings and appended them to his October 27, 1995 state exhaustion petition. Carmen's dissolution proceedings were commenced with a petition for dissolution of marriage filed July 17, 1981. Ms. Huffman (then Mendez) represented her. Ms. Huffman represented Carmen through custody and child support proceedings. She withdrew as Carmen's lawyer on December 28, 1982, after final judgment of dissolution was entered on December 6, 1982.[29]

### b.    Transcript Excerpts Summarizing Examination of Carmen Santana.

Carmen Santana's trial testimony taken on June 23, 1983, is documented at RT-9: 603-46. On direct examination, she described a gathering at her house in Mojave on April 7, 1982 (the night of the crime) attended by Ruiz, Carrera, Teresa Fout, Tina and Sherry Harris, Maria Carrera Nunez (Carrera's sister), and her (Carmen's) brothers Pablo and Miguel Santana. At 7:30 or 8 p.m., after many people were congregated at her house, she and Maria left to go to "the arcade." She left her children with her brother Miguel. She remembers that Ruiz returned to her house around 10 p.m. She did not recall if Carrera was taking care of Maria's children at Maria's house or at her house. She did not recall what either Carrera or Ruiz were wearing that night.

On cross examination, Ms. Huffman began the questioning by eliciting that she (Ms. Huffman) had handled Carmen's divorce. On April 7, 1982 Carmen and her husband were separated, although he came by to visit her later (after midnight) to obtain beer and tortillas. Carmen denied telling authorities that Maria told her Carrera and Ruiz were going to "rip-off" a motel. At the time Carmen went out for a snack with her husband, she did not know there had been a murder.

---

[29] Ms. Huffman began representing Carrera on April 24 or 25, 1982. *See* March 11, 2008 order, pp.6-7.

1          **c.      Transcript Excerpts Summarizing Examination of Miguel Santana**

2                    **in Carrera's Case.**

3          Santana testified in both the People's case in chief (June 27-28, 1983) and on rebuttal (July 18,

4   1983).  On direct examination, he testified that Carrera, Ruiz, and his brother Pablo (Santana) left

5   Carmen's house between 8 and 8:30 p.m. and were gone less than a half an hour.  RT-9: 782.  Later,

6   Carrera and Ruiz left, about 9 or 9:30 p.m. and returned about a half hour to 45 minutes later.  *Id.*: 783-

7   84.  When they returned, Carrera or Ruiz (the testimony is confusing) came in the house and said

8   whoever was going to Rosamond should leave.  *Id.*: 784, 785.  With Ruiz's car loaded, they (including

9   Santana) left for Rosamond at five or ten minutes after 10 p.m.  *Id.*: 787.  Ruiz appeared nervous to

10  Santana and wanted to leave Mojave as soon as possible.  *Id.*: 788-89.  One stop past Rosamond, Ruiz

11  stopped the car.  *Id.*: 789.  Ruiz and Carrera went to the back of the car and opened the trunk.  *Id.*: 790.

12  They changed their clothes.  He testified that Carrera changed into gray pants.  *Id.*: 791.  Carrera changed

13  out of brown corduroy pants and gray Trax tennis shoes.  *Id.*: 793.  Carrera was not then wearing a

14  jacket, but had been wearing a brown jacket with fur around the collar when he (Carrera) and Ruiz left

15  the Santana house the second time that evening.  *Id.*: 794.  After changing his clothes, Carrera was

16  wearing black slip on dress shoes.  *Id.*: 795.  The brown corduroy pants he had been wearing had a blood

17  stain on them just above the right knee.  *Id.*: 796-97.  Just before Ruiz and Carrera left Carmen's house,

18  at approximately 9 p.m., Carrera asked Santana if he "had the guts to kill someone."  *Id.*: 797-98.  After

19  dropping Tina and Sherry Harris off at their home, Ruiz drove to the last motel in Rosamond.  Santana

20  and Ruiz registered, leaving Carrera and Teresa Fout in the car.  *Id.*: 800-01.  Santana then described

21  what Carrera said happened at the Imperial 400 Motel, including the confused testimony about Carrera

22  cutting Mrs. Hayes's wrist after Ruiz stabbed her a couple of times, following which he (Carrera) froze

23  while Ruiz apparently continued stabbing her to death.  Santana also relayed Carrera's comment that

24  "when Ruiz was stabbing the the people, that the knives broke and *he* went inside the kitchen and got

25  a bigger knife."  *Id.*: 804-06.[30]  Continuing his examination of Santana the next day, Mr. Vendrasco next

26  elicited information about efforts to destroy clothing, knives, and dishwashing gloves Ruiz and Carrera

27

28          [30] The Court discussed the import of this testimony at length in the October 4, 2004 order.

1    wore and/or used when they entered the Imperial 400 Motel. This destruction was attempted by burning

2    the items in the desert. RT-10: 815-30. Mr. Vendrasco elicited that Santana had been offered immunity

3    from prosecution for being an accessory. *Id*.: 829.

4         Ms. Huffman's cross examination of Santana sought to clarify events of the day leading up to

5    the robbery murders, including use of drugs and alcohol. *Id*.: 835-47. She tried to elicit from Santana

6    the information Ruiz had told him about what happened at the Imperial 400 Motel, but the attempt drew

7    a hearsay objection from Mr. Vendrasco which the trial court sustained. *Id*.: 863. The testimony also

8    covered Ruiz's and Carrera's clothing, which provoked aggressive and probing questioning from Ms.

9    Hufffman, to demonstrate Santana changed his story about the color of Carrera's shoes. *Id*.: 898-907.

10   The re-direct and re-cross examination focused further on the color of shoes Santana told authorities

11   Carrera had been wearing the evening of April 7, 1982. *Id*.: 939-49.

12        In the People's rebuttal case, Santana's testimony again focused on the color of shoes Carrera

13   had on before the robbery murders, the burning of clothing in the desert, and the clothes Ruiz and

14   Carrera changed out of and into on the way to Rosamond. RT-13:1719-34.

15                    **d.       Summary of Ms. Huffman's Summation in Carrera's Case.**

16        Ms. Huffman was very critical of all the teenagers who testified in the case, referring to them as

17   "game players" for whom the oath to testify truthfully meant nothing. RT-14: 2013-14. She was

18   especially critical of Santana's testimony, urging the jurors to disbelieve his version of what color

19   Carrera's pants were and what color/kind his shoes were. *Id*.: 2014. She pointed out that Santana's

20   demeanor (which isn't apparent from the cold record) indicated his lack of trustworthiness, pointing

21   specifically to the long pauses before responding and looking at the prosecution counsel table rather than

22   the jury for direction as to how he should testify. *Id*.: 2015. With respect to a bloody dishwashing glove

23   Santana said he found, Ms. Huffman characterized his testimony as conjured, as was his testimony that

24   Carrera had blood splatters on his face the following morning. Even his testimony about his own

25   clothing on the night of the crime was incredible. *Id*.: 2016. She posited it was implausible for Santana

26   to have remembered with specificity what clothing Carrera had worn, but not remember what he,

27   himself, wore or what anyone else wore. Ms. Huffman also argued that Santana did not actually see

28   Carrera and Ruiz change their clothes at the back of the car during the trip from Mojave to Rosamond.

*Id.*: 2017.  She argued that both Teresa Fout and Santana had motives to fabricate their testimony.  With respect to Santana, she argued: "Miguel Santana, what has he got to lose?  He was given immunity, only immunity for destroying evidence.  He admitted he destroyed evidence.  But what has he got to lose?  He could be on trial for murder."  *Id.*: 2019.  Separately, she reiterated he was not credible because he kept changing his story about what happened.  *Id.*; 2027.  Also, he kept his head lowered when he testified.  She maintained that if he had been telling the truth, "he wouldn't have to squirm on the stand" and he could look the jurors "in the eye."  *Id.*: 2028.  She suggested the jury should question why Santana said only one pair of shoes was burned.  *Id.*: 2031.  She also suggested that Santana testified Carrera's pre-crime pants were brown because that's the color of corduroy material found at the burn site.  *Id.*: 2032.

### e. Transcript Excerpts Summarizing Examination of Miguel Santana in Ruiz's Case.

At the beginning of Mr. Vendrasco's direct examination of Santana in Ruiz's case, he elicited Santana's understanding that immunity had been offered for testimony that might be self-incriminating in exchange for Santana's promise to testify truthfully.  CT-11: 804.[31]  On cross examination, Ruiz's trial attorney, elicited that when Santana first spoke to authorities investigating the murders, he did not tell him he went with Ruiz and Carrera to the desert to destroy (burn) evidence.  *Id.*: 872-73.  He (Santana) decided to tell authorities everything, including the evidence destruction, because they told him of their belief he was involved in the murders and they were going to arrest him.  *Id.*: 873.  Santana insisted he was *not* involved in the murders and he was not the look-out man.  *Id.*

### f. July 11, 1996 Declaration of Ms. Huffman.

Ms. Huffman acknowledges that Carrera claims her previous representation of Carmen Santana in dissolution proceedings created a conflict of interest hampering her cross examination of Carmen and her brother Miguel Santana.  She explains that she was retained by Carrera and his family *because* of her legal work for Carmen, which she describes as a "rather routine dissolution action."  Referring to an earlier declaration appended to the State's June 23, 1988 return to Carrera's initial state habeas

---

[31] Clerk's Transcript 11 is comprised of a portion of the Reporter's Transcript from Ruiz's trial. The page numbers are from the Reporter's Transcript.

petition,[32] Ms. Huffman recites efforts she made to cross examine Santana about the "guts to kill question" and who went into the kitchen to get the bigger knife. She reports that her efforts were thwarted because the trial court refused to allow her to elicit from Santana information he learned from Ruiz. *See* Oct. 4, 2004 Ord., pp. 30-34, 94-96, 115-16.

In the present declaration, Ms. Huffman also address the "welter of personal details which petitioner [Carrera] has collected and presented" concerning her personal and financial affairs. Responding to those details, she avers:

> I have never permitted any aspect of my personal life to impede my work. My record of pre-trial motions, for example, demonstrates that I was focused intently on petitioner's defense. In February, 1983, for example, I moved to suppress tapes of petitioner's damaging statements to family members the week after the murders. . . . I also sought a change of venue because of the extensive publicity which petitioner's case and companion case [of Ramiro Ruiz-Gonzales] had received. [After the jury's guilt phase conviction] I undertook to bar the death penalty, based upon a theory of petitioner's comparatively less culpable conduct than his juvenile crime partner, Ramiro Ruiz Gonzales.

### 2.   Carrera's Argument.

With respect to the alleged conflict derived from Ms. Huffman's prior representation of Carmen Santana, Carrera claims that her brother, Miguel Santana, was "perhaps the prosecution's most important witness." He claims he was not made aware of the adverse impact Ms. Huffman's prior representation of Santana's sister would have on his defense. He complains that Ms. Huffman's divided loyalties between the Santana family and his own interests prevented her from more vigorously cross examining Carmen and Miguel Santana. In particular, he complains that Ms. Huffman did not cross examine Santana on the informal immunity he received from the prosecution in exchange for his testimony against both Ruiz and Carrera (at their separate trials). Although Santana didn't say so in the context of Carrera's trial, at Ruiz's trial he testified that he was threatened with arrest as the "look-out" at the Imperial 400 Motel while Carrera and Ruiz were inside committing robbery and murder. Had Ms. Huffman explored this avenue of questioning, Carrera argues, she could have shown that Santana had a motivation to lie in his testimony.

---

[32] That earlier declaration is dated June 13, 1988 and attached to the State's return as Exhibit G.

1   Carrera relies on *Cuyler v. Sullivan*, 446 U.S. 335, 346-47 (1980) for the proposition that defense

2   counsel has an ethical obligation to notify the court of a potential or actual conflict.  Next, he cites

3   *Glasser v. United States*, 315 U.S. 60 (1942), *superseded in part on other grounds, as recognized by*

4   *Bourjaily v. United States*, 483 U.S. 171 (1987), which, like *Sullivan* involved an attorney's concurrent

5   representation of two defendants with conflicting interests.  He also relies on the Eighth Circuit case of

6   *Dawan v. Lockhart*, 31 F.3d 718 (8th Cir. 1994), where the defendant's counsel previously represented

7   a co-defendant who had pleaded guilty prior to defendant's trial.  Since the co-defendant testified at

8   defendant's trial, and admitted that he earlier implicated the defendant in the crime, the defendant's

9   conviction was reversed on account of defense counsel's conflict of interest.  Finally, he relies on

10  *Rosenwald v. United States*, 898 F.2d 595 (7th Cir. 1990), where defense counsel previously represented

11  a prosecution witness and recommended that defendant plead guilty in order to avoid a trial at which he

12  would be required to cross examine his prior client (the prosecution witness).

13  The second conflict pertains to Ms. Huffman's continued representation of Carrera even though

14  she was distracted by serious financial difficulties, leading to personal bankruptcy proceedings, marital

15  problems with an abusive husband, resulting in her institution of dissolution proceedings and criminal

16  investigation of his abuse, and family problems concerning the health of her daughter and son-in-law,

17  both of whom worked in her law practice.  Carrera's theory for this claim is that Ms. Huffman needed

18  money, and, in order to receive reimbursement, she agreed to go to trial in Carrera's case without being

19  fully prepared.  As a result of these distractions, Carrera claims Ms. Huffman did not adequately prepare

20  for his trial, including her failure to monitor the testimony at Ruiz's earlier trial and her concomitant

21  failure to note inconsistencies in the testimony of the same witnesses between the two trials.  Finally,

22  he claims Ms. Huffman's acceptance of appointment in another felony case interrupted her preparation

23  for Carrera's trial from October 1982 through May of 1983.  He also surmises that her failure to cross

24  examine Santana about his grant of immunity may have been related to her lack of preparation as much

25  or more than her prior representation of his sister, Carmen.  He recognizes that when external forces

26  cause an attorney to lose focus on his or her professional responsibilities, the trial proceedings must be

27  evaluated to assess where the attorney may have been provided incompetent representation.  *Dows v.*

28  *Wood*, 211 F.3d 480, 485 (9th Cir. 2000) (state court properly evaluated performance of attorney who

18 months after trial was diagnosed with Alzheimer's disease); *Smith v. Ylst*, 826 F.2d 872, 876 (9th Cir. 1987) (alleged mental illness of attorney must manifest itself in courtroom behavior before inherent prejudice can be determined).

### 3.    Analysis.

Carrera is not entitled to relief for this claim.  First, as to Ms. Huffman's representation of Carmen Santana, the cited authorities do not support the existence a conflict. Both *Sullivan*, 446 U.S. 335, and *Glasser*,  315 U.S. 60, involve joint representation of defendants with conflicting interests. *Dawan*, 31 F.3d 718, similarly involved defense counsel's previous represented a co-defendant who had pleaded guilty prior to defendant's trial.  More on point is *Rosenwald*, 898 F.2d 595, where defense counsel previously represented a prosecution witness, but then recommended that defendant plead guilty in order to avoid a trial at which he would be required to cross examine his prior client (the prosecution witness).  All of these cases are distinguishable.  First, unlike *Sullivan*, *Glasser*, and *Dawan*, neither Carmen Santana, nor her brother, Santana were actually co-defendants of Carrera.  To the extent Carrera continues to insist that Santana was a potential co-defendant, the Court continues to reject that notion.[33] Even with the additional evidence of Santana's testimony at Ruiz's trial that police authorities *threatened* to arrest him for having been the look-out man, the record fails to support the notion Santana was involved with anything more than being an accessory after the fact (for assisting in destroying evidence).  A police threat is not on par with an actual prosecution of even the filing of a criminal complaint.  As reflected in his testimony at Carrera's trial, the crime for which he actually received informal immunity from Mr. Vendrasco was being an accessory after the fact.[34]  Second, unlike *Rosenwald*, there was no failure or hesitancy on Ms. Huffman's part in cross examining either Carmen or Miguel Santana.  With respect to Miguel Santana, the record reflects that Ms. Huffman's cross examination was aggressive and comprehensive.  Her summation emphasized that his testimony about Carrera's clothing and shoes was inconsistent and incredible.  Further, contrary to Carrera's contentions,

---

[33] The Court has twice before rejected this contention. *See* June 22, 2000 ord., p. 26; Oct. 4, 2004 Ord., p. 15, n. 16.

[34] The evidence adduced at Ruiz's trial also did not show that Santana was considered a co-perpetrator as a look-out man for the murder.

1   she did bring up the fact that Santana received immunity from prosecution for being an accessory after

2   the fact when he could have been prosecuted for murder.  The Court rejects the notion that asking

3   Santana additional questions about police threats to arrest him for being a look-out man would have

4   benefitted Carrera's case.  Ms. Huffman acted reasonably in reserving the issue of Santana's immunity

5   for summation.  The Court is further hard put to understand Carrera's argument that Ms. Huffman could

6   have cross examined Carmen Santana more vigorously.  Carmen's testimony was largely inconclusive.

7       The purported prejudice occasioned by Ms. Huffman's personal distractions similarly is

8   unavailing.  In his points and authorities, Carrera describes two categories of prejudice: failure to

9   discover and use inconsistencies in testimony and prosecutorial strategy between Ruiz's trial and

10  Carrera's trial; and failure to adequately explore a mental state defense.  In his reply memorandum, he

11  also suggests that the failure to cross examine Santana about his immunity grant could have been

12  attributable to her distraction from her personal problems.

13      Inconsistencies in prosecutorial strategies between Carrera's and Ruiz's trials has been

14  determined in the October 4, 2004 order, in Carrera's favor.  Ms. Huffman's alleged incompetence for

15  not developing a mental defense has been resolved against Carrera in the Court's discussion of Claim

16  88 in the March 11, 2008 order.  *See* Mar. 11, 2008 Ord., pp. 56-70.  There is neither a basis for showing

17  the existence of a cognizable conflict of interest nor incompetent representation on the part of Ms.

18  Huffman.  Claim 90 is denied on the merits.

19  **VI.    Certificate of Probable Cause of Appealability.**

20      As noted in Part IV., *supra*, the Court has applied pre-AEDPA standards for reviewing and

21  analyzing Carrera's claims.  This follows because Carrera sought adjudication on the merits of claims

22  prior to the effective date of AEDPA.  *Garceau*, 538 U.S. at 207.  When parties to habeas actions subject

23  to pre-AEDPA review standards file appeals after the effective date of AEDPA, however, post-AEDPA

24  standards apply to determine whether the appellate court will issue a certificate of appealability under

25  28 U.S.C. § 2253 (as amended by AEDPA).  *Morales v. Woodford*, 388 F.3d 1159, 1167 (9th Cir. 2004).

26      In the present case, Carrera has not applied for either a certificate of appealability under § 2253

27  (as amended) or a certificate of probable cause under former § 2253.  Rather, the Court chooses to

28  address the merits of any appealable issues since the Court presently is familiar with the facts of the case

1    and applicable law.  In these circumstances, since Carrera has not actually initiated an appeal, it is not

2    clear that post-AEDPA standards of a certificate of appealability, rather than the pre-AEDPA standards

3    of a certificate of probable cause, apply.  The Court therefore considers the merits of any appealable

4    issue under both standards.  Under pre-AEDPA standards, a certificate of probable cause will issue only

5    upon the petitioner's "substantial showing of the denial of a federal right." *Barefoot v. Estelle*, 463 U.S.

6    880, 893 (1983).  Under post-AEDPA standards, a certificate of appealability will issue "if the applicant

7    has made a substantial showing of the denial of a constitutional right," § 2253(c)(2), meaning a "showing

8    that reasonable jurists could debate whether . . . the petition should have been resolved in a different

9    manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack*

10   *v. McDaniel*, 529 U.S. 473  484 (2000); *see Sassounian v. Roe*, 230 F.3d 1097, 1101 (9th Cir. 2000).

11          Carrera cannot meet either standard.  The Court has carefully analyzed his claims against the

12   record and all proffered evidence.  Except for the death eligibility special circumstance, under Claims

13   2, 2A, and 44, he is not entitled to relief.  The denial of his remaining guilt phase claims, which leaves

14   in place his robbery conviction and his first degree murder conviction under the theory of robbery felony

15   murder, does not deprive him of a federal or constitutional right,  The Court therefore declines to issue

16   either a certificate of probable cause or a certificate of appealability. [35]

17   **VII.   Order.**

18          Except for Claims 2, 2A, and 44, all guilt phase claims presented in Carrera's Petition are denied

19   on the merits and all requests for further evidentiary development also are denied.  With respect to

20   Claims 2, 2A, and 44, and as more fully explained in the Court's October 4, 2004 order,  habeas corpus

21   relief is granted as to Carrera's death eligibility, only.  A writ of habeas corpus shall issue directing the

22   State of California to vacate and set aside the death eligibility special circumstances in the case of *People*

23   *v. Constantino Carrera*, Kern County Superior Court Case No. 23918, unless within 120 days of the

24   entry of judgment herein, the State of California grants Carrera a new trial on death eligibility.  Should

25   the State of California elect to retry Carrera on the issue of death eligibility and obtains a finding that

26   the special circumstances are true, the State may further retry Carrera on the appropriate penalty.  If the

27

28          [35] The Warden is not required to seek a certificate of appealability or a certificate of  probable
     cause.  Federal Rule of Appellate Procedure 22 (Current and pre-AEDPA renditions).

State elects not to retry the issue of Carrera's death eligibility, the Superior Court shall resentence him in accordance with applicable California law and the United States Constitution.  All penalty phase claims are moot.  The Clerk is directed to enter judgment forthwith.

IT IS SO ORDERED.

Dated:   March 13, 2008

                                        /s/ Anthony W. Ishii
                                        Anthony W. Ishii
                                   United States District Judge